# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| R.H. DONNELLEY CORPORATION, et al.,[1] | Case No. 09-11833 (KG) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR R.H. DONNELLEY CORPORATION AND ITS SUBSIDIARIES

SIDLEY AUSTIN LLP
James F. Conlan
Jeffrey C. Steen
Jeffrey E. Bjork
Paul S. Caruso
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors in Possession

Dated: October 19, 2009

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: R.H. Donnelley Corporation (0040), R.H. Donnelley Inc. (7635), DonTech Holdings, LLC (1351), R.H. Donnelley Publishing & Advertising of Illinois Holdings, LLC (1433), DonTech II Partnership (0375), R.H. Donnelley Publishing & Advertising of Illinois Partnership (9571), R.H. Donnelley Publishing & Advertising, Inc. (8228), Get Digital Smart.com, Inc. (4530), R.H. Donnelley APIL, Inc. (6495), RHD Service LLC (0222), Dex Media, Inc. (9762), Dex Media East, Inc. (5763), Dex Media East LLC (4575), Dex Media East Finance Co. (5761), Dex Media West, Inc. (7004), Dex Media West LLC (3487), Dex Media West Finance Co. (7059), Dex Media Service LLC (9647), Business.com, Inc. (9750), and Work.com, Inc. (5224). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 Winstead Drive, Cary, NC 27513.

## IMPORTANT DATES

- Date by which Ballots and Master Ballots must be received: [December 17, 2009]

- Date by which objections to Confirmation of the Plan must be filed and served: [December 17, 2009]

- Hearing on Confirmation of the Plan: [January 12, 2010] at [    --.m.] (Prevailing Eastern Time)

# TABLE OF CONTENTS

IMPORTANT DATES ............................................................................................................. i

I. INTRODUCTION ............................................................................................................ 1

    A.    Parties Entitled to Vote on the Plan. ................................................................ 4

    B.    Overview of Chapter 11. ................................................................................. 5

    C.    Solicitation Package. ....................................................................................... 5

    D.    Voting Procedures, Ballots, and Voting Deadline. .......................................... 6

    E.    Confirmation Hearing and Deadline for Objections to Confirmation. .................. 7

II. OVERVIEW OF THE PLAN .......................................................................................... 7

    A.    General Overview. ........................................................................................... 7

    B.    Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors Under the Plan. .................................................. 9

    C.    General Unsecured Claims and Claims Resolution Matters .................................. 18

    D.    Estimated Recoveries for Holders of Certain Noteholders Claims ..................... 20

    E.    Resolution of Objections to Approval of the Disclosure Statement .................... 21

III. GENERAL INFORMATION ......................................................................................... 22

    A.    The Debtors' Businesses and Properties. ......................................................... 22

        1.    Company Overview. .............................................................................. 22

        2.    Properties. ............................................................................................ 22

    B.    Operational Structure of the Debtors. .............................................................. 23

        1.    Print Products and Services. ................................................................. 23

        2.    Online Products and Distribution .......................................................... 24

        3.    Intellectual Property. ........................................................................... 25

        4.    Raw Materials. ..................................................................................... 26

        5.    Printing and Distribution ...................................................................... 26

        6.    Sales and Customer Care. ..................................................................... 27

        7.    Employees. .......................................................................................... 27

        8.    Recent Operations. ............................................................................... 28

        9.    Corporate History and Business Acquisitions. ....................................... 28

    C.    Management of the Debtors. ............................................................................ 29

        1.    Board of Directors. .............................................................................. 29

        2.    Compensation of Directors. .................................................................. 30

        3.    Executive Officers. .............................................................................. 30

        4.    Executive Compensation. ..................................................................... 30

    D.    Compensation and Benefits Programs. ............................................................. 31

        1.    Bonus Programs. .................................................................................. 32

        2.    Long-Term Incentive Program. ............................................................ 32

        3.    Other Incentive Programs. .................................................................... 32

        4.    Executive Agreements. ......................................................................... 33

        5.    Retirement Plans. ................................................................................. 33

        6.    Other Post-Retirement Benefit Programs. ............................................. 35

    E.    Prepetition Debt and Capital Structure of the Company. ................................... 35

        1.    Prepetition Secured Credit Obligations. ................................................ 36

        2.    Prepetition Note Debt. .......................................................................... 38

        3.    Intercompany Debt. .............................................................................. 39

        4.    Trade Debt. .......................................................................................... 40

  5.  Equity of RHDC. ...................................................................41
 F. Post-Confirmation Debt and Capital Structure of the Company. .........41
  1.  Post-Confirmation Secured Debt. ..........................................42
  2.  Post-Confirmation Note Debt. ................................................44
  3.  Post-Confirmation Intercompany Debt......................................46
  4.  Post-Confirmation Equity in RHDC. ......................................47
 G. Pending Litigation Against the Debtors. .........................................47
 H. Events Leading up to Chapter 11...................................................47
IV. EVENTS DURING THE CHAPTER 11 CASES .................................................51
 A. Joint Administration of Debtors' Chapter 11 Cases. ..........................51
 B. Other First-Day Relief. ..............................................................51
  1.  Utility Services. .................................................................51
  2.  Payment of Federal, State and Local Taxes................................52
  3.  Shippers and Other Lien Claimants. ........................................52
  4.  Critical Trade Vendor Treatment and Payment of Priority Claims. ..........52
  5.  Continuation and Payment of Prepetition Insurance. ....................52
  6.  Customer Programs...............................................................53
  7.  Employee Compensation and Benefits. .....................................53
  8.  Cash Management.................................................................54
  9.  Use of Cash Collateral. .........................................................54
 C. Professional Retention. ...............................................................54
  1.  Retention of Professionals by the Debtors' Estates. .....................54
  2.  The Committee and Its Advisors. ............................................55
 D. Administrative Matters in the Chapter 11 Cases. ...............................56
  1.  Unexpired Leases. ...............................................................56
  2.  Bar Date. ..........................................................................56
  3.  Miscellaneous. ...................................................................57
V. THE PLAN OF REORGANIZATION ...................................................................57
 A. General. ................................................................................57
 B. Classification and Allowance of Claims & Equity Interests Generally.................58
  1.  Classification and Allowance. ................................................58
 C. Provisions for Payment of Administrative Expense Claims and Priority
  Tax Claims. ............................................................................59
  1.  Administrative Expense Claims................................................59
  2.  Priority Tax Claims..............................................................60
 D. Non-Substantive Consolidation and Classification of Claims............................61
 E. Provisions for Treatment of Claims and Interests.................................62
  1.  Priority Non-Tax Claims (Classes 1A through 19A)................................62
  2.  Other Secured Claims (Classes 1B through 19B)....................................62
  3.  Convenience Claims (Classes 1C through 19C)....................................63
  4.  Noteholders Claims (Classes 1E, 2D, 3E, 4E, 4F)................................64
  5.  RHDI Noteholders Guaranty Claims (Classes 1F, 10E through
    16E)..................................................................................65
  6.  Prepetition Lenders Claims (Classes 3D, 4D, 5D). ...................................65
  7.  Prepetition Lenders Guaranty Claims (Classes 1D, 6D through
    16D). .................................................................................66

8.      General Unsecured Claims (Classes 1G, 2E, 3F, 4G, 5E through 9E, 10F through 16F, 17D through 19D)....................................................67

9.      Intercompany Claims (Classes 1H, 2F, 3G, 4H, 5F through 9F, 10G through 16G, 17E through 19E, and 20A). ........................................69

10.    RHDC Interests (Class 1I). ............................................................69

11.    Interests in Debtors Other Than RHDC (Classes 2G, 3H, 4I, 5G through 9G, 10H through 16H, 17F through 19F, and 20B). ...................69

F.     Identification of Classes of Claims and Interests That Are Impaired; Acceptance or Rejection of the Plan. ...........................................................70

     1.      Holders of Claims Entitled to Vote........................................................70

     2.      Acceptance by an Impaired Class. .......................................................70

     3.      Deemed Acceptance of the Plan. .........................................................71

     4.      Presumed Rejection of the Plan. ..........................................................71

     5.      Consensual Confirmation.....................................................................71

     6.      Cram-Down. .........................................................................................71

     7.      Reservation of Rights............................................................................71

G.    Means for Implementation of the Plan........................................................72

     1.      Non-Substantive Consolidation. ..........................................................72

     2.      Corporate Governance, Directors, Officers and Corporate Action............72

     3.      Issuance of New RHDC Common Stock and New RHDC Notes. ............74

     4.      Distribution of New Securities and Related Matters. ...............................74

     5.      Reporting Requirements Under Securities Exchange Act of 1934 and Listing on the New York Stock Exchange or NASDAQ Stock Market. ..................................................................................................75

     6.      Amended and Restated Credit Agreements. ............................................75

     7.      Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors...........................................................................76

     8.      Cancellation of Notes, Instruments, Debentures and RHDC Interests. ..............................................................................................76

     9.      Cancellation of Liens. ..........................................................................77

     10.    Compensation and Benefits Programs. ..................................................77

     11.    Management Incentive Plan. .................................................................78

     12.    Sources of Cash for Plan Distributions. .................................................78

     13.    Restructuring Transactions. ...................................................................78

     14.    Additional Transactions Authorized Under the Plan. ..............................80

H.    Treatment of Executory Contracts and Unexpired Leases. .............................80

     1.      Assumption of Executory Contracts and Unexpired Leases....................80

     2.      Rejection of Executory Contracts and Unexpired Leases........................81

     3.      Rejection Damages Bar Date. ...............................................................81

I.      Provisions Governing Distributions............................................................82

     1.      General Matters. ...................................................................................82

     2.      Interest on Claims. ...............................................................................82

     3.      Distributions.........................................................................................82

     4.      Record Date for Distributions. ..............................................................83

     5.      Means of Cash Payment.......................................................................84

     6.      Withholding and Reporting Requirements. ...........................................84

     7.      Setoffs. .................................................................................................84

  8. Fractional Shares.................................................................85
J. Provisions for Treatment of Disputed Claims and Disputed Interests..................85
K. Confirmation and Consummation of the Plan. ........................................85
  1. Conditions to Confirmation of the Plan. ...................................85
  2. Conditions to Effective Date.................................................86
  3. Waiver of Conditions.........................................................86
  4. Consequences of Non-Occurrence of Effective Date. ...........................87
  5. Substantial Consummation. ...................................................87
L. Injunctions, Releases and Discharges ...............................................87
  1. Discharge of Claims and Termination of Interests. ...........................87
  2. Discharge Injunction.........................................................88
  3. Discharge and Discharge Injunction Integral to Plan. ........................89
  4. Releases by Debtors and Estates..............................................89
  5. Releases by Holders of Claims. ..............................................89
  6. Injunction Related to Releases. .............................................90
  7. Releases and Injunctions Related to Releases Integral to Plan...............90
  8. Deemed Consent. .............................................................90
  9. No Waiver....................................................................91
M. Supplemental Injunction..............................................................91
  2. Bankruptcy Rule 3016 Compliance. ............................................92
  3. Integral to Plan.............................................................92
N. Disallowed Claims And Disallowed Equity Interests.....................................92
O. Exculpation. .........................................................................93
P. Revesting of Assets...................................................................93
Q. Preservation of Rights of Action and Litigation Claims................................94
R. Survival of Indemnification Obligations. .............................................94
  1. Prepetition Indemnification and Reimbursement Obligations....................94
  2. Integral Part of Plan........................................................95
S. Miscellaneous Plan Provisions. .......................................................95
  1. Retention of Jurisdiction....................................................95
  2. Surrender of Instruments.....................................................95
  3. Committees. .................................................................96
  4. Post-Confirmation Date Retention of Professionals. ..........................96
  5. Bar Date for Payment or Reimbursement of Professional Fees and Expenses and Claims for Substantial Contribution. ...................96
  6. Effectuating Documents and Further Transactions..............................96
  7. Exemption from Transfer Taxes. ..............................................96
  8. Payment of Statutory Fees. ..................................................97
  9. Payment of Notes Indenture Trustee Fees. ....................................97
  10. Notes Indenture Trustees' Proofs of Claim in Respect of Noteholders Claims.................................................97
  11. Amendment or Modification of the Plan. ......................................97
  12. Severability of Plan Provisions..............................................97
  13. Binding Effect; Successors and Assigns.......................................98
  14. Revocation, Withdrawal or Non-Consummation of the Plan. .....................98
VI. VOTING PROCEDURES AND REQUIREMENTS .......................................................98
A. Voting Deadline.......................................................................98

B.      Holders of Claims Entitled to Vote...................................................99
C.      Vote Required for Acceptance by a Class of Claims............................100
D.      Voting Procedures...........................................................................100
       1.      Ballots.......................................................................100
       2.      Withdrawal or Change of Votes on the Plan. ........................101

VII. CONFIRMATION OF THE PLAN ...................................................101
A.      Confirmation Hearing......................................................................101
B.      Statutory Requirements for Confirmation of the Plan. .......................102
       1.      Acceptance. ................................................................103
       2.      Fair and Equitable Test. ...............................................103
       3.      Feasibility. .................................................................104
       4.      Best Interests Test and Liquidation Analysis........................105

VIII. PROJECTED FINANCIAL INFORMATION .....................................107
A.      Projected Financial Information. .....................................................107
B.      Valuation of the Reorganized Debtors...............................................109
       1.      Overview....................................................................110
       2.      Additional Assumptions Regarding the Reorganized Debtors. ..............112
       3.      Valuation Methodology. ...............................................113

IX. DESCRIPTION OF CAPITAL STOCK OF REORGANIZED RHDC ........116
A.      RHDC Common Stock. ...................................................................116
B.      RHDC Preferred Stock. ..................................................................117

X. RISK FACTORS...........................................................................117
A.      General Bankruptcy Law Considerations...........................................117
       1.      Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.....................117
       2.      Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.....................118
B.      Other Risk Factors.........................................................................118
       1.      Variances from Projections May Affect Ability to Pay Obligations. ......118
       2.      Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations. ...................................................119
       3.      The Debtors May Have Insufficient Liquidity to Successfully Operate Their Businesses...................................................120
       4.      Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect. .......................................................120
       5.      Historical Financial Information May Not Be Comparable. ...................120
       6.      Market and Business Risks May Adversely Affect Business Performance. ...............................................................120
       7.      Business, Financial Condition and Results of Operations Could be Negatively Impacted by the Loss of Customers and Suppliers. ..............122
       8.      Business Could Suffer From the Loss of Key Personnel.........................122
       9.      Adverse Publicity in Connection with the Chapter 11 Case or Otherwise, Could Negatively Affect Business. ......................122
       10.      Pursuit of Litigation by the Parties in Interest Could Disrupt Confirmation of the Plan and Could Have Material Adverse Effects on the Debtors' Business and Financial Condition. ....................123

11. Debtors May Have an Inability to Take Advantage of Business Opportunities During the Chapter 11 Cases Without Bankruptcy Court approval. ..........................................................................123

12. Other Firms in the Industry May Have a Competitive Advantage. .........123

C. Risks to Creditors Who Will Receive Securities. ......................................124

1. Lack of Established Market for the Securities May Adversely Affect Liquidity. ............................................................................124

2. Lack of Dividends on Securities May Adversely Affect Liquidity. ........124

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .....................124

A. Federal Income Tax Consequences to the Debtors. ...................................125

1. Cancellation of Indebtedness Income. .................................................125

2. Annual Section 382 Limitation on Use of NOLs and "Built-In" Losses and Deductions. ..........................................................................127

3. Alternative Minimum Tax. ...................................................................129

B. Federal Income Tax Consequences to Holders of Claims and Interests. .............130

1. General. ...............................................................................................131

2. Holders of Convenience Claims (Classes 1C through 19C). ...................132

3. Holders of Claims in Classes 1D and 3D through 16D (Lenders Claims and Lenders Guaranty Claims). .................................................132

4. Holders of Class 1E Claims (RHDC Noteholders Claims). ...................134

5. Holders of Class 1F, 2D, 3E, 4F, and 10E through 16E Claims (RHDI Noteholders Guaranty, DMI Noteholders, RHDI Noteholders, and DMW Senior Subordinated Notes Noteholders Claims). ...............................................................................................134

6. Holders of Class 4E Claims (DMW Senior Notes Noteholders Claims). ...............................................................................................135

7. Holders of General Unsecured Claims (Classes 1G, 2E, 3F, 4G, 5E through 9E, 10F through 16F, and 17D through 19D). ..........................136

8. Holders of RHDC Interests (Class 1I). .................................................136

9. Definition of "Security". .....................................................................136

10. Market Discount. ..................................................................................137

11. Non-United States Persons. ..................................................................137

12. Information Reporting and Backup Withholding. ..................................137

C. Importance of Obtaining Professional Tax Assistance. ...........................137

D. Reservation of Rights. .............................................................................138

XII. CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS ............................................................................................138

A. Exemption From Registration Requirements. ..........................................138

B. Subsequent Transfers of Securities. .........................................................138

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................................................................................................139

A. Continuation of the Chapter 11 Cases. ...................................................139

B. Liquidation Under Chapter 7 or Chapter 11. ...........................................140

XIV. CONCLUSION AND RECOMMENDATION ...........................................................140

## INDEX OF EXHIBITS

Exhibit A - Joint Plan of Reorganization for R.H. Donnelley Corporation and Its Subsidiaries

Exhibit B - Banks Support Agreements

Exhibit C - Noteholders Support Agreement

Exhibit D - Corporate Structure Chart

Exhibit E - Projections

Exhibit F - Liquidation Analysis

Exhibit G - The Committee's Statement and Responses Thereto by the Debtors and the Prepetition Lenders Agents

# I. INTRODUCTION

On May 28, 2009 (the "<u>Petition Date</u>"),[2] R.H. Donnelley Corporation ("<u>RHDC</u>") and its subsidiaries (collectively with RHDC, the "<u>Debtors</u>" or the "<u>Company</u>")[3] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "<u>Chapter 11 Cases</u>"). In all, the Debtors comprise 20 entities.

To facilitate the Debtors' emergence from bankruptcy and effect their reorganization, on October 7, 2009, the Debtors filed the Joint Plan of Reorganization for R.H. Donnelley Corporation and Its Debtor Subsidiaries, dated October 7, 2009 (as the same may be amended from time to time, the "<u>Plan</u>") with the Bankruptcy Court. A copy of the Plan is attached hereto as <u>Exhibit A</u>. The Debtors hereby submit this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in each of the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for [January 12, 2010], commencing at [    ] --.m. prevailing Eastern Time. In advance of the hearing on confirmation of the Plan, the Debtors will file a Plan Supplement containing the documents listed on page iv of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions, provide certain information, as required under Section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Plan. Creditors entitled to vote to accept or reject the Plan will receive a ballot ("<u>Ballot</u>") together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of these Chapter 11 Cases. This Disclosure Statement also contains information respecting significant events that have occurred during these Chapter 11 Cases. In addition, an overview of the Plan is included, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

## <u>The Committee's Statement in Response to the Disclosure Statement</u>

<u>Exhibit G</u> to this Disclosure Statement includes certain information that the Official Committee of Unsecured Creditors (the "<u>Committee</u>") believes is necessary for the Holders of Claims to make an informed decision whether to accept or reject a plan of reorganization predicated on the Plan Support Agreements. This information is based on the Committee's view that (i) credit markets have improved considerably since May 21, 2009, when the Plan Support

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.
[3] The Debtors are set forth on the cover page of this Disclosure Statement.

Agreements were executed, (ii) the Reorganized Debtors have substantial additional capacity to issue debt securities for the benefit of all Holders of Noteholders Claims, and (iii) since 2004, the Prepetition Lenders have failed to perfect their prepetition liens on the Debtors' registered copyrights. Exhibit G also contains the responses of the Debtors and the Prepetition Lenders Agents to certain arguments raised by the Committee. The Committee urges creditors to review Exhibit G carefully before voting to accept or reject the Plan.

A Ballot for the acceptance or rejection of the Plan is also enclosed with the Disclosure Statement transmitted to each Holder of a Claim entitled to vote on the Plan.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS, APPENDICES, AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR

ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE X, "RISK FACTORS" AND IN RHDC'S ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2008.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  NONE OF THE DEBTORS, NOR ANY OF THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THE DEBTORS' PROFESSIONAL ADVISORS, PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT.  WHILE THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT THEY

CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT BE REALIZED.  FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES.  ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER ANY DEBTOR OR ANY OF THE REORGANIZED DEBTORS.

**A.**     Parties Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept that plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote.  Creditors or equity interest holders whose claims or interests are impaired by the Plan, but will receive no distribution under the Plan, are also not entitled to vote because they are deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code.  For a discussion of these matters, see Article VI, "Voting Procedures and Requirements" and Article VII, "Confirmation of the Plan."

The following sets forth which classes are entitled to vote on the Plan and which are not:

- The Debtors are seeking votes from the Holders of Convenience Claims (Classes 1C through 19C), Noteholders Claims (Classes 1E, 2D, 3E, 4E, and 4F), RHDI Noteholders Guaranty Claims (Classes 1F and 10E through 16E), Prepetition Lenders Claims (Classes 3D, 4D, and 5D), Prepetition Lenders Guaranty Claims (1D and 6D through 16D) General Unsecured Claims (Classes 1G, 2E, 3F, 4G, 5E though 9E, 10F through 16F, and 17D through 19D), and Intercompany Claims (Classes 1H, 2F, 3G, 4H, 5F through 9F, 10G through 16G, 17E through 19E, and 20A).

- The Debtors are not seeking votes from Holders of RHDC Interests (Class 1I) because those Interests are impaired under the Plan and the Holders are receiving no distribution on account of such Interests.  These Holders will be deemed to have voted to reject the Plan.

- The Debtors are not seeking votes from Holders of Priority Non-Tax Claims (Classes 1A through 19A), Other Secured Claims (Classes 1B through 19B), and Interests in Debtors Other Than RHDC (Classes 2G, 3H, 4I, 5G through 9G, 10H through 16H, 17F through 19F, and 20B) because those Claims and Interests are unimpaired under the Plan, and the Holders of Claims and Interests in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article V, Sections B and E.

## B.     Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity security holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to Holders of Allowed Claims and Interests against each Debtor in order to satisfy the requirements of Section 1125 of the Bankruptcy Code.

## C.     Solicitation Package.

Accompanying this Disclosure Statement is a package of materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving the Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Voting Procedures Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against and Interests in the Debtors, establishes the procedures for tabulating Ballots used in voting on the Plan, and fixes the deadline for objecting to confirmation of the Plan;

- the notice of Confirmation Hearing and entry of the Voting Procedures Order; and

- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which will be used by creditors who are entitled to vote on the Plan.

**D.**      Voting Procedures, Ballots, and Voting Deadline.

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.  In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided (copies will not be accepted).  In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a contested Claim, this amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into which the Claim has been placed under the Plan.  Accordingly, in voting to accept or reject the Plan, a Holder must use only the coded Ballot or Ballots sent with this Disclosure Statement.

**In order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and actually received no later than the Voting Deadline (as defined in the Voting Procedures Order) by the Voting Agent (as defined below).  Do not return any debt instruments or equity securities with your Ballot.**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call The Garden City Group, at 1-888-571-1767.

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain at your own expense an additional copy of this Disclosure Statement and its appendices, schedules and exhibits, please contact the Voting Agent.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VI, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Plan, each Holder of a Claim in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

**E.** **Confirmation Hearing and Deadline for Objections to Confirmation.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Bankruptcy Court has scheduled the Confirmation Hearing on [January 12, 2010] at [___ __] (prevailing Eastern time) before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 3, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing. Any objection to Confirmation of the Plan must be made in accordance with the requirements of Section 1128(b) of the Bankruptcy Code, Bankruptcy Rule 9014 and the procedures set forth in Article VII, Section A of this Disclosure Statement.

## II. OVERVIEW OF THE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. For a more detailed description of the terms and provisions of the Plan, see Article V, "The Plan of Reorganization." The Debtors, moreover, reserve the right to modify the Plan consistent with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**A.** **General Overview.**

The Company, in consultation with its advisors, has reached prepetition agreements in principle on a pre-arranged restructuring plan with (i) the Company's secured lenders and (ii) the holders of a majority of the aggregate outstanding principal amount of the Company's unsecured bonds. The terms of the Company's pre-arranged restructuring plan are evidenced by (i) prepetition plan support agreements, together with accompanying term sheets, executed by the Company and lenders holding well in excess of two-thirds (2/3) in principal amount and one-half (1/2) in number of claims under each of the RHDI Credit Agreement, DME Credit Agreement, and DMW Credit Agreement (collectively, the "Banks Support Agreements"), true and correct copies of which are attached hereto as Exhibit B; and (ii) a prepetition restructuring support agreement, together with accompanying plan term sheet, executed by the Company and Noteholders holding in excess of a majority of the principal amount of the Prepetition Note Debt (the "Noteholders Support Agreement" and, collectively, with the Banks Support Agreements,

the "Plan Support Agreements"), a true and correct copy of which is attached hereto as Exhibit C. The Plan Support Agreements, together with the applicable term sheets, formed the basis for the Plan, the principal terms of which are summarized in Article V of this Disclosure Statement.

The salient economic terms of the Company's pre-arranged restructuring plan (which are subject in all respects to the specific terms set forth in the term sheets attached to the Plan Support Agreements and the negotiation and execution of definitive documentation) include, but are not limited to, the following: (i) elimination of approximately $6.4 billion of indebtedness (including through payment of $700 million of secured indebtedness) and $500 million of annual interest expense; (ii) receipt by the Prepetition Lenders of approximately $655 million of debt paydown (including the $200 million in principal that the Debtors paid down prior to the Petition Date) in addition to scheduled amortization and interest payments (subject to future Company cash flows); (iii) the exchange of all Prepetition Note Debt for (a) 100% of the reorganized RHDC equity (subject to dilution pursuant to the Management Incentive Plan) and, (b) in the case of the Holders of the DMW 8.5% Senior Notes due 2010 and the DMW 5.875% Senior Notes due 2011, in addition to their allocable share of the reorganized RHDC equity, $300 million of new seven-year RHDC unsecured notes issued on a *pro rata* basis; (iv) the RHDI Revolver will be termed out with a maturity of October 2014 and new pricing of LIBOR plus 600-625 basis points ("bps") subject to a grid and the RHDI Term Loans D-1 and D-2 will be amended with new pricing (LIBOR plus 600-625bps subject to a grid) and a maturity of October 2014; (iv) each of the DME and DMW Revolvers will be termed out with maturities of October 2014 and pricing increased by 75bps (subject to step-downs) and (a) each of the DME and DMW Term Loan A's will be amended with extended maturities of October 2014 and pricing increased by 75bps (subject to step-downs) and (b) each of the DME and DMW Term Loan B's will be amended with pricing increased by 50bps (subject to step-downs); and (v) enhancement of the collateral and guarantee packages of the DME, DMW and RHDI secured debt. As of emergence, the Company anticipates that its secured and consolidated debt will be approximately $3.1 billion and $3.4 billion, respectively, which represents approximately 2.9x and 3.2x net secured and net consolidated leverage, respectively. The restructuring will allow the Company to preserve and retain significant tax attributes that could meaningfully reduce the Company's post-emergence cash tax obligation for the foreseeable future.[4]

The Company's pre-arranged restructuring plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously. Through confirmation of a plan implementing the terms of the pre-arranged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is better aligned with its expected future cash flows; retain flexibility to invest in growth initiatives to maximize enterprise value; and maintain very favorable pricing to the Company under certain of its Prepetition Credit Facilities (as amended and restated). Additionally, the Company expects that it will continue to generate cash flows from its operations, and build liquidity during the pendency of these Chapter 11 Cases. For all of these reasons, the Company believes it will be well-positioned going forward.

---

[4] The debt obligations described in this paragraph and the proposed treatment of such obligations as provided in the Plan are described in detail and otherwise defined in Article III.E of this Disclosure Statement.

**B.** <u>Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors Under the Plan.</u>

The following chart summarizes the projected distributions to Holders of Allowed Claims against and Interests in each of the Debtors under the Plan. For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in five (5) groups: (i) Primary Obligor Debtors (Debtors 1 through 5), (ii) DMW Guarantor Debtors (Debtors 6 and 7), (iii) DME Guarantor Debtors (Debtors 8 and 9), (iv) RHDI Guarantor Debtors (Debtors 10 through 16); and (v) Non-Guarantor Debtors (Debtors 17 through 20). Each group is specifically listed in Appendixes A through E to the Plan, and each Debtor is ascribed a numerical designation therein that corresponds to the applicable Debtor.

Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate. Any estimates of the Allowed amount of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS | | |
|---|---|---|
| **Class & Description** | **Estimated Allowed Amount[5]** | **Treatment Under the Plan** |
| **Administrative Expense Claims:[6]**<br><br>Any Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under Sections 328, 330, 363, 364(c)(1), 365, 503(b), and 507(a)(2) of the Bankruptcy Code. | Not Estimated | Subject to the provisions of Sections 328, 330, 331 and 503(b) of the Bankruptcy Code, on either: (i) the latest to occur of (x) the Effective Date (or as soon as practicable thereafter), (y) the date upon which such Administrative Expense Claim becomes an Allowed Claim and (z) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) on such other date as the Bankruptcy Court may order, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Claim, (a) cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (b) such other treatment as the applicable Debtor and such Holder shall have agreed; <u>provided, however</u>, that Allowed Administrative Expense Claims not |

---

[5] Amounts estimated in this table are principal only and do not include any Allowed accrued interest, if applicable.
[6] Although treatment of Administrative Expense Claims and Priority Tax Claims is included in this chart for informational purposes, neither category of Claims is classified for purposes of the Plan.

| | | |
|---|---|---|
| | | yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.<br><br>**Estimated Percentage Recovery: 100%** |
| **Priority Tax Claims:**<br><br>Any Claim of a governmental unit of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code. | Not Estimated | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of (i) the Effective Date (or as soon as practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable. All Allowed Priority Tax Claims against any of the Debtors which are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.<br><br>**Estimated Percentage Recovery: 100%** |
| **Priority Non-Tax Claims:**<br><br>Classes 1A through 19A consist of all Claims other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in Section 507(a) of the Bankruptcy Code. | $0 | **Unimpaired**<br><br>Except to the extent that a Holder of an Allowed Claim in Classes 1A through 19A ("Allowed Priority Non-Tax Claim") has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Priority Non-Tax Claim that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors: (i) cash equal to the amount of such Allowed Priority Non-Tax Claim in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code. All Allowed Claims in Classes 1A through 19A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.<br><br>**Estimated Percentage Recovery: 100%** |
| **Other Secured Claims:**<br><br>Classes 1B though 19B consist of all Claims, other than a Prepetition Lenders Claim, that is secured by a Lien on property in which a | $375,000 | **Unimpaired**<br><br>On or as soon as reasonably practicable after, the latest to occur of (i) the Effective Date or (ii) the date on which such Claim in Classes 1B through 19B ("Other Secured Claim") becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, if any, shall receive, on account of, and in full and complete settlement, |

| | | |
|---|---|---|
| Debtor's Estate has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code or, in the case of the setoff, pursuant to Section 553 of the Bankruptcy Code. | | release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, in consultation with the Consenting Noteholders, (a) Reinstatement of any such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment in full, in cash, of such Allowed Other Secured Claim; (c) satisfaction of any such Allowed Other Secured Claim by delivering the collateral securing any such Claim and paying any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) providing such Holder with such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to any Allowed Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.<br><br>**Estimated Percentage Recovery: 100%** |
| **Convenience Claims:**[7]<br><br>Classes 1C through 19C consist of Claims against any of the Debtors, each of which would otherwise be classified as an Allowed General Unsecured Claim, and which (i) is in an amount that is equal to or less than $5,000 or (ii) pursuant to the Ballot has been reduced to $5,000 by election of the Holder of such Claim. | $1 million | **Impaired**<br><br>On or as soon as reasonably practicable after the latest of (i) the Effective Date or (ii) the date on which a Claim in Classes 1C through 19C ("Convenience Claim") becomes an Allowed Convenience Claim, each Holder of an Allowed Convenience Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of and in exchange for such Allowed Convenience Claim, a cash payment equal to one hundred percent (100%) of such Allowed Convenience Claim, subject to a cap of $5,000 for each Allowed Convenience Claim; provided, however, that if the Allowed Convenience Claims in the aggregate against all of the Debtors exceed the Maximum Convenience Class Payment ($1,000,000), then the Holders of Allowed Convenience Claims shall receive their *pro rata* share of the Maximum Convenience Class Payment.<br><br>**Estimated Percentage Recovery: 100%** |
| **RHDI Lenders Guaranty Claims:**<br><br>Classes 1D and 10D through 16D consist of all RHDI Lenders Guaranty Claims. | $1.434 billion | **Impaired**<br><br>On or as soon as practicable after the Effective Date, in full and complete settlement, release and discharge of, and in exchange for, the Allowed RHDI Lenders Guaranty Claim, as of the Effective Date, each Holder of an Allowed RHDI Lenders Guaranty Claim shall receive the treatment set forth in greater detail in the RHDI Lenders Plan Support Agreement included in Exhibit B hereto, including, |

[7] Any Holder of a General Unsecured Claim that desires treatment of such Claim as a Convenience Claim shall have the opportunity to make such election on the Ballot to be provided to Holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline. Any election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

| | | |
|---|---|---|
| | | without limitation, such rights set forth in the Amended and Restated RHDI Credit Agreement, the Amended and Restated RHDI Lenders Guaranty & Collateral Agreement and such other definitive documentation executed in connection therewith executed as of the Effective Date. Holders of Allowed RHDI Lenders Guaranty Claims shall receive no additional consideration under the Plan on account of such Allowed RHDI Lenders Guaranty Claims.<br><br>**Estimated Percentage Recovery**: **100%** |
| **RHDC Noteholders Claims:**<br><br>Class 1E consists of all RHDC Noteholders Claims against RHDC. | $3.211 billion | **Impaired**<br><br>On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1E Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 21.0% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).<br><br>**Estimated Percentage Recovery**: **not less than 5.9%** |
| **DMI Noteholders Claims:**<br><br>Class 2D consists of all DMI Noteholders Claims against DMI. | $1.25 billion | **Impaired**<br><br>On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2D Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 23.3% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).<br><br>**Estimated Percentage Recovery**: **not less than 17.1%** |
| **RHDI Lenders Claims:**<br><br>Class 3D consists of all RHDI Lenders Claims against RHDI. | $1.434 billion | **Impaired**<br><br>On or as soon as reasonably practicable after, the Effective Date, in full and complete satisfaction, settlement, release and discharge of the Allowed Class 3D Claim, as of the Effective Date, each Holder of an Allowed Class 3D Claim shall be entitled to the treatment set forth in greater detail in the RHDI Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated RHDI Credit Agreement, the RHDI Lenders Guaranty and Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date, and payment by Reorganized RHDI of the RHDI Revolving Loans, RHDI Term Loans and RHDI Hedge Termination Payments in an aggregate amount equal to at least the Prepayment Amount (as defined in the RHDI Lenders Plan Support Agreement), which shall include cash in the sum of $50,000,000 received from RHD Service LLC ("<u>RHD Service</u>") on account of RHDI's Class 20E Claim.[8] |

---

[8] Notwithstanding anything to the contrary in the Disclosure Statement or the Plan, in the event the Class 3D Claims do not accept the Plan, RHDI expressly reserves the right to cure and reinstate the Claims in Class 3D against the Holders of Class 3D Claims under Section 1124 of the Bankruptcy Code, and the RHDI Lenders Agent and RHDI

| | | |
|---|---|---|
| | | **Estimated Percentage Recovery**: 100% |
| **RHDI Noteholders Claims:**<br><br>Class 3E consists of all RHDI Noteholders Claims against RHDI. | $413 million | **Impaired**<br><br>On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 3E Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 25.8% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).<br><br>**Estimated Percentage Recovery**: not less than 57.4%[9] |
| **DMW Lender Claims:**<br><br>Class 4D consists of all DMW Lenders Claims against DMW. | $1.107 billion | **Impaired**<br><br>On or as soon as reasonably practicable after, the Effective Date, in full and complete satisfaction, settlement, release and discharge of the Allowed Class 4D Claims, as of the Effective Date, each Holder of an Allowed Class 4D Claim shall be entitled to the treatment set forth in greater detail in the DMW Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated DMW Credit Agreement, the Amended and Restated DMW Guaranty and Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date, and payment by Reorganized DMW of the DMW Revolving Loans, DMW Term Loans and DMW Hedge Termination Payments in an amount equal to the Paydown (as defined in the DMW Lenders Plan Support Agreement), which shall include cash in the sum of $75,000,000 received from RHD Service on account of DMW's Class 20E Claim.[10]<br><br>**Estimated Percentage Recovery:** 100% |

Lenders expressly reserve the right to contest, litigate and oppose such relief.

[9] The estimated recoveries for the Holders of Allowed RHDI Noteholders Claims represent the total estimated recoveries that such Holders shall be entitled to receive under the Plan on account of their Allowed RHDI Noteholders Claims and their Allowed RHDI Noteholders Guaranty Claims.
[10] Notwithstanding anything to the contrary in the Disclosure Statement or the Plan, in the event the Class 4D Claims do not accept the Plan, DMW expressly reserves the right to cure and reinstate the Claims in Class 4D against the Holders of Class 4D Claims under Section 1124 of the Bankruptcy Code, and the DMW Lenders Agent and DMW Lenders expressly reserve the right to contest, litigate and oppose such relief.

| | | |
|---|---|---|
| **DMW Senior Notes Noteholder Claims**:<br><br>Class 4E consists of all DMW Senior Notes Noteholders Claims against DMW. | $394 million | **Impaired**<br><br>On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 4E Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of (i) the New RHDC Notes and (ii) 13.0% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan). Notwithstanding the terms of either of the DMW Senior Subordinated Notes Indenture or DMW Senior Subordinated Notes, each Holder of a DMW Senior Notes Noteholders Claim shall be deemed to have consented and agreed to the treatment provided under the Plan to all Holders of DMW Senior Subordinated Noteholders Claims in accordance with Section 3.5.6 thereof, and to have waived and/or relinquished and shall be barred from asserting any rights or claims pursuant to Section 510(a) of the Bankruptcy Code in respect of their Class 4E Claims.<br><br>**Estimated Percentage Recovery: not less than 87.6%** |
| **DMW Senior Subordinated Notes Noteholders Claims**:<br><br>Class 4F consists of all DMW Senior Subordinated Notes Noteholders Claims against DMW. | $762 million | **Impaired**<br><br>On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 4F Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 16.9% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).<br><br>**Estimated Percentage Recovery: not less than 20.3%** |
| **DME Lenders Claims**:<br><br>Class 5D consists of all DME Lenders Claims against DME. | $1.101 billion | **Impaired**<br><br>On or as soon as reasonably practicable after, the Effective Date, in full and complete satisfaction, settlement, release and discharge of the Allowed Class 5D Claims, as of the Effective Date, each Holder of an Allowed Class 5D Claim shall be entitled to the treatment set forth in greater detail in the DME Lenders Plan Support Agreement included in Exhibit B hereto, including without limitation, such rights as set forth in the Amended and Restated DME Credit Agreement, the DME Lenders Guaranty and Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date, and payment by Reorganized DME of the DME Revolving Loans, DME Term Loans and DME Hedge Termination Payments in an aggregate amount equal to the Paydown (as defined in the DME Lenders Plan Support Agreement), which shall include cash in the sum of $50,000,000 received from RHD Service on account of DME's Class 20E Claim.[11]<br><br>**Estimated Percentage Recovery: 100%** |

---

[11] Notwithstanding anything to the contrary in the Disclosure Statement or the Plan, in the event the Class 5D Claims do not accept the Plan, DME expressly reserves the right to cure and reinstate the Claims in Class 5D against the Holders of Class 5D Claims under Section 1124 of the Bankruptcy Code, and the DME Lenders Agent and DME Lenders expressly reserve the right to contest, litigate and oppose such relief.

| DMW Lenders Guaranty Claims:<br><br>Classes 6D and 7D consist of all DMW Lenders Guaranty Claims against the DMW Guarantor Debtors. | $1.107 billion | **Impaired**<br><br>On or as soon as practicable after the Effective Date, in full and complete settlement, release and discharge of, and in exchange for, the Allowed Claims in Classes 6D and 7D, as of the Effective Date, each Holder of an Allowed Class 6D or 7D Claim (as the case may be) shall receive the treatment set forth in greater detail in the DMW Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated DMW Credit Agreement, the Amended and Restated DMW Lenders Guaranty & Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date. Holders of Allowed Claims in Classes 6D and 7D shall receive no additional consideration under the Plan on account of such Allowed Claims in Classes 6D and 7D.<br><br>**Estimated Percentage Recovery: 100%** |
|---|---|---|
| **DME Lenders Guaranty Claims**:<br><br>Classes 8D and 9D consist of all DME Lenders Guaranty Claims against the DME Guarantor Debtors. | $1.101 billion | **Impaired**<br><br>On or as soon as practicable after the Effective Date, in full and complete settlement, release and discharge of, and in exchange for, the Allowed Claims in Classes 8D and 9D, as of the Effective Date, each Holder of an Allowed Class 8D or 9D Claim (as the case may be) shall be entitled to the treatment set forth in greater detail in the DME Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated DME Credit Agreement, the Amended and Restated DME Lenders Guaranty & Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date. Holders of Allowed Claims in Classes 8D and 9D shall receive no additional consideration under the Plan on account of such Allowed Claims in Classes 8D and 9D.<br><br>**Estimated Percentage Recovery: 100%** |
| **RHDI Noteholders Guaranty Claims**:<br><br>Classes 1F and 10E through 16E consist of all RHDI Noteholders Guaranty Claims. | $413 million | **Impaired**<br><br>On or as soon as practicable after the Effective Date, in full and complete settlement, release and discharge of, and in exchange for, the Allowed Claims in Classes 1F and 10E through 16E, each Holder of an Allowed Claim in Classes 1F and 10E through 16E shall receive the same treatment as provided to Allowed Claims in Class 3E, and Holders of such Allowed Claims in Classes 1F and 10E through 16E shall receive no additional consideration under the Plan on account of such Allowed Claims in Classes 1F and 10E through 16E. For the avoidance of doubt, to the extent that a Notes Indenture Trustee and a Noteholder each file a Proof of Claim evidencing a duplicative Class 1F and/or 10E through 16E Claim, only the Claim of the Notes Indenture Trustee shall be Allowed.<br><br>**Estimated Percentage Recovery: not less than 57.4%[12]** |

---

[12] The estimated recoveries for the Holders of Allowed RHDI Noteholders Guaranty Claims represent the total estimated recoveries that such Holders shall be entitled to receive under the Plan on account of their Allowed RHDI Noteholders Claims and their Allowed RHDI Noteholders Guaranty Claims.

| General Unsecured Claims:[13] | $19.5 million | **Impaired** |
|---|---|---|
| Classes 1G, 2E, 3F, 4G, 5E through 9E, 10F through 16F, and 17D through 19D consist of all Unsecured Claims in excess of $5,000 against any of the Debtors. | | The Plan provides for the following distributions to the Holders of Allowed General Unsecured Claims against each of RHDC, DMI, RHDI and DMW: |

The Plan provides for the following distributions to the Holders of Allowed General Unsecured Claims against each of RHDC, DMI, RHDI and DMW:

In the event that each Class of Impaired Claims against RHDC, DMI, RHDI, and DMW, respectively, has accepted the Plan, then each Holder of an Allowed General Unsecured Claim in Classes 1G, 2E, 3F, and 4G (each such Claim, an "Allowed 1G, 2E, 3F, or 4G Unsecured Claim"), respectively, including any General Unsecured Claims for damages relating to executory contracts and unexpired leases rejected by RHDC, DMI, RHDI, and DMW, respectively (either pursuant to the Plan or otherwise) and trade payables owed by each of RHDC, DMI, RHDI and DMW, shall receive the following treatment at the option of the Debtors: (i) on the Effective Date, or as soon thereafter as practicable, payment in cash equal to 100% of such Allowed 1G, 2E, 3F, or 4G Unsecured Claim; provided, however, that if the aggregate amount of Allowed General Unsecured Claims against any of RHDC, DMI, RHDI, and DMW, respectively, exceeds the Maximum Payment (as defined below) for that particular Class, then Holders of Allowed General Unsecured Claims against that particular Debtor will receive a *pro rata* share of the Maximum Payment for such Class payable in cash and thus may potentially receive a recovery of less than 100%, unless the Maximum Payment for such Class is increased in the manner described in Section III.C hereof; or (ii) the assumption or payment in full or in part of any such Allowed 1G, 2E, 3F, or 4G Unsecured Claim as such Claim becomes due in the ordinary course of business; provided, however, that in the event that any Class of Impaired Claims against RHDC, DMI, RHDI, or DMW, as applicable, does not accept the Plan, then, on the Effective Date, or as soon thereafter as practicable, each Holder of an Allowed General Unsecured Claim against the applicable Debtor, including Claims for damages relating to executory contracts and unexpired leases rejected by such Debtor (either pursuant to the Plan or otherwise) and trade payables owed by such Debtor, shall receive payment in cash equal to the value, as of the Effective Date, of the distribution to which the Holder of such Allowed General Unsecured Claim would have been entitled under the Plan had such General Unsecured Claim been classified with the Noteholders Claims against the applicable Debtor, as such value shall be determined by the Bankruptcy Court at or in connection with the Confirmation Hearing. The Debtors shall reserve all rights to challenge the legal basis and amount of any such Claims.

In addition, the Plan provides for the following distributions to the Holders of Allowed General Unsecured Claims against each of the Debtors other than RHDC, DMI, RHDI, DMW:

---

[13] Any Holder of a General Unsecured Claim that desires treatment of such Claim as a Convenience Claim shall make such election on the Ballot to be provided to Holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline. Any election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

| | | |
|---|---|---|
| | | Each Holder of an Allowed General Unsecured Claim against any of the Debtors other than RHDC, DMI, RHDI, DMW (each such Claim, an "<u>Allowed 5E through 9E, 10F through 16F, and 17D through 19D Unsecured Claim</u>"), respectively, including Claims for damages relating to executory contracts and unexpired leases rejected by such Debtor (either pursuant to the Plan or otherwise) and trade payables owed by such Debtor, shall receive the following treatment at the option of the Debtors: (i) on the Effective Date, or as soon thereafter as practicable, payment in cash equal to 100% of such Allowed 5E through 9E, 10F through 16F, and 17D through 19D Unsecured Claim; or (ii) the assumption or payment in full or in part of any such Allowed 5E through 9E, 10F through 16F, and 17D through 19D Unsecured Claim as such Claim becomes due in the ordinary course of business. The Debtors shall reserve all rights to challenge the legal basis and amount of any such Claims.<br><br>**Estimated Percentage Recovery: 100%[14]** |
| **Intercompany Claims Against Each Debtor Other Than RHD Service:**<br><br>Classes 1H, 2F, 3G, 4H, 5F through 9F, 10G through 16G, and 17E through 19E consist of all Intercompany Claims except Intercompany Claims against RHD Service. | $1.916 billion | **Impaired**<br><br>Holders of Allowed Claims in Classes 1H, 2F, 3G, 4H, 5F through 9F, 10G through 16G, and 17E through 19E ("<u>Allowed Non-RHD Service Intercompany Claims</u>") shall receive no monetary distributions on account of such Allowed Non-RHD Service Intercompany Claims, and all of the Allowed Non-RHD Service Intercompany Claims shall be deemed settled, cancelled and extinguished; provided, however, that any Allowed Non-RHD Service Intercompany Claims may be reinstated, in full or in part, to the extent the Debtors and a Majority of Consenting Noteholders agree to such treatment. Subject to the foregoing proviso, no Holder of an Allowed Non-RHD Service Intercompany Claim shall be entitled to, or shall receive or retain, any property or interest in property on account of such Allowed Non-RHD Service Intercompany Claim.<br><br>**Estimated Percentage Recovery: 0%** |
| **RHD Service Intercompany Claims:**<br><br>Class 20A consists of all Intercompany Claims against | $175 million | **Unimpaired**<br><br>With respect to the Claims in Class 20A, RHD Service shall repay in cash the aggregate principal amount of (i) $50,000,000 to DME, (ii) $50,000,000 to RHDI, and (iii) $75,000,000 to DMW, on account of, |

---

[14] In the event that any Class of Impaired Claims against any of RHDC, DMI, RHDI, or DMW, respectively, does not accept the Plan, the estimated recovery under the Plan for each Holder of an Allowed General Unsecured Claim against the applicable Debtor shall be equal to the estimated recovery under the Plan for the Holders of Allowed Noteholders Claims against such Debtor, provided that the distributions to Holders of such Allowed General Unsecured Claims shall be payable in cash. For example, if a Class of Impaired Claims against RHDC fails to accept the Plan while all Classes of Impaired Claims against each of DMI, RHDI, and DMW, respectively, accept the Plan, then the estimated recovery (in cash) for Holders of Allowed General Unsecured against RHDC will be not less than 5.9% (with the exact amount of such recovery to be determined by the Bankruptcy Court at or in connection with the Confirmation Hearing) – the same as the estimated recovery (in New Common Stock) for the Holders of Allowed RHDC Noteholders Claims in Class 1E – while the Holders of Allowed General Unsecured Claims against each of DMI, RHDI and DMW, respectively, will, unless the aggregate amount of Allowed General Unsecured Claims against any of DMI, RHDI and DMW, respectively, exceeds the Maximum Payment for that particular Class, receive a 100% recovery payable in cash.

| | | |
|---|---|---|
| RHD Service. | | and in full and complete satisfaction, settlement, release and discharge of and in exchange for their respective Allowed Claims in Class 20A.<br><br>**Estimated Percentage Recovery: 100%** |
| **RHDC Interests:**<br><br>Class 1I consists of all RHDC Interests.[15] | Not Estimated | **Impaired**<br><br>On the Effective Date, all of the Class 1I Interests outstanding as of the Effective Date shall be extinguished, cancelled and discharged as of the Effective Date. Holders of Class 1I Interest shall not be entitled to, nor receive, any distribution or retain any property or interest in property on account of such Class 1I Interests pursuant to Section 1129(b)(2)(C) of the Bankruptcy Code.[16]<br><br>**Estimated Percentage Recovery: 0%** |
| **Interests in Debtors Other Than RHDC:**<br><br>Classes 2G, 3H, 4I, 5G through 9G, 10H through 16H, 17F through 20F, and 20B consist of all Interests in the remaining Debtors. | Not Estimated | **Unimpaired**<br><br>As of the Effective Date, each Holder of an Allowed Interest in Classes 2G, 3H, 4I, 5G through 9G, 10H through 16H, 17F through 20F, and 20B shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitles the Holder immediately prior to the Effective Date.<br><br>**Estimated Percentage Recovery: 100%** |

## C.   General Unsecured Claims and Claims Resolution Matters

As reflected in the foregoing Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors Under the Plan (the "Claims Summary"), the estimated recovery percentage with respect to Allowed General Unsecured Claims against each Debtor is 100%. The estimated recovery percentage with respect to the Allowed General Unsecured Claims against RHDC, DMI, RHDI and DMW, respectively, is based upon the assumption that (i) each Class of Impaired Claims against the applicable Debtor has accepted the Plan and (ii) the aggregate dollar amount of Allowed General Unsecured Claims against RHDC will not exceed the Maximum Class 1G Payment, the aggregate dollar amount of Allowed General Unsecured Claims against DMI will not exceed the Maximum Class 2E Payment, the aggregate dollar amount of Allowed General Unsecured Claims against RHDI will not exceed the Maximum Class 3F Payment, and the aggregate dollar amount of Allowed General Unsecured Claims against DMW will not exceed the Maximum Class 4G Payment (collectively, with the Maximum Class 1G Payment, the Maximum Class 2E Payment, and the Maximum

---

[15] The Debtors reserve the right, if and as appropriate, to classify any potential Subordinated Equity Securities Claim either as an RHDC Interest or as a separate class for such Subordinated Equity Securities Claim.

[16] In the event that the Debtors separately classify any Subordinated Equity Securities Claim, any such Claims shall be extinguished, cancelled and discharged as of the Effective Date, and any Holders thereof shall receive no distribution in respect of their Claims pursuant to Section 1129(b)(2)(C) of the Bankruptcy Code.

Class 3F Payment, the "Maximum Payments").[17] If the aggregate dollar amount of Allowed General Unsecured Claims against any of RHDC, DMI, RHDI and DMW, respectively, exceeds the Maximum Payment for that particular Class, then Holders of Allowed General Unsecured Claims against that particular Debtor will receive a *pro rata* share of the Maximum Payment for such Class and thus may potentially have a recovery percentage of less than 100%, unless the Maximum Payment for such Class is increased in the manner described below.

The Debtors' estimated recovery percentage with respect to the Allowed General Unsecured Claims against RHDC, DMI, RHDI and DMW, respectively, as well as the Maximum Payments, are predicated upon, among other things, the information contained in the Schedules. Pursuant to the bar date order entered by the Bankruptcy Court on September 11, 2009 (the "Bar Date Order") [Docket. No. 439], all Persons (other than governmental entities) must file proofs of claim against the Debtors by no later than 4:00 PM (ET) on October 30, 2009 (the "General Bar Date").[18] In the event that, based upon, among other things, a review and assessment of General Unsecured Claims filed in accordance with the Bar Date Order, the Debtors, in consultation with the Consenting Noteholders, conclude that the aggregate amount of such filed General Unsecured Claims, if Allowed, could materially exceed the Maximum Payments referenced above and set forth in the Plan, then the Debtors reserve the right, subject to the reasonable consent of a Majority of Consenting Noteholders, to modify the Plan to adjust the Maximum Class 1G Payment, the Maximum Class 2E Payment, the Maximum Class 3F Payment, and/or the Maximum Class 4G Payment as may be appropriate.

With respect to the allowance of Claims, under the terms of the Noteholders Support Agreement, the Consenting Noteholders have certain consent rights with respect to the Allowance of Claims prior to the entry of the Confirmation Order. For example, pursuant to paragraph 11 of the Noteholders Support Agreement, the Debtors may enter into agreements with Holders of Claims (other than the Claims of the Consenting Noteholders) relating to the allowance, estimation, validity, extent or priority of such Claims, or the treatment and classification of such Claims under the Plan; provided, however, that the Debtors shall provide the Consenting Noteholders with not less than five (5) Business Days prior written notice of any motion seeking authorization for the Debtors to enter into such a proposed agreement, and upon the expiration of such period, if the Consenting Noteholders have not notified the Debtors of an objection to such proposed treatment of such Claims, the Debtors shall be authorized to proceed with such motion and agreement. Notwithstanding the foregoing, the Debtors are not required to provide the Consenting Noteholders with advanced notice or any objection period with respect to

---

[17] In quantifying the amounts of the respective Maximum Payments, the Debtors examined the claims set forth in each of the applicable Debtors' Schedules of Assets and Liabilities (the "Schedules") and their current open prepetition accounts payable. The Debtors then netted out payments on Claims that are not subject to the Maximum Payment limitation, including (i) cure amounts that the Debtors must pay to satisfy the requirements of section 365 of the Bankruptcy Code in connection with the executory contracts and unexpired leases anticipated to be assumed pursuant to the Plan or otherwise (including, but not limited to, the Employee Benefit Plans listed on Exhibit C to the Noteholders Plan Term Sheet) and (ii) all payments made or anticipated to be made to Holders of Allowed General Unsecured Claims pursuant to any order of this Court entered prior to the Confirmation Date (including, but not limited to, payments to Critical Vendors (as defined below)). After netting these payments against the Claims listed in the Schedules and each respective Debtor's current open prepetition accounts payable, the Debtors then added back a contingency for unknown and unliquidated claims. The Maximum Payments were consented to by a Majority of Consenting Noteholders.

[18] The claims bar date for governmental entities is November 24, 2009 at 4:00 PM (ET).

payment of (i) any trade payables and employee benefits and obligations which arise in the ordinary course of the Debtors' business, (ii) Claims asserted in a liquidated amount of $250,000 or less, and (iii) Claims which the Debtors have been authorized to resolve or pay pursuant to any first day orders.

**D.**     Estimated Recoveries for Holders of Certain Noteholders Claims

As reflected in the foregoing Claims Summary, the estimated recovery percentages for Holders of RHDC Noteholders Claims, DMI Noteholders Claims, RHDI Noteholders Claims, DMW Senior Notes Noteholders Claims and DMW Senior Subordinated Notes Noteholders Claims, as applicable, will depend upon a variety of factors, including but not limited to, the ultimate value of the New RHDC Common Stock distributed to such Holders on account of their respective Noteholders Claims.

As discussed in greater detail in Article VIII. B below, and subject to the assumptions and qualifications set forth therein, such recovery estimates reflect, among other things, computations of the hypothetical range of the estimated Equity Value (as defined below) of the Reorganized Debtors through the application of various valuation techniques and do not purport to reflect estimates of the actual market value of the New RHDC Common Stock on and after the Effective Date.  For example, for illustrative purposes only, the recovery percentage for Holders of DMW Senior Notes Noteholders Claims is estimated to be not less than 87.6%.

If, and to the extent that, the value of the distributions made to Holders of DMW Senior Notes Noteholders Claims under the Plan is less than 100% of the amount of such Allowed Claims, then, assuming acceptance of the Plan by the Class of Holders of DMW Senior Notes Noteholders Claims and confirmation of the Plan, notwithstanding the terms of either of the DMW Senior Subordinated Notes Indenture or the DMW Senior Subordinated Notes, each Holder of a DMW Senior Notes Noteholders Claim shall be deemed to have consented and agreed to the treatment provided under the Plan to all Holders of DMW Senior Subordinated Noteholders Claims in accordance with the terms of the Plan and to have waived and/or relinquished, and shall be barred from asserting, any rights or claims pursuant to Section 510(a) of the Bankruptcy Code.

Under the terms of Section 10.01 of the DMW Senior Subordinated Notes Indenture, Holders of DMW Senior Subordinated Notes have agreed to subordinate their right to payment to, inter alia, the prior payment in full of the DMW Senior Notes.  Wilmington Trust Company, in its capacity as indenture trustee under the DMW Senior Notes Indenture, believes that the subordination provisions may under certain circumstances have the effect of prohibiting the Holders of the DMW Senior Subordinated Notes from receiving any recovery until the DMW Senior Notes are paid in full as provided under the DMW Senior Subordinated Notes Indenture. The Debtors believe that, consistent with applicable law, the Plan provides for a valid, enforceable and consensual waiver of any subordination rights by the Holders of DMW Senior Notes in the event the Class of Holders of DMW Senior Notes has accepted the Plan, in which case any subordination rights in favor of the Holders of DMW Senior Notes will not be enforced. Wilmington Trust Company believes that, under the terms of the DMW Senior Notes Indenture, the Debtors may be obligated, pursuant to Section 510(a) of the Bankruptcy Code, to enforce subordination agreements in accordance with applicable non-bankruptcy law, and that

acceptance of the Plan by the Class of Holders of DMW Senior Notes Noteholders Claims may not waive those rights under the Plan without the consent of each Holder of DMW Senior Notes or over the objection of a Holder of DMW Senior Notes. The Debtors, however, do not believe that such statement is consistent with prevailing bankruptcy law. In the event that the value of distributions made to Holders of DMW Senior Notes Noteholders Claims under the Plan is less than 100% of the amount of such Allowed Claims, Wilmington Trust reserves the right to enforce, subject to the terms of the DMW Senior Subordinated Notes Indenture and applicable bankruptcy law, the subordination provisions in connection with confirmation of the Plan or otherwise oppose confirmation of the Plan.

**E.**     Resolution of Objections to Approval of the Disclosure Statement

   Limited Objection of Maricopa County, Arizona

Maricopa County, Arizona ("Maricopa County") filed a limited objection to approval of the Disclosure Statement, arguing that the Disclosure Statement should not be approved because it does not specify the treatment to which Maricopa County's personal property tax claim will be entitled under the Plan. Maricopa County asserts that it holds an Other Secured Claim against DMI for 2009 personal property taxes in the amount of $13,775.16 (the "Maricopa County Claim"). Maricopa County further asserts that the Maricopa County Claim is secured by first priority liens on certain property of the Debtors. Upon information and belief, the Maricopa County Claim will not become due and payable under applicable non-bankruptcy law until November 1, 2009.

The Debtors have not had the opportunity to assess the merits of the Maricopa County Claim and therefore reserve the right to contest the allowance of the Maricopa County Claim on any applicable grounds. However, assuming that the Maricopa County Claim is ultimately deemed to be an Allowed Claim, it will be treated as an Allowed Other Secured Claim against DMI and will be paid in full in cash (plus any unpaid interest thereon accruing at the statutory rate of 16% per annum) on, or as soon as reasonably practicable after, the later to occur of (a) the Effective Date and (b) the date on which the Maricopa County Claim becomes an Allowed Other Secured Claim that is due and payable under applicable non-bankruptcy law.

   Objection of Treasurer of Douglas County, Colorado

Sharon K. Jones, the Treasurer of Douglas County, Colorado ("Douglas County"), also filed an objection to approval of the Disclosure Statement, similarly arguing that the Disclosure Statement should not be approved because it does not specify the treatment to which Douglas County's personal property tax claim will be entitled under the Plan. Douglas County asserts that it holds an Other Secured Claim against each of RHDC and DMI for 2009 personal property taxes in the amount of $181,148.62 (collectively, the "Douglas County Claim"). Douglas County further asserts that the Douglas County Claim is secured by a statutory lien on certain personal property of RHDC and DMI. Upon information and belief, the Douglas County Claim will not become due and payable under applicable non-bankruptcy law until April 30, 2010.

The Debtors have not had the opportunity to assess the merits of the Douglas County Claim and therefore reserve the right to contest the allowance of the Douglas County Claim on

any applicable grounds. However, assuming that the Douglas County Claim is ultimately deemed to be an Allowed Claim, it will be treated as an Allowed Other Secured Claim against each of RHDC and DMI and will be paid in full in cash (plus any unpaid interest thereon accruing at the statutory rate of 12% per annum) on, or as soon as reasonably practicable after, the later to occur of (a) the Effective Date and (b) the date on which the Douglas County Claim becomes an Allowed Other Secured Claim that is due and payable under applicable non-bankruptcy law.

## III. GENERAL INFORMATION

**A.** The Debtors' Businesses and Properties.

**1. Company Overview.**

Based in Cary, North Carolina, the Company is among the leading providers of local search solutions in the United States, through print and web-based products and services. As of the Petition Date, the Company operated in twenty-eight (28) states and the District of Columbia, and it currently employs approximately 3,600 employees nationwide.

Through the Company's Dex® Advantage ("Dex Advantage"), the Company leverages and markets its customers' business information through a single profile and distributes it via a variety of local search products. The Dex Advantage helps to ensure advertisers' business content and messages are found wherever, whenever, and however consumers choose to search. The Dex Advantage spans multiple media platforms for local advertisers, including print with the Dex directories, which the Debtors co-brand with other recognizable brands in the industry, including Qwest, Embarq, and AT&T, online and mobile devices with *dexknows.com*® ("*dexknows.com*"), voice-activated directory search at 1-800-Call-Dex™, and leading search engines and other online sites, such as Google and Yahoo! via Dex Net™. The Company's proprietary database contains up-to-date information for over 190 million residential searchable listings and approximately 11.5 million business listings, as well as an infrastructure to service these national and local advertisers. In addition, the Company publishes print directories in over 600 markets, with a combined circulation of over 75 million.

**2. Properties.**

The Company's executive offices are located at 1001 Winstead Drive, Cary, NC 27513. This executive office space is leased by the Company. In addition, as set forth below, the Company operates sixteen (16) principal operations, sales, and administrative facilities in the United States. The Company also has sales and office space at various other locations. With the exception of the Bristol Tennessee location (which is owned by R.H. Donnelley Publishing & Advertising, Inc.), all other facilities are leased by the Company.

| Location | Purpose |
|---|---|
| Lone Tree, Colorado | Sales and Administration |
| Englewood, CO | Sales and Operations |
| Cary, NC | Corporate Headquarters |
| Omaha, NE | Sales and Operations |

| | |
|---|---|
| Chicago, IL | Sales and Operations |
| Phoenix, AZ | Sales and Operations |
| Morrisville, NC | Pre-Press Publishing |
| Maple Grove, MN | Sales and Operations |
| Overland Park, KS | Sales and Operations |
| Bellevue, WA | Sales and Operations |
| Beaverton, OR | Sales and Operations |
| Bristol, TN | Graphics Operations |
| Murray, UT | Sales and Operations |
| Fort Myers, FL | Sales and Operations |
| Tinley Park, IL | Sales and Operations |
| Dunmore, PA | Graphics Operations |
| Lombard, IL | Sales and Operations |

**B.**    Operational Structure of the Debtors.

RHDC currently has nineteen (19) domestic subsidiaries.  RHDC is a holding company that conducts its business operations through three wholly-owned direct subsidiaries: R.H. Donnelley Inc. ("RHDI"), Dex Media, Inc. ("DMI"), and Business.com, Inc. ("BDC").  A chart depicting the Company's corporate structure is annexed hereto as Exhibit D.

The Company provides the following marketing products and services to its customers: (i) marketing consultation, including the assessment of marketing programs and advertisements, advertising design and copywriting, and advertising placement advice; (ii) industry and market-specific research and information; (iii) information regarding consumer search behavior; and (iv) distribution of the advertisers' business information through a variety of media platforms.  The Company's yellow and white pages directories offer the broadest reach of the active buying market in the Company's local communities.  The *dexknows.com* platform, which includes approximately 11.5 million business listings and more than 190 million residential listings from across the United States, allows consumers to search listings based on category, business name, or set of keyword terms within a geographic region.  The Company also provides business-to-business ("B-to-B") advertising sales, with online properties that include Business.com, a leading business search engine and performance-based advertising network, and Work.com, a B-to-B publishing platform where experts share advice on common business topics.

**1.**    **Print Products and Services.**

The Company publishes three primary types of printed directories: core directories, community directories, and Plus companion directories.  These directories generally can be further broken down into three basic categories:  Yellow Pages, White Pages, and Specialty/Awareness Products.

(a)    Yellow Pages

The Company's yellow pages are a comprehensive directory of local area businesses published under the Dex brand and co-branded with other recognizable telecommunications brands in the industry, *e.g.*, Qwest, Century Link (formerly Embarq), and AT&T.  A business's

name, address, and telephone number are included in the relevant edition of the Company's yellow pages directories at no charge. A range of paid advertising options is available in the Company's yellow pages directories. For example, businesses can enhance their complimentary listing by highlighting their business name or setting it in a bolder typeface. They may also purchase various advertisements, ranging from in-column advertising, which increases the space in the column in which the listing appears, to a display advertisement, which includes a wide range of information, illustrations, photographs, and logos.

(b)     White Pages

The Company publishes white pages directories listing the name, address, and phone number of each residence and business in the local market for Qwest, Embarq, and AT&T, as required by state public utilities commissions. Advertising in the white pages is available and includes similar options available in the Company's yellow pages directories: bold and highlighted names, extra lines, and in-column and display advertisements.

(c)     Specialty/Awareness Products

In addition to the regular advertisements in the yellow and white pages, the Company also offers certain "awareness products" that allow businesses to advertise in a variety of high-visibility locations on or inside a directory, such as the inside and outside of the front and back cover, on tabs within the directory, on the edges of the directory, on delivery bags, and on card stock inserted in the directory and delivery bags. Because of scarcity and the highly-visible nature of the locations, these products are priced at a premium to in-column and display advertisements.

**2.     Online Products and Distribution.**

The Company also offers online products on the Company's proprietary Internet directory sites – *dexknows.com*, Business.com, and Work.com – as well as distributed to third party Internet search engines and directories such as Google, Yahoo!, YellowPages.com, and the Company's B-to-B pay-per-click advertising network comprised of over 100 partners, including Forbes, Financial Times, and Hoovers.

(a)     *dexknows.com*

The Company places its listing and advertiser content, including basic listings and business profiles, from its print directories onto its *dexknows.com* platform. In addition, the Company enhances the *dexknows.com* listings through the purchase of information from national databases to enhance its in-region listings and to supply out-of-region listings. The *dexknows.com* database includes approximately 11.5 million business and more than 190 million residential listings from across the United States. In February of 2009, the Company launched a new *dexknows.com* site and content management platform.

(b)     DexNet™

DexNet™ focuses exclusively on the delivery of local advertisements across multiple local search directories and major search engines such as Google and Yahoo!. DexNet™

provides these services through four major product and service elements. The first element is the Storefront Profile, which is designed to construct a simple but content-rich Internet presence for advertisers. The second is the distribution capabilities that provide the advertiser's business information to multiple local search platforms. The third element is paid search, which is the development, deployment, and management of effective search marketing campaigns across multiple major search platforms on behalf of the advertiser. Finally, the network provides reporting capabilities that provide advertisers with transparent, real-time results, such as click and call activity that occurs on the advertiser's website or Storefront Profile.

(c)     Business.com

The Business.com Advertising Network serves advertising on non-proprietary websites such as Forbes.com and Allbusiness.com, and shares advertiser revenue with such third-party sites each time a visitor clicks on the advertisers' listings. Business.com's online properties include Business.com, Work.com, and the Business.com Advertising Network. The Business.com and Work.com properties attract an audience of highly-qualified and motivated business decision-makers. Business.com increases the revenues from these properties through the use of its performance-based advertising platform ("PBA"). PBA allows advertisers to effectively bid on a cost-per-click basis against other advertisers for priority placement within search results. The Business.com platform thus provides flexible advertising provisioning and bid management capabilities.

## 3.     Intellectual Property.

The Company owns and controls a number of trade secrets, trademarks, service marks, trade names, copyrights and other intellectual property rights that, in the aggregate, are of material importance to the Company. These marks include "R.H. Donnelley," "Dex," "Business.com," "Work.com," "*dexknows.com*" and "Dex Search Marketing," and the related names, marks and logos, all of which are material to the Company's business. The Company is also licensed to use certain technology and other intellectual property rights owned and controlled by third-parties. The Company licenses certain of its technology and other intellectual property rights to third parties.

In addition, the Company is the exclusive official directory publisher of listings and classified advertisements for Qwest and has the exclusive right to use certain Qwest branding on directories in the markets Qwest serves through 2052. The Company also has the exclusive license to use Embarq's name and logo on directories in the markets Embarq serves through 2052. Similarly, the Company has an exclusive license to provide yellow pages directory services for AT&T as well as the exclusive right to use through 2054 the AT&T brand and logo on print directories in Illinois and Northwest Indiana. In addition to the foregoing, the Company is party to certain licensing agreements for subscriber listings and directory delivery lists with Qwest, Embarq, and AT&T. These agreements are non-exclusive, non-transferable restricted licenses of listing and delivery information for persons and businesses that order and/or receive local exchange telephone services in the relevant service areas at the prices set forth in the respective agreements. The terms of these licensing agreements are generally consistent with the term of the respective publishing agreements described above.

### 4. Raw Materials.

Paper is the principal raw material the Company uses in the publication of its print directories. It is one of the largest cost items, representing approximately 4% of net revenue for the year ended December 31, 2008. The Company depends on third-party vendors to supply the paper the Company requires to produce their print directories. Because of the volume and quality of paper the Company requires, there is a limited number of paper vendors capable of meeting the Company's supply requirements. The Company currently purchases large volumes of paper from four (4) paper companies: CellMark Paper, Inc. ("CellMark"); Kruger, Inc. ("Kruger"); Nippon Paper Industries USA, Co., Ltd. ("Nippon"); and Catalyst Paper (USA) Inc. ("Catalyst"). The Company's agreements with CellMark, Kruger, Nippon, and Catalyst each expire on December 31, 2009. Furthermore, the Company purchases paper used for the covers of directories from Tembec Paper Group ("Temboard"). Temboard is contractually obligated to provide 100% of the Company's annual cover stock at pre-negotiated prices for each basis weight. This agreement also expires on December 31, 2009. The Company intends to continue purchasing paper from one or more of these vendors for periods beginning after December 31, 2009.

### 5. Printing and Distribution.

#### (a) Printing

The Company also depends on third parties to print and distribute its print directories. Due to the large print volume and specialized binding of directories, only a limited number of companies are capable of servicing the Company's printing needs. The Company's directories are printed under its long-standing relationships with specialized printing vendors R.R. Donnelley & Sons Company ("R.R. Donnelley"), and Quebecor World (USA) Inc. ("Quebecor"). RHDC and R.R. Donnelley share a common heritage, but are not otherwise affiliated. In general, R.R. Donnelley prints all AT&T and Embarq directories and larger, higher-circulation Qwest directories, whereas Quebecor prints Qwest directories that are smaller and have a more limited circulation. The Company has a long-standing contract with Quebecor to print various of the Company's smaller-sized Qwest print directories and certain other print directories that have a more limited circulation. On or about January 21, 2008, Quebecor and certain of its affiliates filed voluntary petitions for Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. These cases are jointly administered under Case No. 08-10152-JMP. Despite its bankruptcy filing, Quebecor has continued to honor its printing contract with the Company. On June 19, 2008, the bankruptcy court entered an order authorizing Quebecor to assume the contract with the Company. On July 2, 2009, an order was entered confirming Quebecor's plan of reorganization. The Company's agreements with R.R. Donnelley and Quebecor extend through 2014 and 2015, respectively.

#### (b) Distribution of Print Directories

The physical delivery of directories is facilitated through several outsourcing relationships. Delivery methods utilized to distribute directories to consumers are selected based on factors such as cost, quality, geography and market need. As of the Petition Date, the Company had relationships with three (3) separate distribution companies for directory delivery

services. These contracts are scheduled to expire at various times through May 2010. In addition to these relationships, other delivery and distribution methods include the U.S. Postal Service, hand delivery and, on occasion, the United Parcel Service for expedited delivery needs. Due to the numerous geographic areas served by the Company, it is frequently necessary to use a combination of all available delivery services in order to distribute the Company's print directories.

(c)     Distribution of Online Content

The Company also relies on services of third-party agencies to deliver Internet traffic (leads) to its proprietary website, which contains its advertisers' content. The leads provided to the Company by these third-party agencies are critical to attract consumers to use the Company's products and ultimately the advertisers' services.

## 6.     Sales and Customer Care.

The Company acquires new customers and maintains long-term customer relationships through various sales, marketing, and distribution channels. The Company employs approximately 1,500 marketing consultants, who are assigned to local service areas. These marketing consultants work to establish personal, long-term relationships with local print and online advertisers. Local sales are divided into three channels: premise sales, telephone sales, and locally centralized sales. Premise sales conduct face-to-face sales meetings at the customer's business location for typically high dollar and complex accounts. Telephone sales tend to handle advertisers with lower spending levels and conduct business over the phone. Finally, locally centralized sales include multiple types of sale efforts, which are used to contact non-advertisers or provide service to advertisers with very low spending levels that in many cases have renewed their account for the same product over several years. The Company utilizes third-party Certified Marketing Representatives ("CMRs") for sales to national advertisers. As of the Petition Date, the Company utilized the services of approximately 165 CMRs.

## 7.     Employees.

The Company currently employs approximately 3,600 active employees, of whom approximately 1,500 are hourly employees and 2,100 are salaried employees. The employees' skills, knowledge, and understanding of the Company's businesses are among the Company's most valuable assets. In addition, the Company typically utilizes the services of approximately between 75 and 100 temporary workers on essentially a full-time basis (the "Temporary Workers"). In 2008, the Company reduced headcount by approximately 20%.

Approximately 1,150, or thirty-two percent (32%), of the employees are represented by unions and are covered by one of two collective bargaining agreements (the "CBAs") with DMI. The International Brotherhood of Electrical Workers of America ("IBEW") represents approximately 385 union employees, and the Communication Workers of America ("CWA") represents approximately 765 union employees. The CBA between DMI and the IBEW expired on May 8, 2009. Prior to that date, DMI and the IBEW were involved in extensive collective bargaining negotiations resulting in DMI presenting its last, best, and final offer to the IBEW bargaining committee on May 10, 2009 (the "Final Offer"). The Final Offer was ratified by the

union's membership effective June 12, 2009, and the new CBA went into effect immediately thereafter. The current CBA with the CWA expires on October 2, 2009. DMI is presently engaged with the CWA in similar collective bargaining negotiations.

### 8. Recent Operations.

As of June 30, 2009, the Company reported total assets having a book value of approximately $11.6 billion and total liabilities of approximately $12.6 billion. In addition, the Company had net revenues from continuous operations of (i) approximately $2.6 billion for the year ending December 31, 2008 and (ii) approximately $1.2 billion for the six months ending June 30, 2009. Approximately 85% of the Company's revenue is derived from the sale of advertising to local small and medium-sized business, and approximately 15% of the Company's revenue is derived from the sale of advertising to national or large regional companies, such as rental car companies, automobile repair shops and pizza delivery businesses, that purchase advertising in several of the Company's directories. The Company has experienced a drop in revenue due to the recent economic environment, trends in its industry, and an increase in competition and more fragmentation in the local business search market.

### 9. Corporate History and Business Acquisitions.

Founded in 1886 as The Chicago Directory Company, the Company was incorporated in New York in 1917 as the Reuben H. Donnelley Company ("R.H. Donnelley"). In 1961, R.H. Donnelley and The Dun & Bradstreet Corporation ("D&B") exchanged stock and R.H. Donnelley continued as a wholly-owned subsidiary of D&B. In November 1996, D&B separated through a spin-off into three separate public companies: D&B, ACNielsen Corporation, and Cognizant Corporation. In June 1998, D&B separated through a spin-off into two separate public companies: RHDC and a new company that changed its name to D&B.

In recent years, the Company has dramatically expanded its presence in the print directory business. On January 3, 2003, the Company completed the acquisition of the directory business of Sprint Nextel Corporation ("Sprint") (the "Embarq Acquisition"). On September 1, 2004, the Company completed the acquisition of the directory publishing business of AT&T Inc. in Illinois and Northwest Indiana, including AT&T's interest in DonTech II Partnership ("DonTech"), a 50/50 general partnership between the Company and AT&T (collectively, the "AT&T Directory Acquisition"). As a result of the AT&T Directory Acquisition, RHDC became the publisher of AT&T branded yellow pages in Illinois and Northwest Indiana. The purpose of both the Embarq Acquisition and the AT&T Directory Acquisition was to transform the Company from one of the largest independent sales agents and pre-press vendors for yellow pages advertising in the United States into a leading publisher of yellow pages directories.

On January 31, 2006, the Company acquired DMI. DMI is the exclusive publisher of the "official" yellow pages and white pages directories for Qwest Communications International Inc. ("Qwest") in markets where Qwest was the primary local exchange carrier in November 2002. DMI is the indirect parent of DME and DMW. By acquiring DMI, the Company further solidified its position as a leading publisher of print and online yellow pages and other local online search directories and products.

On September 6, 2006, the Company acquired Local Launch, Inc. ("Local Launch"), a local search products, platform and fulfillment provider (the "Local Launch Acquisition"). Through the Local Launch Acquisition, the Company sought to expand its local search engine marketing and search engine optimization offerings and to provide new, innovative solutions to enhance the Company's local search engine marketing and search engine optimization capabilities.

The Company also expanded its online presence by launching Internet directories, including *dexknows.com*, and by acquiring BDC, together with its wholly-owned subsidiary, Work.com, Inc. ("WDC"), on August 23, 2007. The BDC acquisition expanded the Company's existing interactive portfolio by adding leading internet advertising talent and technology, strengthened the Company's position in the growing local commercial search market and developed an online performance-based advertising network. BDC also provided the Company with the established B-to-B online properties of Business.com, Work.com and the Business.com Advertising Network. The Company is now one of the nation's leading consumer and B-to-B local commercial search companies.

**C.**     Management of the Debtors.

**1.**     **Board of Directors.**

The board of directors of RHDC (the "Board of Directors") currently consists of nine (9) members: E. Thayer Bigelow, Jr. (age 67), Robert Kamerschen (age 73), Thomas J. Reddin (age 48), Ron Rittenmeyer (age 62), Alan F. Schultz (age 50), David C. Swanson (age 54), David M. Veit (age 70), Barry Lawson Williams (age 65), and Edwina Woodbury (age 57). Seven of the current members of the Board of Directors were elected by RHDC's common stockholders, and two, Mr. Bigelow and Mr. Rittenmeyer, were appointed by the Board of Directors to fill vacancies and have not yet been up for election by RHDC's common stockholders. All members of the Board of Directors are independent, with the exception of Mr. Swanson, who is the Chief Executive Officer of RHDC.

RHDC's Board of Directors has four committees: (i) the Audit and Finance Committee, (ii) the Corporate Governance Committee, (iii) the Compensation and Benefits Committee, and (iv) the Restructuring Committee. The Audit and Finance Committee maintains oversight responsibilities with respect to accounting, auditing, financial reporting and internal control processes generally. The members of the Audit and Finance Committee are Mr. Bigelow, Mr. Rittenmeyer, Mr. Veit, and Ms. Woodbury (Chair). The Corporate Governance Committee assists the Board of Directors by overseeing, among other things, the composition of the Board of Directors and its committees' composition and the development, maintenance and evolution of corporate governance guidelines, policies and procedures. The members of the Corporate Governance Committee are Mr. Reddin, Mr. Schultz, and Mr. Williams (Chair). The Compensation and Benefits Committee maintains oversight responsibility with respect to, among other things, the compensation of officers and employees, as well as the Company's benefit programs. The members of the Compensation and Benefits Committee are Mr. Reddin, Mr. Schultz (Chair), and Mr. Williams. The Restructuring Committee was established to better facilitate the Company's restructuring analysis and execution process and to make itself available to management and its advisors, on an as needed basis, for the purpose of reviewing, analyzing

and facilitating any restructuring recommendations presented by management and the Company's advisors. The members of the Restructuring Committee are Mr. Kamerschen (Chair), Mr. Bigelow, Mr. Rittenmeyer, Mr. Swanson and Ms. Woodbury.

## 2. Compensation of Directors.

RHDC has standard compensation arrangements for its Board of Directors. Effective April 2009, each member of RHDC's Board of Directors receives an annual cash retainer of $75,000. Each member of RHDC's Audit and Finance Committee earns a supplement of $20,000 annually and each member of the Compensation and Benefits and Corporate Governance Committees earns a supplement of $15,000 annually. Each member of the Restructuring Committee earns a supplement of $8,000 quarterly. Additionally, the chair of the Audit and Finance Committee, Ms. Woodbury, earns a supplement of $25,000 annually. The chair of RHDC's Compensation and Benefits Committee, Mr. Schultz, and the chair of RHDC's Corporate Governance Committee, Mr. Williams, each earns a supplement of $15,000 annually. The Lead Director, Mr. Kamerschen, also earns a supplement of $75,000 annually. Finally, each member of RHDC's Board of Directors earns an additional $90,000 annually, payable at the end of the year in stock or cash, at the election of the Board.

## 3. Executive Officers.

Set forth below are the senior executive officers of RHDC as of the date of this Disclosure Statement and each officer's position within RHDC.

| Name | Position |
|---|---|
| David C. Swanson | Chairman of the Board and Chief Executive Officer |
| George F. Bednarz | Executive Vice President — Enterprise Sales and Operations |
| Steven M. Blondy | Executive Vice President and Chief Financial Officer |
| Sean W. Greene | Senior Vice President, Interactive |
| Tyler D. Gronbach | Senior Vice President of Corporate Communications and Administration |
| Mark W. Hianik | Senior Vice President, General Counsel and Corporate Secretary |
| Margaret LeBeau | Senior Vice President and Chief Marketing Officer |
| Gretchen Zech | Senior Vice President — Human Resources |
| Jenny L. Apker | Vice President and Treasurer |
| Sylvester J. Johnson | Vice President, Corporate Controller and Chief Accounting Officer |

## 4. Executive Compensation.

The Compensation and Benefits Committee determines the compensation of all of the Company's executive officers. Compensation of RHDC's named executive officers, as such term is defined in Item 402(a) of Regulation S-K promulgated under the Securities Exchange Act of 1934, as amended (the "NEOs"), is determined under the Company's compensation program

for senior executives.  This program is governed by the Compensation and Benefits Committee.[19]

In February 2009, the Compensation and Benefits Committee assessed and modified the executive compensation program.  In general, the 2009 compensation program has been structured with the same elements of the 2008 program (*i.e.* base salary, annual incentive plan and long-term incentive plan).  However, because of the dramatic decline in the Company's stock price during the latter part of 2007 and into 2008, as well as the challenging economic environment that the Company projected it would face for 2009, the Compensation and Benefits Committee awarded no increases in base salary, annual incentive target or total direct remuneration target to any NEO for 2009.  The Compensation and Benefits Committee also eliminated the use of equity awards at all levels of the organization, in favor of a cash-based long-term incentive plan, which is further described below.

**D.**     <u>Compensation and Benefits Programs.</u>

In the ordinary course of business, the Debtors have implemented a number of compensation and benefits programs, which are designed to reward the Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefits package.  Except and to the extent previously assumed by an order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Employee Benefit Plans, including the Employment and Retirement Benefit Agreements, of the Debtors, as amended or modified, including programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before, on or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed except for (i) executory contracts or plans specifically rejected pursuant to the Plan, and (ii) executory contracts or plans that have previously been rejected, are the subject of a motion to reject or have been specifically waived by the beneficiaries of any plans or contracts; <u>provided</u>, <u>however</u>, that (x) the Debtors shall pay all "retiree benefits" (as defined in Section 1114(a) of the Bankruptcy Code), (y) to the extent applicable, each of the Employment and Retirement Benefit Agreements shall be amended prior to (or upon) such assumption to provide that the implementation of the restructuring in accordance with the Plan shall not alone constitute "Good Reason" to terminate employment; and (z) notwithstanding anything to the contrary in Section 5.9.1 of the Plan, the assumption of Employee Benefit Plans not (i) listed on Exhibit C of the Noteholders Plan Term Sheet, or (ii) otherwise approved, authorized or assumed by an order of the Bankruptcy Court, shall be reasonably acceptable to a Majority of Consenting Noteholders.

Certain of these employee compensation and benefits programs are generally described below, with the blanket exception of insured and self-insured programs (*e.g.*, health plans), customary fringe benefit policies (*e.g.*, vacation, sick leave) and individual employment or similar agreements or arrangements.  The list of programs and descriptions set forth below is not, and is not intended to be, exhaustive or comprehensive.  All such plans and other programs are governed by applicable plan and program terms and conditions, as in effect or amended from

---

[19] Compensation provided to the NEOs for fiscal year 2008 is set forth in RHDC's Annual Report on Form 10-K/A for the year ended December 31, 2008.

time to time.  In addition, the Debtors reserve the right (i) to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law; and (ii) to file one or more motions to assume and/or implement these or such other compensation plans or agreements during the pendency of these cases as management and the Board, in consultation with their advisors, deem appropriate.  The Debtors expressly reserve their right, at any time prior to the Effective Date, to amend Exhibit 6.5 to the Plan to delete any executory compensation or benefits program therefrom or add any executory compensation or benefits program thereto, provided, however, that such amendment is reasonably acceptable to a Majority of Consenting Noteholders.

### 1.     Bonus Programs.

Prior to the Petition Date and in the ordinary course of business, the Debtors awarded certain bonuses/commissions to certain employees in order to recognize and encourage exceptional individual and overall Company performance (the "Production Bonuses").  The Production Bonuses are generally based on achievement of some pre-set performance metric (in most cases, sales targets) and are paid monthly or quarterly and, in some cases, annually in arrears.  The Debtors estimate that approximately 1,700 employees are currently eligible to receive Production Bonuses.

### 2.     Long-Term Incentive Program.

The 2009 Long-Term Incentive Program for Executive Officers and the 2009 Long-Term Incentive Program (the "2009 LTIPs") are cash-based plans designed to provide long-term incentive compensation to participants based on the achievement of stated performance goals.  Such performance goals include certain cumulative free cash flow targets and, in the case of the 2009 Long-Term Incentive Program for Executive Officers, the achievement of certain restructuring goals related to the Company's outstanding indebtedness and liabilities, in each case during the three-year performance period of 2009, 2010 and 2011.  The Compensation and Benefits Committee administers the 2009 LTIPs in its sole discretion and may, subject to certain exceptions, delegate some or all of its power and authority under the 2009 LTIPs to the Chief Executive Officer or other executive officer of the Company.

Participants in the 2009 LTIPs consist of (i) such executive officers of the Company and its affiliates as the Compensation and Benefits Committee in its sole discretion has selected in connection with the adoption of the 2009 LTIPs and may select from time to time and (ii) such other employees of the Company and its subsidiaries and affiliates as the Chief Executive Officer in his sole discretion may select from time to time.  The amount of each award under the 2009 LTIPs will be paid in cash and is dependent upon the attainment of the performance goals described above.

### 3.     Other Incentive Programs.

The 2009 Annual Incentive Plan ("AIP") is a cash-based plan designed to provide short-term incentive compensation to eight executive officers of the Company in order to align their interests with and motivate them to meet and exceed the Company's short-term financial and

operational goals. Awards under the AIP are subject to the Company's achievement of (i) pre-determined EBITDA and free cash flow targets and (ii) certain other operational performance targets to be determined in the sole discretion of the Compensation and Benefits Committee. The amount of each award under the 2009 AIP will be paid in cash and is dependent on the attainment of the foregoing measures during the 2009 fiscal year (the "AIP Performance Period").

The Company also maintains numerous additional annual incentive compensation plans for other employees, including for non-sales, non-bargaining unit employees, and for key employees of certain subsidiaries. Incentive awards under these plans generally will be paid in cash (or, in some cases, stock) following the end of the fiscal year and generally are subject to the achievement of corporate metrics (*e.g.*, EBITDA and/or free cash flow), individual or team-based goals, or some combination of corporate and individual or team-based metrics.

### 4. Executive Agreements.

In July 2008, the Board reached and approved an agreement with Mr. Swanson, the Company's CEO, which had two components. The first component was a grant of 300,000 restricted stock units, 50% of which vest upon Mr. Swanson's attaining age 55 and the remainder of which vest ratably over the three years following Mr. Swanson's 55th birthday. The second component was the Supplemental Agreement, which was entered into in December 2008. The Supplemental Agreement was to provide Mr. Swanson with a benefit that was limited to the smallest amount necessary to cause his annual retirement benefit from the Supplemental Agreement and all Company plans to yield a total single life annuity of $500,000 per year if Mr. Swanson were to retire at age 60, subject to specified vesting conditions. In April 2009, the Company and Mr. Swanson entered into an amendment to the Supplemental Agreement which increased this amount to $1,000,000. Such amendment also clarified that any transaction completed pursuant to or during the course of a restructuring, reorganization and/or recapitalization of all or a significant portion of the Company's outstanding indebtedness and liabilities would not constitute a change in control of the Company, and thus would not result in any accelerated vesting under the Supplemental Agreement. In addition, as of the Petition Date, the Company had entered into employment agreements with Mr. Swanson, Mr. Blondy, Ms. LeBeau, and Ms. Catherine Crump, the Company's Franchise Vice President - Sales Talent Development. These employment agreements, along with the Supplemental Agreement, will be assumed by the Company under the Plan.

### 5. Retirement Plans.

Retirement benefits are provided to employees through savings and pension plans sponsored either by the Debtors or by unions, which are generally described below (the "Employee Retirement Plans").

On October 21, 2008, the Compensation and Benefits Committee approved a comprehensive redesign of the Company's employee retirement savings and pension plans. Effective January 1, 2009, except as described below, the sole retirement benefit available to all non-union employees of the Company (other than those employed by BDC) will be provided through a single defined contribution plan (the "RHDC 401(k) Plan").

In connection with the redesign of the Debtors' employee retirement programs, all benefit accruals for non-union employees under the Company's pension plans ceased as of December 31, 2008. However, all participants' balances under the Employee Pension Plans remained intact and interest credits on participant account balances, as well as service credits for vesting and retirement eligibility, continue in accordance with the terms of the respective plans. The Debtors' redesign of their employee retirement program includes the provision of transition credits, which will be in the form of additional employer contributions by the Debtors under the RHDC 401(k) Plan over a period of five calendar years beginning with 2009, to certain plan participants nearing retirement who might otherwise lose a significant portion of their anticipated retirement benefits as a result of the freezing of the Company's pension plans.

(a)     The RHDC 401(k) Plan

The RHDC 401(k) Plan replaced the pre-existing RHDC and DMI 401(k) savings plans. Under the RHDC 401(k) Plan, RHDC contributes 100% for each dollar contributed by a participating employee, up to a maximum of 6% of each participating employee's salary (including bonus and commissions) and contributions made by RHDC are fully vested for participants who have completed one year of service with the Company.

(b)     The BDC 401(k) Plan

BDC employees continue to be eligible to participate in the BDC 401(k) plan until such time as the Company is able to efficiently transition them to the RHDC 401(k) Plan. Under the BDC 401(k) Plan, BDC contributes 100% for each dollar contributed by a participating employee, up to a maximum of 3% of each participating employee's salary (including bonus and commissions) and contributions made by BDC will now be fully vested for participants who have completed one year of service with the Company.

(c)     Union-only Plans

Because union employees may still participate in the DMI Employee Savings Plan and continue to accrue benefits under the DMI Pension Plan, a summary of each of these plans prior to the redesign is provided below.

(i)     DMI Pension Plan

The DMI Pension Plan is a defined benefit pension plan covering substantially all union employees within DMI. The underlying pension plan assets are invested in diversified portfolios consisting primarily of equity and debt securities.

(ii)    DMI Employee Savings Plan

For union employees under the DMI Employee Savings Plan, the Company contributes 81% of the first 6% of each participating employee's salary not to exceed 4.86% of eligible earnings for any one pay period. Matching contributions are limited to $4,860 per union employee annually.

### 6. Other Post-Retirement Benefit Programs.

(a) Supplemental Retirement Plans

In addition to the Employee Retirement Plans described above, the Debtors maintain a nonqualified defined contribution plan, the R.H. Donnelley 401(k) Restoration Plan, and a nonqualified defined benefit plan, the RHDC Pension Benefit Equalization Plan, each of which is intended to provide benefits to employees in excess of applicable IRS annual limits.

(b) Health Care and Life Insurance Continuation

The Debtors maintain a self-insured plan that provides different levels of medical, dental, vision and prescription drug programs to approximately 495 retired union and non-union former employees (collectively, the "Retiree Medical Benefits"). Medical coverage provided as part of the Retiree Medical Benefits is administered through Blue Cross Blue Shield of North Carolina. The Debtors also maintain a retiree life insurance plan that is provided by MetLife (the "Retiree Life Insurance"). The Retiree Life Insurance program provides benefits to approximately 495 retired former employees.

On October 21, 2008, the Compensation and Benefits Committee approved for non-union employees (i) the elimination of all non-subsidized access to retiree health care and life insurance benefits effective January 1, 2009, (ii) the elimination of subsidized retiree health care benefits for any Medicare-eligible retirees effective January 1, 2009 and (iii) the phase out of subsidized retiree health care benefits over a three-year period beginning January 1, 2009 (with all non-union retiree health care benefits terminating January 1, 2012). The new CBA with the IBEW similarly implements the foregoing changes. With respect to the phase out of subsidized retiree health care benefits, if an eligible retiree becomes Medicare-eligible at any point in time during the phase out process noted above, such retiree will no longer be eligible for retiree health care coverage.

(c) Severance Benefits

Prior to the Petition Date and in the ordinary course of business, the Debtors (except for BDC) maintained severance plans (the "Severance Programs") for certain of their union and non-union employees. Eligible employees' severance payments and benefits ("Severance") vary depending on several factors, including, whether the employee is an employee of RHDI or DMI, and whether the employee's employment is governed by a CBA; however, in general, upon a severable event, an employee is typically entitled to receive a cash benefit tied to length of service, employee's position and annual salary, as well as a continuation of health and life insurance benefits. The Debtors also maintain a severance plan applicable to individuals at the senior vice president level and above who are not provided severance benefits pursuant to an employment agreement. The Debtors sought and received authority from the Court to continue their Severance Programs under the CBAs, and after a hearing on June 25, 2009, the Court authorized the Debtors to continue Severance Programs to all of its non-insider employees.

### E. Prepetition Debt and Capital Structure of the Company.

Prior to the Petition Date, the Company obtained financing under certain senior secured bank facilities comprised of term loans and revolving credit facilities (the "Prepetition Secured Debt") and the issuance of unsecured notes (the "Prepetition Note Debt"). As of the Petition Date, the Company owed approximately $3,642,000,000 in outstanding aggregate principal amount on account of the Prepetition Secured Debt, plus accrued but unpaid interest with respect thereto. This amount is net of approximately $200 million in prepayments made to the Prepetition Lenders under the Debtors' prepetition secured credit facilities, as further described below. In addition, the Company owed as of the Petition Date approximately $6,028,700,000 in outstanding aggregate principal amount on account of the Prepetition Note Debt, plus any accrued but unpaid interest with respect thereto.

Prior to the Petition Date and in accordance with the terms and the effectiveness conditions of the Banks Support Agreements, (i) DME prepaid approximately $60,000,000 of indebtedness outstanding under the DME Prepetition Credit Agreement, consisting of approximately $5,000,000 prepaid on the DME Revolver, approximately $34,000,000 prepaid on DME Term Loan A and approximately $20,000,000 prepaid on DME Term Loan B; (ii) DMW prepaid approximately $63,000,000 of indebtedness outstanding under the DMW Prepetition Credit Agreement, consisting of approximately $5,000,000 prepaid on the DMW Revolver, approximately $7,000,000 prepaid on DMW Term Loan A and approximately $51,000,000 prepaid on DMW Term Loan B; and (iii) RHDI prepaid approximately $78,000,000 of indebtedness outstanding under the RHDI Prepetition Credit Agreement, consisting of approximately $9,000,000 prepaid on the RHDI Revolver and approximately $69,000,000 prepaid on RHDI Term Loans D-1/2.

## 1. Prepetition Secured Credit Obligations.

### (a) DME Prepetition Secured Debt

DME is the borrower under that certain Credit Agreement, dated as of October 24, 2007, among DMI, Dex Media East, Inc., and DME, as borrower, the lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent (the "DME Administrative Agent") (as amended, restated, supplemented or modified from time to time, the "DME Prepetition Credit Agreement"). The DME Prepetition Credit Agreement includes a revolving credit facility, a Term Loan A, and a Term Loan B and had as of the Petition Date an outstanding aggregate principal balance totaling approximately $1,101,000,000, comprised of:

(i) a revolving credit facility with an outstanding principal balance of approximately $92,000,000 (the "DME Revolver");

(ii) a term loan (the "DME Term Loan A") with an outstanding principal balance of approximately $631,000,000; and

(iii) a term loan (the "DME Term Loan B") with an outstanding principal balance of approximately $378,000,000.

The DME Revolver and the DME Term Loan A will both mature in October 2013, and the DME Term Loan B will mature in October 2014. The DME Prepetition Credit Agreement is

secured by liens and security interests on substantially all equity and the assets and property of Dex Media East, Inc., DME and Dex Media East Finance Co. – and all proceeds thereof – as well as the capital stock of Dex Media East, Inc., DME and Dex Media East Finance Co.

(b)    DMW Prepetition Secured Debt

DMW is the borrower under that certain Credit Agreement, dated as of June 6, 2008, among DMI, Dex Media West, Inc., and DMW, as borrower, the lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent (the "DMW Administrative Agent") (as amended, restated, supplemented or modified from time to time, the "DMW Prepetition Credit Agreement"). As of the Petition Date, the DMW Prepetition Credit Agreement had an outstanding aggregate balance totaling approximately $1,107,000,000 and provided for, among other things:

(i)    a revolving credit facility with an outstanding principal balance of approximately $85,000,000 (the "DMW Revolver");

(ii)    a term loan (the "DMW Term Loan A") with an outstanding principal balance of approximately $123,000,000; and

(iii)    a term loan (the "DMW Term Loan B") with an outstanding principal balance of approximately $899,000,000.

The DMW Revolver and DMW Term Loan A will mature in October 2013, and the DMW Term Loan B will mature in October 2014. The DMW Prepetition Credit Agreement is secured by liens and security interests on substantially all equity and the assets and property of Dex Media West, Inc., DMW and Dex Media West Finance Co. – and all proceeds thereof – as well as the capital stock of Dex Media West, Inc., DMW and Dex Media West Finance Co.

(c)    RHDI Prepetition Secured Debt

RHDI is the borrower under that certain Second Amended Credit Agreement, dated as of December 13, 2005, among RHDC, RHDI, as borrower, the lenders party thereto from time to time (the "RHDI Lenders"), and Deutsche Bank Trust Company Americas, as Administrative Agent (the "RHDI Administrative Agent") (as amended, restated, supplemented, or modified from time to time, the "RHDI Prepetition Credit Agreement"). As of the Petition Date, the RHDI Prepetition Credit Agreement – consisting of a revolving credit facility and Term Loans D-1/2 – had an outstanding aggregate principal balance totaling approximately $1,434,000,000, comprised of:

(i)    a revolving credit facility with an outstanding principal balance of approximately $165,000,000 (the "RHDI Revolver"); and

(ii)    two term loans (collectively, "RHDI Term Loans D-1/2") with an outstanding principal balance of approximately $1,269,000,000.

Approximately $71 million of the RHDI Revolver matures in December 2009, and $94 million of the RHDI Revolver matures in 2011. The RHDI Term Loans D-1/2 require accelerated amortization payments beginning in 2010 through their final maturity in June 2011. The RHDI Prepetition Credit Agreement is secured by liens and security interests on substantially all assets and property of RHDI and the RHDI Guarantor Debtors – and all proceeds thereof – as well as the capital stock of RHDI and RHDI's direct and indirect subsidiaries. In addition, RHDC is a guarantor of RHDI's obligations under the RHDI Prepetition Credit Agreement.

## 2. Prepetition Note Debt.

(a) RHDC Notes

RHDC issued five separate series of unsecured notes with an aggregate outstanding principal amount as of the Petition Date of approximately $3,212,000,000 (the "RHDC Notes"):

- 6.875% senior notes in the aggregate outstanding principal amount of approximately $207,000,000, due 2013;

- 6.875% series A-1 senior discount notes in the aggregate outstanding principal amount of approximately $304,000,000, due 2013;

- 6.875% series A-2 senior discount notes in the aggregate outstanding principal amount of approximately $458,000,000, due 2013;

- 8.875% series A-3 senior notes in the aggregate outstanding principal amount of approximately $1,013,000,000, due 2016; and

- 8.875% series A-4 senior notes in the aggregate outstanding principal amount of approximately $1,230,000,000, due 2017.

The RHDC Notes are not guaranteed by any Debtor.

(b) RHDI Notes

RHDI issued one series of unsecured notes, the 11.75% senior notes due 2015 (the "RHDI Notes"). The aggregate outstanding principal amount of the RHDI Notes as of the Petition Date was approximately $413,000,000. The RHDI Notes are guaranteed by RHDC and RHDI's subsidiaries: R.H. Donnelley APIL Inc., Get Digital Smart.com, Inc. R.H. Donnelley Publishing & Advertising, Inc., DonTech Holdings, LLC, RHD Publishing & Advertising of Illinois Holdings, LLC, DonTech II Partnership, and RHD Publishing & Advertising of Illinois Partnership.

(c) DMI Notes

DMI issued three series of unsecured notes with an aggregate outstanding principal amount as of the Petition Date of approximately $1,250,000,000 (the "DMI Notes"):

- 8% senior notes in the aggregate outstanding principal amount of approximately $500,000,000, due 2013; and

- two series of 9% senior discount notes in the aggregate outstanding principal amount of approximately $750,000,000, due 2013.

(d)    DMW Notes

DMW is obligated under three separate series of unsecured notes with an aggregate outstanding principal amount as of the Petition Date of approximately $1,156,000,000:

- 8.5% senior notes in the aggregate outstanding principal amount of approximately $385,000,000, due 2010;

- 5.875% senior notes in the aggregate outstanding principal amount of approximately $9,000,000, due 2011; and

- 9.875% senior subordinated notes in the aggregate outstanding principal amount of approximately $762,000,000, due 2013.

**3.    Intercompany Debt.**

(a)    Ordinary Course Claims

In the normal operations of the Debtors' businesses, the Debtors engage in intercompany transactions involving intercompany trade and intercompany capital needs. As a result, there are numerous intercompany claims that reflect intercompany receivables and intercompany payables made and/or accrued in the ordinary course of the Debtors' businesses. These intercompany transactions include, but are not limited to:

Accounts Receivable, Accounts Payable and Payroll. As discussed above, in the ordinary course of business, certain Debtors collect cash and disburse funds on behalf of other Debtors. The Debtors' accounts reflect the net position of both receipts and disbursements received or made on behalf of each Debtor. The Debtors account for this intercompany movement of cash in their intercompany books and records.

Centrally Billed Expenses. In the ordinary course of business, the Debtors incur centrally billed expenses, such as general overhead costs, employee benefits costs, digital traffic expenses, advertising commitments, insurance premiums, accounts payable processing, and certain taxes (including real estate, franchise, sales taxes, etc.). These charges are allocated among the Debtors and are reflected in the Debtors' intercompany books and records.

> Corporate Expense Allocation. Charges for corporate expenses provided among the Debtors are allocated among the Debtors based upon the cost of service provided, directly identifiable costs, and other allocation methods.

> Intercompany Loans. In the ordinary course of business, certain of the Debtors provide revolving loans to other Debtors in order to meet their liquidity needs. Such intercompany loans are reflected in the Debtors' books and records and are separately documented.

Accordingly, at any given time, there may be intercompany claims owing among the Debtors. The Debtors maintain records of all intercompany transactions and can ascertain, trace and account for all intercompany transactions.

(b)     Intercompany Loans

RHDC is the lender under that certain Loan Agreement, dated as of October 17, 2007, between DMI as borrower and RHDC as lender (the "RHDC Loan"). The RHDC Loan has a current outstanding principal balance of $300,000,000; an interest rate of 8.75%; and matures on October 17, 2017. The RHDC Loan is subordinated to the prior payment in full in cash of all obligations under the RHDC Notes.

In addition, on or about March 19, 2009, RHDI transferred $50 million to RHD Service, DME transferred $50 million to RHD Service, and DMW transferred $75 million to RHD Service, in each case by way of an intercompany loan (collectively, the "RHD Service Loan"). The RHD Service Loan was permissible under the relevant credit agreements and unsecured note indentures, as applicable. The $175 million loaned to RHD Service (the "RHD Service Cash") is not encumbered by liens in favor of the Administrative Agents and therefore does not constitute "cash collateral" within the meaning of Section 363(a) of the Bankruptcy Code. Accordingly, the RHD Service Cash is not subject to any provisions of the Final Cash Collateral Orders and is not encumbered by the adequate protection liens or claims granted to the Administrative Agents under such orders. On the Effective Date, in accordance with treatment to be provided to the Prepetition Lenders under the Plan, RHD Service shall repay in full the loans it received from each of RHDI, DME and DMW (together with any earnings realized by RHD Service on the investment of the proceeds of such loans) and such amounts shall be deposited into accounts in which the respective Agents have a perfected security interest in favor of the applicable Prepetition Lenders.

**4.      Trade Debt.**

As of the Petition Date, the Debtors had accrued approximately $20 million in trade debt. As demonstrated by the table below, only eight (8) of the twenty (20) Debtors had outstanding trade debt on the Petition Date. Therefore, the outstanding prepetition trade debt, primarily for goods such as paper and services such as shipping and distribution, constitutes a small percentage of the Debtors' overall prepetition debt profile. The Debtors expect that a significant portion of the overall trade debt will be payable to counterparties to executory contracts in connection with the Debtors' assumption thereof.

| Name of Debtor | Number of Scheduled Trade Claims | Amount of Scheduled Trade Debt |
| --- | --- | --- |
| BDC | 121 | $5,286,712.62 |
| Dex Media East, Inc. | 645 | $7,652,908.85 |
| Dex Media West, Inc. | 608 | $1,711,153.06 |
| DonTech II Partnership | 83 | $309,914.59 |
| RHDC | 35 | $375,562.84 |
| RHDI | 144 | $2,619,643.79 |
| R.H. Donnelley Publishing & Advertising of Illinois Partnership | 119 | $391,566.80 |
| R.H. Donnelley Publishing & Advertising, Inc. | 379 | $1,838,935.46 |

### 5. Equity of RHDC.

RHDC's certificate of incorporation authorizes the issuance of 400,000,000 shares of common stock, of which 68,359,949 shares were outstanding as of the Petition Date. As of the Petition Date, RHDC's common stock was traded over-the-counter on the Pink Sheets. In RHDC's Annual Report on Form 10-K/A for the year ended December 31, 2008, RHDC listed the following entities as beneficial owners of five percent (5%) or more of RHDC's common stock as of April 15, 2009: Doddsville Investments, LLC; Wells Fargo & Company; Kevin Douglas; Amalgamated Gadget, L.P.; Kinetics Asset Management, Inc.; Jack B. Corwin; and Goldman Sachs Asset Management. As of that date, all other Holders owned less than five percent (5%) of the outstanding common stock of RHDC. RHDC had no preferred stock outstanding as of the Petition Date.

### F. Post-Confirmation Debt and Capital Structure of the Company.

Through confirmation of the Plan, the Company will restructure its balance sheet, reduce its cash interest expense to a level that is better aligned with its expected future cash flows, retain additional flexibility to invest in growth initiatives to maximize enterprise value, and maintain very favorable pricing to the Company under the Prepetition Credit Facilities (as amended and restated). Under the terms of the Plan, the Company will (i) eliminate approximately $6.4 billion of indebtedness (including through payment of approximately $700 million of secured indebtedness) and $500 million of annual interest expense; (ii) provide the Prepetition Lenders with approximately $655 million of debt paydown (including the $200 million in principal that the Debtors paid down prior to the Petition Date), in addition to scheduled amortization and interest payments (subject to future Company cash flows); and (iii) the exchange of all Prepetition Note Debt for (a) 100% of the reorganized RHDC equity (subject to dilution pursuant to the Management Incentive Plan) and, (b) in the case of the Holders of the DMW 8.5% Senior Notes due 2010 and the DMW 5.875% Senior Notes due 2011, in addition to their allocable share of the reorganized RHDC equity, $300 million of new seven-year RHDC unsecured notes issued on a *pro rata* basis. Post-emergence, the Company anticipates that its secured and consolidated debt will be approximately $3.1 billion and $3.4 billion, respectively, which will represent 2.9x and 3.2x net secured and net consolidated leverage, respectively.

1. **Post-Confirmation Secured Debt.**

   (a) DME Post-Confirmation Secured Debt

Pursuant to the Plan, DME will repay a portion of the outstanding principal balance of the DME Revolver, the DME Term Loan A and the DME Term Loan B (the "DME Loans") on the Effective Date in an aggregate amount equal to approximately $75 million, subject to a formula specified in the applicable Banks Support Agreement (the "DME Effective Date Paydown Amount"). Such repayment shall be applied to the DME Loans and the DME Hedge Termination Payments *pro rata* based on the outstanding principal balance of each DME Loan and each DME Hedge Termination Payment.

The Plan will extend the maturity of the DME Revolver and the DME Term Loan A from October 2013 to October 2014. All commitments of the revolving lenders under the DME Prepetition Credit Agreement to make additional advances under the DME Revolver were terminated on the Petition Date, and all outstanding Revolving Loans will be converted to a new tranche of term loans. Letters of credit outstanding under the DME Prepetition Credit Agreement will remain outstanding and to the extent any amounts are drawn thereunder, such amounts will be added to the balance of the DME Revolver. The Plan will increase the interest rate applicable to the DME Revolver and the DME Term Loan A by 0.75% per annum to a floating rate of LIBOR plus 2.5% per annum or ABR plus 1.5% per annum (subject to step-downs in such margin based on the DME leverage ratio).

The maturity of the DME Term Loan B will remain October 2014. The Plan will increase the interest rate applicable to the DME Term Loan B by 0.50% per annum to a floating rate of LIBOR plus 2.5% per annum (subject to step-downs in such margin based on the DME leverage ratio).

Pursuant to the Plan, the DME Loans will amortize based on aggregate quarterly amortization payments of $27,250,000 through September 2011 and quarterly amortization payments of $36,000,000 thereafter through September 2014, with the remaining outstanding principal balance due at maturity. Pursuant to the Plan, commencing with the 2010 fiscal year, the DME Loans will also be subject to mandatory prepayments equal to 65% of annual excess cash flow of DME and its subsidiaries (subject to a step down in such percentage based upon the DME leverage ratio) and certain assets sales, debt issuances and equity issuances by DME and its subsidiaries and certain equity issuances by RHDC (subject to the leverage ratio test).

The DME Loans outstanding after giving effect to the Plan (the "DME Post-Confirmation Secured Debt") will be guaranteed by each domestic subsidiary of DME and by RHDC, DMI, RHD Service, BDC and certain hereafter formed or acquired subsidiaries of RHDC (such hereafter formed or acquired subsidiaries of RHDC, the "New RHDC Subsidiaries"). The DME Post-Confirmation Secured Debt will be secured by substantially all of the assets of DME, each domestic subsidiary of DME, RHDC (excluding its stock of RHDI), DMI and RHD Service. In the case of BDC and the New RHDC Subsidiaries, such guaranty may be subordinated to other indebtedness of such entity, and the collateral provided by such entity, if any, may be limited to its capital stock held by its holding company.

(b)     DMW Post-Confirmation Secured Debt

Pursuant to the Plan, DMW will repay a portion of the outstanding principal balance of the DMW Revolver, the DMW Term Loan A and the DMW Term Loan B (the "DMW Loans") on the Effective Date in an aggregate amount equal to approximately $180 million, subject to a formula specified in the applicable Banks Support Agreement (the "DMW Effective Date Paydown Amount").  Such repayment shall be applied to the DMW Loans and the DMW Hedge Termination Payments *pro rata* based on the outstanding principal balance of each DMW Loan and each DMW Hedge Termination Payment.

The Plan will extend the maturity of the DMW Revolver and the DMW Term Loan A from October 2013 to October 2014.  All commitments of the revolving lenders under the DMW Prepetition Credit Agreement to make additional advances under the DMW Revolver were terminated on the Petition Date, and all outstanding Revolving Loans will be converted to a new tranche of term loans.  The Plan will increase the interest rate applicable to the DMW Revolver and the DMW Term Loan A by 0.75% per annum to a floating rate of LIBOR plus 4.5% per annum (subject to step-downs in such margin based on the DMW leverage ratio).

The maturity of the DMW Term Loan B will remain October 2014.  The Plan will increase the interest rate applicable to the DMW Term Loan B by 0.50% per annum to a floating rate of LIBOR plus 4.5% per annum or ABR plus 3.5% per annum (subject to step-downs in such margin based on the DMW leverage ratio).

Pursuant to the Plan, the DMW Loans will amortize based on aggregate quarterly amortization payments of $5,625,000 in March 2010, $7,250,000 from June 2010 through March 2012 and $8,875,000 from June 2012 through September 2014, with the remaining outstanding principal balance due at maturity.  Pursuant to the Plan, commencing with the 2010 fiscal year, the DMW Loans will also be subject to mandatory prepayments equal to 65% of annual excess cash flow of DMW and its subsidiaries (subject to a step down in such percentage based upon the DMW leverage ratio) and certain assets sales, debt issuances and equity issuances by DMW and its subsidiaries and certain equity issuances by RHDC (subject to the leverage ratio test).

The DMW Loans outstanding after giving effect to the Plan (the "DMW Post-Confirmation Secured Debt") will be guaranteed by each domestic subsidiary of DMW and by RHDC, DMI, RHD Service, BDC and the New RHDC Subsidiaries.  The DMW Post-Confirmation Secured Debt will be secured by substantially all of the assets of DMW, each domestic subsidiary of DMW, RHDC (excluding its stock of RHDI), DMI and RHD Service.  In the case of BDC and the New RHDC Subsidiaries, such guaranty may be subordinated to other indebtedness of such entity, and the collateral provided by such entity, if any, may be limited to its capital stock held by its holding company.

(c)     RHDI Post-Confirmation Secured Debt

Pursuant to the Plan, RHDI will repay a portion of the outstanding principal balance of the RHDI Revolver and the RHDI Term Loans D-1/2 (the "RHDI Loans") on the Effective Date in an aggregate amount equal to approximately $200 million, subject to a formula specified in the applicable Banks Support Agreement (the "RHDI Effective Date Paydown Amount").  Such

repayment shall be applied to the RHDI Loans and the RHDI Hedge Termination Payments *pro rata* based on the outstanding principal balance of each RHDI Loan and each RHDI Hedge Termination Payment.

The Plan will extend the maturity of a portion of the RHDI Revolver from December 2009 to October 2014 and will extend the maturity of the remainder of the RHDI Revolver and the RHDI Term Loans D-1/2 from June 2011 to October 2014. All commitments of the revolving lenders under the RHDI Prepetition Credit Agreement to make additional advances under the RHDI Revolver were terminated on the Petition Date, and all outstanding Revolving Loans will be converted to a new tranche of term loans. The Plan will increase the interest rate applicable to the RHDI Loans to a floating rate of LIBOR plus 6.25% per annum or ABR plus 5.25% per annum (subject to a step down in such margin based upon the RHDI leverage ratio).

Pursuant to the Plan, the RHDI Loans will amortize quarterly in aggregate installments as follows: 2010 - $50,000,000; 2011 - $50,000,000; 2012 - $60,000,000; 2013 - $70,000,000; and 2014 - $70,000,000. Pursuant to the Plan, commencing with the 2010 fiscal year, the RHDI Loans will also be subject to mandatory prepayments equal to 60% of annual excess cash flow of RHDI (subject to a step down in such percentage based upon the RHDI leverage ratio) and certain assets sales, debt issuances and equity issuances by RHDI and its subsidiaries and certain equity issuances by RHDC (subject to the leverage ratio test).

The RHDI Loans outstanding after giving effect to the Plan (the "RHDI Post-Confirmation Secured Debt") will be guaranteed by each domestic subsidiary of RHDI and by RHDC, DMI, RHD Service, BDC and the New RHDC Subsidiaries. The RHDI Post-Confirmation Secured Debt will be secured by substantially all of the assets of RHDI, each domestic subsidiary of RHDI, RHDC, DMI (excluding its stock of DME and DMW) and RHD Service. In the case of BDC and the New RHDC Subsidiaries, such guaranty may be subordinated to other indebtedness of such entity, and the collateral provided by such entity, if any, will be limited to its capital stock held by its holding company.

## 2. Post-Confirmation Note Debt.

Following emergence from chapter 11, the Company's outstanding note debt shall consist of only $300,000,000 in aggregate principal amount of unsecured notes issued by RHDC which will be due on the seventh anniversary of the date of issuance (the "New RHDC Notes"). The New RHDC Notes shall be issued on a *pro rata* basis to the Holders of the DMW 8.5% Senior Notes due 2010 and the DMW 5.875% Senior Notes due 2011. Interest under the New RHDC Notes will be paid semi-annually beginning March 31, 2010 at the Company's election (for any interest period) either (i) 7% in cash and 7% paid-in-kind ("PIK") or (ii) 12% in cash. PIK interest will be paid at the maturity of the New RHDC Notes or at the time of any optional redemption. The New RHDC Notes may be redeemed at the Company's option at any time after the first anniversary of the Effective Date at the redemption rates (expressed as a percentage of principal amount of New RHDC Notes, including any principal amount of New RHDC Notes issued as PIK interest, to be redeemed) set forth below (plus all accrued and unpaid interest, which will be paid in cash):

Months Following Effective Date                    Redemption %

| | |
|---|---|
| 12-24 | 106% |
| 25-36 | 102% |
| 37-48 | 101% |
| After 48 months | 100% |

In addition, the New RHDC Notes will contain customary affirmative and negative covenants, which will only apply to RHDC and, to the extent permitted under the Senior Credit Facilities (as such term is defined in the Noteholders Support Agreement), existing subsidiaries of RHDC.  Affirmative covenants include limitations on the incurrence of additional indebtedness other than the following:

(i) $140 million in additional indebtedness for borrowed money and guarantees thereof, subject to customary exceptions;

(ii) non-recourse debt to finance acquisitions (including purchase money debt) and/or non-recourse debt assumed in acquisitions;

(iii)  (a) recourse debt to finance acquisitions and/or debt assumed in acquisitions of a target with principal lines of business that include print directory publishing and/or the sale of print directory advertising (as further defined in the applicable indenture governing the New RHDC Notes), solely to the extent that *pro forma* leverage after giving effect to the incurrence or assumption of such indebtedness is 5.5x or lower; and

(b) recourse debt to finance acquisitions and/or debt assumed in acquisitions of a target having principal lines of business that are the same as one or more lines of business conducted by Debtors on the Effective Date, but are not print directory publishing and/or the sale of print directory advertising (as further defined in the applicable indenture governing the New RHDC Notes), solely to the extent that *pro forma* leverage after giving effect to the incurrence or assumption of such indebtedness is 5.5x or lower; provided, however, that solely with respect to this clause (b) the holders of the New RHDC Notes will have the option to cause RHDC to redeem such holders' New RHDC Notes at a price equal to 101% of the principal amount thereof (plus accrued and unpaid interest) upon consummation;

(iv) refinancings of existing RHDC debt or debt of any of its subsidiaries (provided that the principal amount of any such debt shall not be increased in connection with the refinancing thereof);

(v) unsecured intercompany debt (which will be subordinate to payment in full in cash of the New RHDC Notes); and

(vi) starting in 2011, any incremental indebtedness that may be incurred to the extent that *pro forma* leverage after giving effect to such indebtedness is 4.25x or lower,

provided that such incremental indebtedness shall be (x) *pari passu* or junior in right of payment to the New RHDC Notes, (y) unsecured, and (z) subject to anti-layering provisions.

Any permitted debt incurred as provided above (other than such debt described in the foregoing clauses (ii), (iii) only with respect to assumed debt and (v)) shall be subject to the following "most favored nations" terms:

If holders of a majority in principal amount of the then outstanding New RHDC Notes (the "Majority Noteholders") determine, in their discretion, that the effective yield to maturity (taking into account, without limitation, interest rates, commitment fees, arranger fees, upfront fees, original issue discount, prepayment fees and other fees of a similar nature) of any such debt described in the foregoing clauses (i), (iii) (other than assumed debt, or (vi) that is senior to (in the case of clauses (i) and (iii)) or *pari passu* with (in the case of clauses (i), (iii), and (vi)) the New RHDC Notes, is higher than that of the New RHDC Notes, the Majority Noteholders shall have the option to amend the terms of the New RHDC Note documents in order to cause the effective yields of maturity of such debt and the New RHDC Notes to be equal.

Customary negative covenants include negative pledge provisions, to the extent permitted under the Senior Credit Facilities (as such term is defined in the Noteholders Support Agreement). The New RHDC Notes will also contain customary events of default, including but not limited to payment defaults, covenant non-compliance, bankruptcy, and cross acceleration with respect to the Senior Credit Facilities (as such term is defined in the Noteholders Support Agreement). The New RHDC Notes will be subject to mandatory prepayment offer at par upon a change in control of the Company. Final documentation setting out the terms of the New RHDC Notes will be included in the Plan Supplement.

The New RHDC Notes will be freely tradeable under Section 1145 of the Bankruptcy Code. To the extent that any of the New RHDC Notes are not freely tradeable under such Section, the holders thereof will have customary demand and S-3 registration rights where any such registration statement would cover both the New RHDC Notes and the New RHDC Common Stock.

### 3. Post-Confirmation Intercompany Debt.

In accordance with the terms of (a) the Court's Order (I) Authorizing the Debtors to Continue Using Their Existing Cash Management System, (II) Authorizing the Continued Use of Existing Bank Accounts and Business Forms, (III) Authorizing the Continuation of Certain Intercompany Transactions, (IV) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (V) Granting Administrative Expenses Status to Post-Petition Intercompany Transactions, dated as of June 1, 2009, which permitted the Debtors to continue using their Cash Management System, and (b) the Plan, all postpetition ordinary course intercompany debt will receive administrative expense priority. The prepetition RHDC Loan will be discharged and will receive no distribution, and the RHD Service Loan (together with any earnings realized by RHD Service on the investment of the proceeds of the RHD Service Loan) will be repaid in full on the Effective Date of the Plan, in accordance with the terms of the Banks Support Agreements. There will be no material post-confirmation intercompany loans.

**4.      Post-Confirmation Equity in RHDC.**

After confirmation of the Plan, Holders of the Prepetition Note Debt will own 100% of the common stock of Reorganized RHDC (subject to dilution by the Management Incentive Plan).  The Plan does not provide for issuance of any preferred stock as of the Effective Date.

**G.      Pending Litigation Against the Debtors.**

As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to Section 362 of the Bankruptcy Code.

The Company is involved in various legal proceedings arising in the ordinary course of business, as well as certain litigation and tax matters.  In many of these matters, plaintiffs allege that they have suffered damages from errors or omissions in their advertising or improper listings, in each case, contained in directories published by the Company.  The Company also is exposed to potential defamation and breach of privacy claims arising from its publication of directories and methods of collecting, processing and using advertiser and telephone subscriber data.

The Company periodically assesses its liabilities and contingencies in connection with these matters based upon the latest information available to it.  Based on its review of the latest information available, the Company believes its ultimate liability in connection with pending or threatened legal proceedings will not have a material effect on its results of operations, cash flows or financial position.

The Debtors anticipate that, to the extent any pending litigation is not resolved prior to the Effective Date of the Plan (including through the claims allowance process during the Chapter 11 Cases) or removed by the Debtors to federal court consistent with their powers under the Bankruptcy Code, such litigation will continue after the Effective Date in the forum(s) in which it was initiated.  Any adverse judgment against or liability of the Debtors arising out of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan and the Bankruptcy Code.

**H.      Events Leading up to Chapter 11.**

The Company's operating performance depends upon its ability to generate revenues from advertising sales.  Beginning in 2008, the Company has experienced lower advertising sales primarily as a result of declines in recurring business (both renewal and increases from existing advertisers), mainly driven by weaker economic trends, reduced consumer confidence and more cautious advertiser spending in the Company's markets.  Advertising sales have also been impacted by an increase in competition and more fragmentation in the local business search market.  In addition, the Company has been experiencing adverse bad debt trends attributable to many of these same economic challenges in its markets.  Through the second quarter of 2009, the Company's gross advertising revenues declined $95.7 million, or 14.4%, compared to the second quarter of 2008.  The Company's adjusted EBITDA in the second quarter of 2009 was down $72.9 million, or 20%, compared to the second quarter of 2009.

In response to these economic challenges, the Company continues to actively manage expenses and has enacted several initiatives to streamline operations and contain costs. In addition, the Company has invested in its future through initiatives such as new sales force automation, an advertiser self service system and portal, new mobile and voice search platforms, and associated employee training.

The decline in revenues has been particularly challenging because, as of the Petition Date, the Company had a substantial amount of debt outstanding and significant near-term debt service obligations, due in large part to financings associated with prior acquisitions. As of the Petition Date, the Company had total outstanding funded debt of approximately $9.7 billion. Absent the filing of these Chapter 11 Cases, the Company was facing cash interest expense of approximately $400 million in connection with unsecured bond debt, and approximately $1.39 billion in principal payments on unsecured and secured debt due in 2010. Notwithstanding the Company's aggressive efforts to enhance revenue and cut expenses, the impact of an unprecedented economic downturn coupled with a highly leveraged balance sheet left the Company with significant liquidity challenges.

Faced with declining advertising revenues and the need to address near-term debt maturities and amortization payments, prior to the Petition Date the Company engaged in extensive discussions about a potential balance sheet restructuring with parties representing its Noteholders and the Prepetition Lenders. In furtherance of those discussions, on May 14, 2009, the Company entered into forbearance agreements with certain of its Noteholders and Prepetition Lenders with respect to the consequences of the expiration of the 30-day grace period relating to a $55 million interest payment on Series A-4 of RHDC's senior unsecured notes. The relevant interest payment was due and payable on April 15, 2009, and the 30-day grace period for such payment expired on May 15, 2009. Those Noteholders and Prepetition Lenders party to the forbearance agreements agreed not to pursue their rights and remedies under the applicable debt agreements relating to such interest payment through May 28, 2009, while the parties continued to negotiate the terms of an overall restructuring. Additionally, counsel for the Consenting Noteholders informed Debtors that the Notes Indenture Trustees were directed by a required percentage of the Noteholders not to pursue rights and remedies under the applicable Notes Indentures.

After several weeks of active and arm's-length negotiations, the Company, in consultation with its advisors, reached prepetition agreements in principle with a substantial majority of Noteholders and the Company's Prepetition Lenders on a pre-arranged restructuring plan. The terms of the Company's pre-arranged restructuring plan are evidenced by (i) Banks Support Agreements executed by the Company and certain of the Prepetition Lenders holding well in excess of two-thirds (2/3) in principal amount and one-half (1/2) in number of claims under each of the RHDI, DME, and DMW Prepetition Credit Facilities and (ii) the Noteholders Support Agreement executed by the Company and Noteholders holding in excess of a majority of the aggregate principal amount of the Prepetition Note Debt. The Plan Support Agreements, together with the applicable terms sheets, form the basis for the Plan.

Pursuant to the Banks Support Agreements, the RHDI Lenders, the DME Lenders and the DMW Lenders party thereto agree, among other things, (i) to vote to accept the Plan so long as it is consistent with the treatment summarized in the RHDI Lenders Plan Term Sheet, the DME Lenders Plan Term Sheet and the DMW Lenders Plan Term Sheet, respectively; and (ii) not to transfer any claim under the relevant credit agreement except to a transferee who agrees to be bound by the applicable Banks Support Agreement. Pursuant to the Noteholders Support Agreement, the Consenting Noteholders agree, among other things, (i) to vote to accept the Plan so long as it is consistent with the treatment summarized in the Noteholders Plan Term Sheet and (ii) not to transfer any Noteholders Claim except to a transferee who agrees to be bound by the Noteholders Support Agreement. Each Plan Support Agreement is subject to certain material conditions and may be terminated upon the occurrence of certain events in accordance with its terms.

Under each Banks Support Agreement, among other things, (a) the Confirmation Order and Voting Procedures Order are required to be in form and substance reasonably acceptable to the administrative agent under the relevant credit agreement and (b) the following documents or items are required to be in form and substance reasonably acceptable to the administrative agent and requisite lenders under the relevant credit agreement: (i) the Amended and Restated RHDI Credit Agreement, the Amended and Restated DME Credit Agreement or the Amended and Restated DMW Credit Agreement, as applicable; and (ii) the Amended and Restated RHDI Lenders Guaranty & Collateral Agreement, the Amended and Restated DME Lenders Guaranty & Collateral Agreement and the Amended and Restated DMW Lenders Guaranty & Collateral Agreement, as applicable, and all related security agreements, intercreditor agreements and other closing documents.

In consideration of the obligation of the Consenting Noteholders to vote to accept the Plan, the Company has granted to the Consenting Noteholders significant rights of approval or consultation relating to the Plan, the Plan Related Documents and related matters and documents pursuant to the Noteholders Support Agreement. In the event that the Company materially breaches its obligations under the Noteholders Support Agreement, the Majority of Consenting Noteholders may under certain circumstances terminate the Noteholders Support Agreement (and the obligations of the Consenting Noteholders thereunder, including their obligation to vote to accept the Plan) in accordance with its terms.

In accordance with the terms of the Noteholders Support Agreement and the Noteholders Plan Term Sheet, among other things, the following documents or items, including any modification, supplement or amendment thereto, are required to be in form and substance reasonably acceptable or acceptable, as the case may be, to a Majority of Consenting Noteholders: (i) the Plan; (ii) the Disclosure Statement; (iii) the Plan Related Documents (including the Amended and Restated Credit Documents and the Confirmation Order and the solicitation materials); (iv) the Plan Supplement; (v) the Exhibits; (vi) the Corporate Governance Documents, as defined in the Noteholders Support Agreement (including the Certificate of Incorporation, the By-Laws, the Registration Rights Agreement and any stockholders agreement); (vii) the New RHDC Notes; (viii) the Management Incentive Plan; and (ix) any Restructuring Transaction entered into or undertaken on or prior to the Effective Date. In

addition, the Company is required to consult with the Consenting Noteholders on a number of matters.[20]

Consistent with the terms of the Noteholders Support Agreement, section 9.2.3 of the Plan provides that, as a condition to the Effective Date, all fees and expenses of counsel and the financial advisor to the Consenting Noteholders (collectively, the "Consenting Noteholders Advisors"), as well as the out-of-pocket expenses of the Consenting Noteholders, incurred prior to the Confirmation Hearing in connection with the restructuring of the Debtors, shall have been paid in full in cash. The Debtors anticipate that the Consenting Noteholders Advisors' fees and the out of pocket expenses of the Consenting Noteholders shall be paid through (a) the granting, pursuant to the terms of the Confirmation Order, of a substantial contribution claim to the Consenting Noteholders allowing for the payment of the Consenting Noteholders Advisors' fees and the out of pocket expenses of the Consenting Noteholders, or (b) such other appropriate mechanism to comply with section 9.2.3 of the Plan as agreed upon by the Debtors and a Majority of Consenting Noteholders. Provided that the Consenting Noteholders and the Consenting Noteholders Advisors have, in the Debtors' reasonable judgment, continued during the course of the Chapter 11 Cases (as they did prior to the commencement of the Chapter 11 Cases) to act in accordance with the Noteholders Support Agreement, the Debtors will support the foregoing mechanisms in order to satisfy section 9.2.3 of the Plan.

The Consenting Noteholders are the following entities: (i) Aegon USA Investment Management, LLC; (ii) James E. Douglas III, the James Douglas and Jean Douglas Irrevocable Descendant's Trust, the K&M Douglas Trust, and the Douglas Family Trust; (iii) Franklin Advisers, Inc., and (iv) Mast Capital Management, LLC. For the avoidance of doubt, Pacific Investment Management Company LLC is not a Consenting Noteholder.

Prior to the Petition Date and in accordance with the terms and the effectiveness conditions of the Banks Support Agreements, the Company made approximately $200 million in prepayments to the Prepetition Lenders. As of the Petition Date, the Company had approximately $300 million in cash on hand. This cash on hand included the RHD Service Cash transferred by RHDI, DME, and DMW to RHD Service on or about March 19, 2009, as permitted by the relevant credit agreements and Note Indentures, as applicable. While the RHD Service Cash did not constitute cash collateral, the Company negotiated for the consensual use of the remaining cash on hand with its Prepetition Lenders. The Company's businesses also continue to generate significant cash flow. As such, the Company has not sought, nor does it intend to seek, approval of any "debtor in possession" financing and does not anticipate it will need exit financing in these Chapter 11 Cases. The Company's pre-arranged restructuring plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously.

---

[20] This is a summary of certain of the material terms and provisions of the Restructuring Support Agreements and does not purport to be complete and is subject to, and is qualified in its entirety by, (i) all of the terms and provisions of the Banks Support Agreements attached hereto as Exhibit B and (ii) all of the terms and provisions of the Noteholders Support Agreement attached hereto as Exhibit C.

## IV. EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. These Chapter 11 Cases have been assigned to United States Bankruptcy Judge Kevin Gross and have been administratively consolidated under case number 09-11833 (KG). The following is a brief description of certain major events that have occurred during the Chapter 11 Cases.

**A.**     Joint Administration of Debtors' Chapter 11 Cases.

On the Petition Date, the Debtors filed the Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion"), which requested procedural consolidation of these Chapter 11 Cases for ease of administration. The Bankruptcy Court approved the Joint Administration Motion on June 1, 2009.

**B.**     Other First-Day Relief.

On the Petition Date, the Debtors also filed "first-day" motions seeking authority to, among other things, (i) prohibit utility companies from discontinuing, altering, or refusing service; (ii) make tax payments to federal, state and local taxing authorities on an uninterrupted basis; (iii) pay certain prepetition claims of shippers and other lien claimants; (iv) make payments to certain prepetition creditors that are vital to the Debtors' uninterrupted operations; (v) continue prepetition insurance programs and pay all premium installments outstanding in connection therewith; (vi) honor prepetition obligations to certain customers and certified marketing representatives and continue customer programs; (vii) pay prepetition wages and other benefits to their employees; (viii) continue use of their existing cash management system, bank accounts and business forms; and (ix) for authority to continue using cash collateral. All of the Debtors' first-day motions were granted by the Bankruptcy Court in substantially the manner requested by the Debtors on an interim or final basis.

### 1. Utility Services.

In connection with the operation of their businesses and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, natural gas, local and long-distance telephone service, data service, solid waste disposal and other similar services. Because uninterrupted utility services are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts, the Debtors requested entry of (i) a bridge order and (ii) a final order (a) prohibiting the utility providers from altering, refusing, or discontinuing service to the Debtors on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (b) providing that the utility providers have "adequate assurance of payment" within the meaning of Section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtors' establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtors' estimated monthly cost of utility service; and (c) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the utility providers (the "Utility Motion"). The Bankruptcy Court entered a bridge order dated as of June 1, 2009, and a final order dated as of June 25, 2009.

### 2.      Payment of Federal, State and Local Taxes.

On the Petition Date, the Debtors filed a motion seeking authority to pay prepetition sales, use, property, franchise and other taxes and governmental charges (the "Tax Motion"). Through the Tax Motion, the Debtors sought the authority to pay any accrued and unpaid liabilities for prepetition taxes in the ordinary course of business up to an aggregate amount not to exceed $5.50 million.  The order, dated as of June 1, 2009, granted the Debtors the authority to pay any accrued and unpaid prepetition Taxes in an amount up to $5.50 million.

### 3.      Shippers and Other Lien Claimants.

The Debtors, in the ordinary course of their business, frequently rely on third-party common carriers (the "Shippers") to transport the printed directories to third-party vendors who distribute the directories on behalf of the Debtors.  On the Petition Date, the Debtors sought authority (i) to pay certain of the Shippers' prepetition claims, at their discretion, and (ii) to pay the prepetition claims of certain third-parties who, under applicable state law, could have asserted liens or had the potential to assert liens against the Debtors and their property if their claims were not satisfied (the "Lien Claimants"), at their discretion (the "Shippers and Lien Claimants Motion").  By order dated as of June 1, 2009, the Court granted the Debtors the authority, at their discretion, to satisfy the prepetition claims of the Shippers and Lien Claimants. The order granted authority to the Debtors to pay up to $1 million per Shipper and Lien Claimant.

### 4.      Critical Trade Vendor Treatment and Payment of Priority Claims.

As part of their "first day" relief, the Debtors sought the authority to pay the prepetition claims of certain vendors (the "Critical Vendors") where a failure to pay such creditor's prepetition claims would have a material impact on the Debtors' operations  (the "Critical Vendor Motion").  The Court approved the Critical Vendor Motion by order dated as of June 1, 2009.  Payments to the Critical Vendors were authorized in a total amount not to exceed $17 million.  Under the terms of the Critical Vendor Order, in return for payment of their prepetition claims, such Critical Vendors must have provided the Debtors with terms that were as, or more, favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Debtors and the Critical Vendors in the six (6) months prior to the Petition Date or such other favorable trade terms as were agreed upon by such parties.

### 5.      Continuation and Payment of Prepetition Insurance.

On the Petition Date, the Debtors filed a motion requesting the authority to (i) continue prepetition insurance programs and (ii) pay all prepetition obligations in respect thereof (the "Insurance Motion").  By order dated as of June 1, 2009, the Bankruptcy Court authorized the Debtors to (a) pay any prepetition premium payments as necessary; (b) perform any other prepetition obligations that may be necessary to maintain the Insurance Policies (as defined in the Insurance Motion); (c) pay the 2008 Adjustment Amount (as defined in the Insurance Motion); and (d) pay all premium adjustment amounts that may come due under certain Zurich Policies.  The ability to continue payments under their policies was necessary to ensure that the Debtors maintained essential insurance coverage on favorable terms.

### 6. Customer Programs.

Prior to the Petition Date, the Debtors engaged in customer programs to develop and sustain a positive reputation with their customers and in the general marketplace for the Debtors' products and services. The Debtors believe that these customer programs assisted, and will continue to assist, them in retaining current customers, attracting new customers, and, ultimately, increasing revenues. Accordingly, through the Motion of the Debtors for Order Authorizing, but not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business (the "Customer Motion"), filed on the Petition Date, the Debtors requested Bankruptcy Court authorization to (i) continue certain prepetition customer programs, such as adjustments and credits to resolve customer claims, honoring pre-paid obligations, and honoring obligations under certain affiliate and barter agreements; (ii) maintain their relationships with certain Certified Marketing Representatives (as defined in the Customer Motion); and (iv) perform any prepetition obligations that the Debtors may owe the Certified Marketing Representatives. The relief requested in the Customer Motion was granted in an order dated as of June 1, 2009.

### 7. Employee Compensation and Benefits.

On the Petition Date, the Debtors filed a motion seeking court authority to continue, among other things, to (i) pay employee wages, salaries, commissions, and other compensation, (ii) pay all prepetition compensation owed to certain temporary workers, (iii) make all payments for which prepetition payroll and tax deductions were made; (iv) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course; (v) honor workers' compensation obligations; and (vi) make all payments to third-parties relating to the foregoing payments and contributions, among other relief (the "Employee Wage Motion"). Specifically, on average the Debtors spend approximately $28.3 million per month in employee wages, of which 98% is paid electronically. Because most of the Debtors' employees are paid in arrears, as of the Petition Date there was approximately $6 million in unpaid, prepetition wages. In addition to the unpaid wages, the Debtors' employees regularly submit expense reports to the Debtors, which the Debtors then pay through the normal payroll process. As of the Petition Date, there was approximately $2.25 million of reimbursable expenses outstanding and approximately $74,000 outstanding in connection with various federal, state and local taxes withheld from the employees' wages. In addition, as of the Petition Date, amounts were also outstanding in connection with various benefit programs maintained by the Debtors for their employees, including employee health care programs, vacation, sick day and holiday benefits, employee savings plans, disability and other types of insurance, retiree medical programs and workers compensation. The Debtors also requested the authority to pay each of the aforementioned prepetition obligations. By order dated as of June 1, 2009, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested by the Debtors. In addition, the Debtors requested authority to continue certain prepetition employee benefit programs, including a severance program. By order dated as of June 25, 2009, the Court allowed the Debtors to continue these prepetition programs.

8.      **Cash Management.**

Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "Cash Management System") to collect funds from their operations and to pay operating and administrative expenses in connection therewith. In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) approving the Cash Management System; (ii) authorizing the continued use of their existing, prepetition bank accounts and business forms; (iii) waiving the requirements of Section 345(b) in connection therewith on an interim basis; and (iv) granting administrative priority status to postpetition intercompany claims between and among the Debtors (the "Cash Management Motion"). By order dated as of June 1, 2009, the Court approved the Cash Management Motion and waived the requirements of Section 345(b) on an interim basis. By order dated September 30, 2009, the Court further extended the interim waiver of the requirements of Section 345(b) through and including June 30, 2010, without prejudice to the Debtors' right to seek a further interim waiver.

9.      **Use of Cash Collateral.**

In order to continue running their business in the ordinary course throughout the Chapter 11 Cases, the Debtors sought authority on the Petition Date to continue using certain cash deposits of RHDI, DME, and DMW, which were otherwise restricted pursuant to certain prepetition security agreements, and to grant adequate protection to the relevant Prepetition Lenders in order to be able to use the cash deposits (the "Cash Collateral Motion"). The relief sought in the Cash Collateral Motion was necessary as the Debtors had an immediate and critical need to use the cash deposits to preserve and protect the value of their assets. In addition, the terms of the Cash Collateral Motion were negotiated in good faith and at arm's-length with the relevant Debtors' Prepetition Lenders. The relief requested in the Cash Collateral motion was granted on an interim basis by an order dated as of June 1, 2009. By order dated as of June 25, 2009, the Court approved the Cash Collateral Motion on a final basis.

**C.**      Professional Retention.

1.      **Retention of Professionals by the Debtors' Estates.**

The Debtors applied for an order authorizing the retention of Sidley Austin LLP ("Sidley") as their general reorganization and bankruptcy counsel under Section 327(a) of the Bankruptcy Code on June 5, 2009 (the "Sidley Retention Application"). The Court approved the Sidley Retention Application by order dated as of June 24, 2009.

The Debtors also filed an application to retain Young Conaway Stargatt & Taylor, LLP ("YCST") as Delaware bankruptcy co-counsel in these Chapter 11 Cases (the "YCST Retention Application"). The YCST Retention Application, which was filed on June 5, 2009, was approved by the Court pursuant to an order dated as of June 24, 2009.

In addition, the Debtors filed an application to retain Lazard Frères & Co., LLC ("Lazard") as their investment banker and financial advisors (the "Lazard Retention"). The Lazard Retention was also filed on June 5, 2009. The Court approved Lazard's retention by order dated as of July 20, 2009. Pursuant to the order, Lazard is entitled to payment of (i) a transaction fee equal to $15.0 million, subject to a credit for up to one half of certain monthly

fees paid by the Debtors, upon confirmation of the Plan or any amendment to the Plan (a "Pre-Arranged Plan"); or (ii) a transaction fee equal to $13.0 million, subject to a credit for up to one half of certain monthly fees paid by the Debtors, upon confirmation of a plan of reorganization that is not a Pre-Arranged Plan. The transaction fee is payable upon confirmation of the Plan; provided, however, if the transaction fee is payable in connection with a Pre-Arranged Plan, one-half of the transaction fee shall be earned and payable upon the execution of definitive lock-up agreements with respect to such Pre-Arranged Plan. In accordance with the terms of the foregoing arrangement, the Debtors paid Lazard $8,400,000 in fees and reimbursed $66,467.10 in expenses prior to the Petition Date. The total fees payable to Lazard (including any fees approved by the Bankruptcy Court for Lazard (or any Lazard affiliate) acting as agent or underwriter in connection with any proposed financing transaction, including any debtor-in-possession financing or exit financing in connection with the Chapter 11 Cases) will, however, be capped at $19 million if a Pre-Arranged Plan is confirmed or at $17 million for circumstances not involving a Pre-Arranged Plan.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also retained the following professionals with the Bankruptcy Court's approval: (i) Sitrick and Company, Inc. as corporate communications consultants; (ii) The Garden City Group, Inc., as claims, noticing, and balloting agent; (iii) KPMG LLP as auditors, tax compliance and tax consultants; (iv) Grubb & Ellis Company as real estate consultant; (v) Deloitte Financial Advisory Services LLP ("Deloitte") as financial advisor and administrative services provider; and (vi) Deloitte Tax LLP as tax advisor. On September 3, 2009, the Debtors filed an application (the "Mercer Application") to employ and retain Mercer (US) Inc. ("Mercer") as compensation consultants effective as of June 1, 2009. Pursuant to an order dated September 11, 2009, the Bankruptcy Court approved the Mercer Application and authorized the Debtors to retain Mercer.

In addition, the Debtors filed a motion seeking authorization to continue paying certain professionals utilized in the ordinary course of the Debtors' business (the "Ordinary Course Motion"). The Ordinary Course Motion was approved by order dated as of June 25, 2009.

### 2. The Committee and Its Advisors.

On June 11, 2009, the United States Trustee for the District of Delaware appointed the Committee. The Committee is comprised of the following parties: (i) Communication Workers of America; (ii) RR Donnelley & Sons Company; (iii) Web.com Holding Company; (iv) The Bank of New York Mellon, as Indenture Trustee; (v) PIMCO High Yield Fund; (vi) Wilmington Trust Company, as Indenture Trustee; and (vii) Law Debenture Trust Company of New York, as Indenture Trustee.[21] On July 1, 2009, the Committee applied for an order authorizing the retention of Ropes & Gray LLP ("Ropes") as its counsel under Sections 328(a) and 1103 of the Bankruptcy Code. In addition, on July 14, 2009, the Committee applied for an order authorizing the retention of Cozen O'Connor ("Cozen") as Delaware bankruptcy co-counsel and J.H. Cohn LLP ("Cohn") as its financial advisor and forensic accountant. The order approving the retention

---

[21] Wilmington Trust Company was added to the Committee by an amended Notice of Appointment filed on June 15, 2009, and Law Debenture Trust Company of New York was added to the Committee by a second amended Notice of Appointment filed on June 19, 2009.

of Ropes was dated as of July 20, 2009, and the orders approving the retention of Cozen and Cohn were dated as of August 17, 2009. On July 16, 2009 (the "Application Date"), the Committee applied for an order to retain The Blackstone Group, LP ("Blackstone") as its financial and restructuring advisor. By order dated as of August 21, 2009, the Bankruptcy Court approved the Blackstone retention application. Pursuant to that order, Blackstone is entitled to payment of (i) a monthly advisory fee (the "Monthly Fee") of $175,000; and (ii) an additional fee (the "Restructuring Fee") equal to $4,000,000, provided that each Monthly Fee payable (a) on or after January 16, 2010 (if a chapter 11 plan for the Debtors is confirmed on or before January 15, 2010) or (b) on or after February 16, 2010 (if a chapter 11 plan for the Debtors is not confirmed on or before January 15, 2010) will be credited against the Restructuring Fee.

**D.** **Administrative Matters in the Chapter 11 Cases.**

**1.** **Unexpired Leases.**

On May 30, 2009, the Debtors filed the First Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Leases of Nonresidential Real Property Pursuant to Section 365 of the Bankruptcy Code (the "First Omnibus Motion"). The First Omnibus Motion identified certain nonresidential real property leases to which the Debtors were a lessee. These leases were for certain real property spaces that were vacant or would be vacant by the proposed effective date for the rejection. On June 24, 2009, the Court granted the First Omnibus Motion.

The Debtors have also filed a number of motions through which they seek to assume various unexpired leases of nonresidential real property, including their headquarters in Cary, North Carolina, as well as to reject other unexpired leases of nonresidential real property. The Debtors also sought and obtained by order dated as of August 20, 2009, an extension of their deadline to assume or reject unexpired leases of real property to December 24, 2009.

**2.** **Bar Date.**

On August 25, 2009, the Debtors filed the Motion of the Debtors for an Order Pursuant to Sections 501,502, and 1111(a) of the Bankruptcy Code, Bankruptcy Rules 2002 and 3003(c)(3), and Local Rule 2002-1(e) Establishing Certain Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion"). In the Bar Date Motion, the Debtors requested the Bankruptcy Court establish certain deadlines for filing Proofs of Claim (as defined in the Bar Date Motion). Specifically, the Debtors requested that the Bankruptcy Court (i) establish October 30, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "General Bar Date") as the deadline for all persons and entities (excluding governmental units, as such term is defined in the Bankruptcy Code) holding a claim against any of the Debtors to file a proof of such claim in the Chapter 11 Cases, except as otherwise provided in the Bar Date Motion; (ii) establish November 24, 2009 at 4:00 p.m. (prevailing Eastern Time) as the deadline for each governmental unit holding a claim against any of the Debtors to file a proof of such claim in the Chapter 11 Cases; (iii) except where a claim has previously been included in the Schedules (as defined in the Bar Date Motion) as disputed, contingent, or unliquidated, establish the later of (a) the General Bar Date or (b) twenty (20) days after the holder of such claim is served with notice of the applicable amendment or supplement to the Schedules as the bar date

for filing a Proof of Claim with respect to such amended claim; and (iv) except as otherwise set forth in any order authorizing rejection of an executory contract or unexpired lease, establish the later of (y) the General Bar Date or (z) thirty (30) days after the entry of any order authorizing the rejection of an executory contract or unexpired lease, as the bar date by which a Proof of Claim for any damages resulting from the Debtors' rejection of such executory contract or unexpired lease must be filed.  The Bankruptcy Court approved the Bar Date Motion pursuant to an order entered on or about September 11, 2009.

### 3.  Miscellaneous.

On August 21, 2009, the Debtors filed a Motion of the Debtors for an Order Authorizing the Payment of Prepetition Contributions to Pension Plans and the Continuation of Such Contributions in the Ordinary Course of Business ("Pension Plan Motion").  Pursuant to the Pension Plan Motion, the Debtors requested the authority, but not direction, to (i) make funding contributions of up to $30 million prior to September 30, 2009 to certain pension plans in order to ensure that such pension plans maintain a funded level – the value of plan assets over plan liabilities – of at least 80% and (ii) continue making funding contributions to such pension plans in the ordinary course of business.  The Bankruptcy Court approved the Pension Plan Motion pursuant to an order entered on or about September 9, 2009.

On  August 24, 2009, the Debtors filed a Motion of the Debtors for Entry of an Order Extending the Deadline for the Debtors to File Notices of Removal of Related Claims and Causes of Action Pursuant to 28 U.S.C. § 1452 (the "Removal Motion").  In the Removal Motion, the Debtors seek an extension of the deadline to file notices of removal of related claims and causes of action through and including December 24, 2009.  The Bankruptcy Court approved the Removal Motion pursuant to an order entered on or about September 9, 2009.

On September 11, 2009, the Debtors filed a Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Exclusive Periods Within Which the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof (the "Exclusivity Motion"), in which they requested that the Court to extend the periods in which the Debtors may exclusively propose and solicit votes on a plan of reorganization to January 22, 2010 and January 31, 2010, respectively.  The Bankruptcy Court approved the Exclusivity Motion pursuant to an order entered on or about September 30, 2009.

## V.  THE PLAN OF REORGANIZATION

### A.  General.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and stockholders.  In addition to permitting rehabilitation of the debtor, another goal of Chapter 11 is to promote equality of treatment of creditors and equity security holders, respectively, who hold substantially similar claims or interests with respect to the distribution of the value of a debtor's assets.  In furtherance of these two goals, upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of substantially all acts and proceedings against the debtor and its

property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's Chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of prepetition equity security holders.

The confirmation requirements of Section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in this Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Debtor.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN. THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

**CAPITALIZED TERMS USED IN THIS SECTION V OF THE DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED IN THIS SECTION V OF THE DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

**B.**     <u>Classification and Allowance of Claims & Equity Interests Generally.</u>

**1.       Classification and Allowance.**

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, Section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests. Only Holders of certain Allowed Claims are entitled to vote on and receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

**C.**     Provisions for Payment of Administrative Expense Claims and Priority Tax Claims.

**1.**     **Administrative Expense Claims.**

Administrative Expense Claims are any claims for costs and expenses of administration of the Chapter 11 Cases that are Allowed under Sections 328, 330, 363, 364(c)(1), 365, 503(b), and 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses Allowed by the Bankruptcy Court; (c) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; (d) any payment to be made under the Plan or otherwise to cure a default on an assumed executory contract or unexpired lease; (e) any fees and charges assessed against the Debtors' Estates under Section 1930, chapter 123, of title 28 of the United States Code; (f) Postpetition Intercompany Claims; and (g) all administrative and superpriority administrative expense claims set forth in the Final Cash Collateral Orders.

The Bankruptcy Code does not require that administrative expense claims be classified under a plan. It does, however, require that allowed administrative expense claims be paid in full in cash in order for a plan to be confirmed, unless the holder of such claim consents to different treatment.

Pursuant to the Plan and subject to the provisions of Sections 328, 330, 331 and 503(b) of the Bankruptcy Code, on either: (i) the latest to occur of (x) the Effective Date (or as soon as practicable thereafter), (y) the date upon which such Administrative Expense Claim becomes an Allowed Claim and (z) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) on such other date as the Bankruptcy Court may order, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Claim, (a) cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (b) such other treatment as the applicable Debtor and such Holder shall have agreed; provided, however,

that Allowed Administrative Expense Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.

Notwithstanding anything to the contrary, Allowed Administrative Expense Claims representing the Debtors' postpetition liabilities incurred in the ordinary course of business will continue to be paid by the Debtors during the Chapter 11 Cases in accordance with the terms and conditions of the particular transactions and any agreement or Court order relating thereto.

Each Allowed Administrative Expense Claim will be paid from, and to the extent of available assets of, the respective Debtor's Estate to which such Claim applies or has been allocated. To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Claim.

**2.      Priority Tax Claims.**

Priority Tax Claims are Claims of governmental units for taxes owed by the Debtors that are entitled to priority in payment pursuant to Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements of Section 507(a)(8)(A), (b) property taxes meeting the requirements of Section 507(a)(8)(B), (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C), (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Section 507(a)(4), to the extent such taxes also meet the requirements of Section 507(a)(8)(D), (e) excise taxes of the kind specified in Section 507(a)(8)(E), (f) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F), and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G).

The Bankruptcy Code does not require that priority tax claims be classified under a plan. It does, however, require that such claims receive the treatment described below in order for a plan to be confirmed unless the holder of such claims consents to different treatment.

Pursuant to the Plan, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of (i) the Effective Date (or as soon as practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable. All Allowed Priority Tax Claims against any of the Debtors which are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.

**D.**    <u>Non-Substantive Consolidation and Classification of Claims.</u>

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes thereof. Unless otherwise provided by the Plan or the Confirmation Order, Allowed Claims held against one Debtor will be satisfied solely from the cash and assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by any of the Estates of the Debtors. Except as specifically set forth in the Plan, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.

Additionally, claimants holding Claims against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes (including, but not limited to, voting and distribution; <u>provided</u>, <u>however</u>, that there shall be only a single recovery on account of such Claims and any distribution from a Debtor on account of such Claims shall take into account the Distributions to be made by other Debtors on account of such Claims pursuant to the Plan), and such Claims shall be administered and treated in the manner provided in the Plan.

The categories of Claims and Interests listed below, which exclude Administrative Expense Claims and Priority Tax Claims in accordance with Section 1123(a)(1) of the Bankruptcy Code, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Classes | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1A through 19A | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 1B through 19B | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 1C through 19C | Convenience Claims | Impaired | Yes |
| 1E, 2D, 3E, 4E, 4F | Noteholders Claims | Impaired | Yes |
| 1F, 10E through 16E | RHDI Noteholders Guaranty Claims | Impaired | Yes |
| 3D, 4D, 5D | Prepetition Lenders Claims | Impaired | Yes |
| 1D, 6D through 16D | Prepetition Lenders Guaranty Claims | Impaired | Yes |
| 1G, 2E, 3F, 4G, 5E through 9E, 10F through 16F, 17D through 19D | General Unsecured Claims | Impaired | Yes |
| 1H, 2F, 3G, 4H, 5F through 9F, 10G through 16G, 17E through 19E, and 20A | Intercompany Claims | Impaired | Yes |
| 1I | RHDC Interests | Impaired | No (deemed to reject) |
| 2G, 3H, 4I, 5G through | Interests in Debtors Other Than | Unimpaired | No (deemed to |

| 9G, 10H through 16H, 17F through 19F, and 20B | RHDC | | accept) |

**E.**     Provisions for Treatment of Claims and Interests

The classification, if any, and treatment of Claims against and Interests in the various Debtors are set forth in detail in the Plan.  A summary of that treatment is provided below.

**1.**     **Priority Non-Tax Claims (Classes 1A through 19A).**

Priority Non-Tax Claim means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in Section 507(a) of the Bankruptcy Code.

Except to the extent that a Holder of an Allowed Priority Non-Tax Claim has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Priority Non-Tax Claim that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Priority Non-Tax Claim in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Priority Non-Tax Claims which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.  As of the date of this Disclosure Statement, the Debtors estimate that they will not owe any amounts on account of Priority Non-Tax Claims when they emerge from chapter 11.

Allowed Priority Non-Tax Claims are Unimpaired under the Plan, and each Holder of an Allowed Priority Non-Tax Claim shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

**2.**     **Other Secured Claims (Classes 1B through 19B).**

Other Secured Claim means a Claim, other than a Prepetition Lenders Claim that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code or, in the case of the setoff, pursuant to Section 553 of the Bankruptcy Code.

On or as soon as reasonably practicable after, the latest to occur of (i) the Effective Date or (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim,

each Holder of an Allowed Other Secured Claim, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Other Secured Claim, at the election of the Debtors, in consultation with the Consenting Noteholders, (a) Reinstatement of any such Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment in full, in cash, of such Other Secured Claim; (c) satisfaction of any such Other Secured Claim by delivering the collateral securing any such Claim and paying any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) providing such Holder with such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

Allowed Other Secured Claims are Unimpaired under the Plan, and each Holder of an Other Secured Claim shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

### 3. Convenience Claims (Classes 1C through 19C).

Convenience Claim means a Claim against any of the Debtors that would otherwise be classified as an Allowed General Unsecured Claim, and which (i) is in an amount that is equal to or less than $5,000 or (ii) pursuant to the Ballot has been reduced to $5,000 by election of the Holder of such Claim. On or as soon as reasonably practicable after, the latest of (i) the Effective Date or (ii) the date on which such Convenience Claim becomes an Allowed Convenience Claim, each Holder of an Allowed Convenience Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of and in exchange for such Allowed Convenience Claim an amount equal to one hundred percent (100%) of such Allowed Convenience Claim, subject to a cap of $5,000 for each such Allowed Convenience Claim; provided, however, that if the Allowed Convenience Claims in the aggregate against all of the Debtors exceed the Maximum Convenience Class Payment ($1,000,000), then the Holders of Allowed Convenience Claims shall receive their *pro rata* share of the Maximum Convenience Class Payment.

In addition, any Holder of a General Unsecured Claim that desires treatment of such Claim as a Convenience Claim shall make such election on the Ballot to be provided to Holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline. Any election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

Allowed Convenience Claims are Impaired under the Plan, and each Holder of an Allowed Convenience Claim shall be entitled to vote to accept or reject the Plan.

4.     **Noteholders Claims (Classes 1E, 2D, 3E, 4E, 4F).**

Noteholders Claims means all Claims arising under or evidenced by the Notes, the Notes Indentures and related documents, and consist of the RHDC Noteholders Claims (Class 1E), DMI Noteholders Claims (Class 2D), RHDI Noteholders Claims (Class 3E), DMW Senior Notes Noteholders Claims (Class 4E) and DMW Senior Subordinated Notes Noteholders Claims (Class 4F).

RHDC Noteholders Claims:  Each Holder of an Allowed RHDC Noteholders Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 21.0% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).  The RHDC Noteholders Claims shall be Allowed under the Plan in the aggregate amount of $3.211 billion, plus accrued but unpaid interest, if any, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

DMI Noteholders Claims:  Each Holder of an Allowed DMI Noteholders Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 23.3% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).  The DMI Noteholders Claims shall be Allowed under the Plan in the aggregate amount of $1.25 billion, plus accrued but unpaid interest, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

RHDI Noteholders Claims: Each Holder of an Allowed RHDI Noteholders Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 25.8% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).  The RHDI Noteholders Claims shall be Allowed under the Plan in the aggregate amount of $413 million, plus accrued but unpaid interest, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

DMW Senior Notes Noteholders Claim: Each Holder of an Allowed DMW Senior Notes Noteholders Claim shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of (i) the New RHDC Notes and (ii) 13.0% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).  The DMW Senior Notes Noteholders Claims shall be Allowed under the Plan in the aggregate amount of $394 million, plus accrued but unpaid interest, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

DMW Senior Subordinated Notes Noteholders Claims: Each Holder of an Allowed DMW Senior Subordinated Notes Noteholders Claims shall receive in full and complete satisfaction, settlement, release and discharge of such Claim, its *pro rata* share of 16.9% of the New RHDC Stock Pool for Unsecured Creditors (subject to dilution pursuant to the Management Incentive Plan).  The DMW Senior Subordinated Notes Noteholders Claims shall be Allowed in the aggregate amount of $762 million, plus

accrued but unpaid interest, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

For the avoidance of doubt, to the extent that a Notes Indenture Trustee and a Noteholder each file a Proof of Claim evidencing a duplicative Noteholders Claim, only the Claim of the Notes Indenture Trustee shall be Allowed.

Such Noteholder Claims are Impaired under the Plan, and each Holder of an Allowed Noteholders Claim shall be entitled to vote to accept or reject the Plan.

### 5.    RHDI Noteholders Guaranty Claims (Classes 1F, 10E through 16E).

RHDI Noteholders Guaranty Claims means those claims arising under or evidenced by the RHDI Noteholders Guaranty, and consist of all Claims in Classes 1F and 10E through 16E. RHDI Noteholders Guaranty Claims are deemed Allowed Claims under the Plan.

Each Holder of a RHDI Noteholders Guaranty Claim shall receive the same treatment provided to Allowed RHDI Noteholders Claims in Class 3E, and Holders of such Allowed RHDI Noteholders Guaranty Claims shall receive no additional consideration under the Plan on account of such RHDI Noteholders Guaranty Claims.

RHDI Noteholders Guaranty Claims are Impaired under the Plan, and each Holder of an Allowed RHDI Noteholders Guaranty Claim shall be entitled to vote to accept or reject the Plan.

### 6.    Prepetition Lenders Claims (Classes 3D, 4D, 5D).

Prepetition Lenders Claims consist of RHDI Lenders Claims (Class 3D), DMW Lenders Claims (Class 4D) and DME Lenders Claims (Class 5D).

RHDI Lenders Claims:  On or as soon as reasonably practicable after, the Effective Date, in full and complete satisfaction, settlement, release and discharge of the Allowed RHDI Lenders Claims, as of the Effective Date, each Holder of an Allowed RHDI Lenders Claim shall be entitled to the treatment set forth in greater detail in the RHDI Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the RHDI Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated RHDI Credit Agreement, the RHDI Lenders Guaranty and Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date, and payment by Reorganized RHDI of the RHDI Revolving Loans, RHDI Term Loans and RHDI Hedge Termination Payments in an aggregate amount equal to at least the Prepayment Amount (as defined in the RHDI Lenders Plan Support Agreement), which shall include cash in the sum of $50,000,000 received from RHD Service on account of RHDI's Class 20 E Claim.  The RHDI Lenders Claims shall be Allowed Secured Claims under the Plan in the aggregate amount of approximately $1.434 billion, plus accrued but unpaid interest, if any, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

DMW Lenders Claims:  On or as soon as reasonably practicable after, the Effective Date, in full and complete satisfaction, settlement, release and discharge of the Allowed DMW Lenders Claims, as of the Effective Date, each Holder of an Allowed DMW Lenders Claim shall be entitled to the treatment set forth in greater detail in the DMW Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated DMW Credit Agreement, the Amended and Restated DMW Guaranty and Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date, and payment by Reorganized DMW of the DMW Revolving Loans, DMW Term Loans and DMW Hedge Termination Payments in an amount equal to the Paydown (as defined in the DMW Lenders Plan Support Agreement), which shall include cash in the sum of $75,000,000 received from RHD Service on account of DMW's Class 20E Claim.  The Allowed DMW Lenders Claims shall be Allowed Secured Claims in the aggregate amount of approximately $1.107 billion, plus accrued but unpaid interest, if any, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

DME Lenders Claims:  On or as soon as reasonably practicable after, the Effective Date, in full and complete satisfaction, settlement, release and discharge of the Allowed DME Lenders Claims, as of the Effective Date, each Holder of an Allowed DME Lenders Claim shall be entitled to the treatment set forth in greater detail in the DME Lenders Plan Support Agreement included in Exhibit B hereto, including without limitation, such rights as set forth in the Amended and Restated DME Credit Agreement, the DME Lenders Guaranty and Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date, and payment by Reorganized DME of the DME Revolving Loans, DME Term Loans and DME Hedge Termination Payments in an aggregate amount equal to the Paydown (as defined in the DME Lenders Plan Support Agreement), which shall include cash in the sum of $50,000,000 received from RHD Service on account of DME's Class 20E Claim.  The DME Lenders Claims shall be Allowed Secured Claims in the aggregate amount of approximately $1.101 billion, plus accrued but unpaid interest, if any, as of the Petition Date, and shall not be subject to objection, challenge, deduction or offset.

Notwithstanding anything to the contrary in the Disclosure Statement or the Plan, in the event the Class of RHDI Lenders Claims, DMW Lenders Claims or the DME Lenders Claims do not accept the Plan, the Debtors expressly reserve the right to cure and reinstate the Claims in such rejecting Class against the Holders of such Prepetition Lenders Claims under Section 1124 of the Bankruptcy Code, and the Prepetition Lenders Agents and Prepetition Lenders expressly reserve the right to contest, litigate and oppose such relief.

Prepetition Lenders Claims are Impaired under the Plan, and each Holder of an Allowed Prepetition Lenders Claim shall be entitled to vote to accept or reject the Plan.

### 7.    Prepetition Lenders Guaranty Claims (Classes 1D, 6D through 16D).

Prepetition Lenders Guaranty Claims consist of RHDI Lenders Guaranty Claims (Classes 1D and 10D through 16D), DMW Lenders Guaranty Claims (Classes 6D and 7D) and DME Lenders Guaranty Claims (Classes 8D and 9D).

RHDI Lenders Guaranty Claims: Each Holder of an Allowed RHDI Lenders Guaranty Claim, in full and complete settlement, release and discharge of, and in exchange for, such Allowed Claims shall receive the treatment set forth in greater detail in the RHDI Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights set forth in the Amended and Restated RHDI Credit Agreement, the Amended and Restated RHDI Lenders Guaranty & Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date. Holders of Allowed RHDI Lenders Guaranty Claims in Classes 1D and 10D through 16D shall receive no additional consideration under the Plan on account of such Allowed Claims in Classes 1D and 10D through 16D.

DMW Lenders Guaranty Claims: Each Holder of an Allowed DMW Lenders Guaranty Claim, in full and complete settlement, release and discharge of, and in exchange for, such Allowed Claims shall receive the treatment set forth in greater detail in the DMW Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated DMW Credit Agreement, the Amended and Restated DMW Lenders Guaranty & Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date. Holders of Allowed DMW Lenders Guaranty Claims in Classes 6D and 7D shall receive no additional consideration under the Plan on account of such Allowed Claims in Classes 6D and 7D.

DME Lenders Guaranty Claims: Each Holder of an Allowed DME Lenders Guaranty Claim, in full and complete settlement, release and discharge of, and in exchange for, such Allowed Claims shall be entitled to the treatment set forth in greater detail in the DME Lenders Plan Support Agreement included in Exhibit B hereto, including, without limitation, such rights as set forth in the Amended and Restated DME Credit Agreement, the Amended and Restated DME Lenders Guaranty & Collateral Agreement and such other definitive documentation executed in connection therewith as of the Effective Date. Holders of Allowed DME Lenders Guaranty Claims in Classes 8D and 9D shall receive no additional consideration under the Plan on account of such Allowed Claims in Classes 8D and 9D.

Prepetition Lenders Guaranty Claims are Impaired under the Plan, and each Holder of an Allowed Prepetition Lenders Guaranty Claim shall be entitled to vote to accept or reject the Plan.

**8.      General Unsecured Claims (Classes 1G, 2E, 3F, 4G, 5E through 9E, 10F through 16F, 17D through 19D).**

General Unsecured Claims means any Claim against the Debtors that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Convenience Claim, a Prepetition Lenders Claim, a Noteholders Claim, a RHDI Noteholders Guaranty Claim or an Intercompany Claim and shall not include Claims that are Disallowed or released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

The Plan provides for the following distributions to the Holders of Allowed General Unsecured Claims against each of RHDC, DMI, RHDI and DMW:

In the event that each Class of Impaired Claims against RHDC, DMI, RHDI, and DMW, respectively, has accepted the Plan, then each Holder of an Allowed 1G, 2E, 3F, or 4G Unsecured Claim, including any General Unsecured Claims for damages relating to executory contracts and unexpired leases rejected by RHDC, DMI, RHDI, and DMW, respectively (either pursuant to the Plan or otherwise) and trade payables owed by each of RHDC, DMI, RHDI and DMW, respectively, shall receive the following treatment at the option of the Debtors: (i) on the Effective Date, or as soon thereafter as is practicable, payment in cash equal to 100% of such Allowed 1G, 2E, 3F, or 4G Unsecured Claim; provided, however, that if the aggregate amount of Allowed General Unsecured Claims against any of RHDC, DMI, RHDI, and DMW, respectively, exceeds the Maximum Payment for that particular Class, then, subject to Section 7.4.2 of the Plan, Holders of Allowed General Unsecured Claims against that particular Debtor will receive a *pro rata* share of the Maximum Payment for such Class payable in cash; or (ii) the assumption or payment in full or in part of any such Allowed 1G, 2E, 3F, or 4G Unsecured Claim as such Claim becomes due in the ordinary course of business; provided, however, that in the event that any Class of Impaired Claims against RHDC, DMI, RHDI, or DMW, as applicable, does not accept the Plan, then, on the Effective Date, or as soon thereafter as practicable, each Holder of an Allowed General Unsecured Claim against the applicable Debtor, including Claims for damages relating to executory contracts and unexpired leases rejected by such Debtor (either pursuant to the Plan or otherwise) and trade payables owed by such Debtor, shall receive payment in cash equal to the value, as of the Effective Date, of the distribution to which the Holder of such Allowed General Unsecured Claim would have been entitled under the Plan had such General Unsecured Claim been classified with the Noteholders Claims against the applicable Debtor, as such value shall be determined by the Bankruptcy Court at or in connection with the Confirmation Hearing. The Debtors shall reserve all rights to challenge the legal basis and amount of any such Claims.

In addition, the Plan provides for the following distributions to the Holders of Allowed General Unsecured Claims against any of the Debtors other than RHDC, DMI, RHDI, DMW:

Each Holder of an Allowed 5E through 9E, 10F through 16F, and 17D through 19D Unsecured Claim, including any General Unsecured Claims for damages relating to executory contracts and unexpired leases rejected by the applicable Debtor (either pursuant to the Plan or otherwise) and trade payables owed by a Debtor other than RHDC, DMI, RHDI, DMW, and RHD Service, respectively, shall receive the following treatment at the option of the Debtors: (i) on the Effective Date, or as soon thereafter as practicable, payment in cash equal to 100% of such Allowed 5E through 9E, 10F through 16F, and 17D through 19D Unsecured Claim; or (ii) the assumption or payment in full or in part of any such Allowed 5E through 9E, 10F through 16F, and 17D through 19D Unsecured Claim as such Claim becomes due in the ordinary course of business. The Debtors shall reserve all rights to challenge the legal basis and amount of any such Claims.

9. **Intercompany Claims (Classes 1H, 2F, 3G, 4H, 5F through 9F, 10G through 16G, 17E through 19E, and 20A).**

Intercompany Claims means all prepetition Claims against any Debtor held by another Debtor. Except as otherwise provided with respect to Class 20A Intercompany Claims (which treatment is described below), Holders of Intercompany Claims shall receive no monetary distributions on account of such Allowed Intercompany Claims, and all of the Allowed Intercompany Claims shall be deemed settled, cancelled and extinguished; provided, however, that any Allowed Intercompany Claim (other than Class 20A Intercompany Claims) may be reinstated, in full or in part, to the extent the Debtors and a Majority of Consenting Noteholders agree to such treatment. Subject to the foregoing proviso, no Holder of an Allowed Intercompany Claim shall be entitled to, or shall receive or retain, any property or interest in property on account of such Allowed Intercompany Claim.

With respect to Class 20A Intercompany Claims (which Claims are held by Debtors DME, RHDI and DMW), RHD Service shall repay in cash the aggregate principal amount of (i) $50,000,000 to DME, (ii) $50,000,000 to RHDI, and (iii) $75,000,000 to DMW, on account of, and in full and complete satisfaction, settlement, release and discharge of and in exchange for their respective Allowed Claims in Class 20A. Intercompany Claims are Impaired under the Plan, and each Holder of an Allowed Intercompany Claim shall be entitled to vote to accept or reject the Plan.

10. **RHDC Interests (Class 1I).**

RHDC Interests consist of any and all Interests in RHDC prior to the Effective Date (including prior to the Petition Date). For the avoidance of doubt, the term RHDC Interests shall include the existing common stock of RHDC of which 400 million shares were authorized and 68,924,438 shares were outstanding as of July 15, 2009.

No distributions shall be made on account of Interests in this Class, and all such Interests shall be extinguished, cancelled and discharged as of the Effective Date.[22] Holders of such Interests shall not be entitled to, nor receive, any distribution or retain any property or interest in property under the Plan. Accordingly, Holders of such Interests are conclusively presumed to reject the Plan and are not entitled to vote.

11. **Interests in Debtors Other Than RHDC (Classes 2G, 3H, 4I, 5G through 9G, 10H through 16H, 17F through 19F, and 20B).**

Interests in Debtors other than RHDC consist of Interests of any holder of equity securities in any of the Debtors other than RHDC represented by any issued outstanding common stock, preferred interests or other instrument evidencing an ownership interest in any of the Debtors prior to the Effective Date (including prior to the Petition Date), whether or not transferable, any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common interests, unvested preferred

---

[22] In the event that the Debtors separately classify any Subordinated Equity Securities Claim, any such claims shall be extinguished, cancelled and discharged as of the Effective Date, and any holders thereof shall receive no distribution in respect of their claims pursuant to Section 1129(b)(2)(C) of the Bankruptcy Code.

interests or any other agreements of any character related to the common or preferred interests of any of the Debtors other than RHDC, obligating any of the Debtors other than RHDC to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of any of the Debtors other than RHDC, any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common interests or preferred interests or other equity securities (or any right, claim, or interest in and to any common interests, preferred interests or other equity securities) of any of the Debtors other than RHDC, any claims for the payment of any distributions with respect to any common or preferred interests of any of the Debtors other than RHDC, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any of the Debtors' (other than RHDC's) outstanding common interests, preferred interests or other equity securities  As of the Petition Date, all such Interests were owned or held, directly or indirectly, by RHDC and its wholly-owned subsidiaries.

As of the Effective Date, each Holder of such Interest shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitles such Holder immediately prior to the Effective Date.  Such Interests are Unimpaired under the Plan, and each Holder of an Allowed Interest shall be conclusively deemed to have accepted the Plan, and, therefore, shall not be entitled to vote to accept or reject the Plan.

**F.** **Identification of Classes of Claims and Interests That Are Impaired; Acceptance or Rejection of the Plan.**

**1.** **Holders of Claims Entitled to Vote.**

Each of the Priority Non-Tax Claims (Classes 1A through 19A), Other Secured Claims (Classes 1B through 19B), and Interests in Debtors Other Than RHDC (Classes 2G, 3H, 4I, 5G through 9G, 10H through 16H, 17F through 19F, and 20B) is Unimpaired by the Plan, and the Holders of Allowed Claims and Interests in each Class are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Each of the Convenience Claims (Classes 1C through 19C), Noteholders Claims (Classes 1E, 2D, 3E, 4E, and 4F), RHDI Noteholders Guaranty Claims (Classes 1F and 10E through 16E), Prepetition Lenders Claims (Classes 3D, 4D, and 5D), Prepetition Lenders Guaranty Claims (1D and 6D through 16D) General Unsecured Claims (Classes 1G, 2E, 3F, 4G, 5E though 9E, 10F through 16F, and 17D through 19D), and Intercompany Claims (Classes 1H, 2F, 3G, 4H, 5F through 9F, 10G through 16G, 17E through 19E, and 20A) is Impaired, and the Holders of Allowed Claims in each are entitled to vote to accept or reject the Plan.

Each of the RHDC Interests (Class 1I) is Impaired by the Plan, and the Holders of Interests in this Class will not receive or retain any property under the Plan on account of such Interests.  Accordingly, Holders of Interests in this Class are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**2.** **Acceptance by an Impaired Class.**

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder designated pursuant to

Section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

### 3. Deemed Acceptance of the Plan.

Pursuant to Section 4.3 of the Plan, Classes of Claims or Interests designated as Unimpaired are conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and the votes of the Holders of such Claims or Interests will not be solicited.

### 4. Presumed Rejection of the Plan.

Class 1I is Impaired by this Plan, and Holders of Interests in Class 1I will not receive or retain any property under the Plan. Under Section 1126(g) of the Bankruptcy Code, Holders of Class 1I Interests are conclusively presumed to reject the Plan and thus the votes of such Holders of Class 1I Interests will not be solicited.

### 5. Consensual Confirmation.

Pursuant to Section 4.5.1 of the Plan, the Confirmation requirements of Section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in the Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate chapter 11 plan for each such Debtor.

### 6. Cram-Down.

Pursuant to Section 4.5.2 of the Plan, with respect to any Impaired Class of Claims that fails to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, if any, including any Classes that may be created pursuant to any amendments to the Plan, the Debtors will request that the Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code with respect to any such non-accepting Classes, in which case or cases, the Plan shall constitute a motion for such relief.

### 7. Reservation of Rights.

Pursuant to Section 4.5.3 of the Plan, the Debtors reserve the right to amend, modify, supplement, or withdraw the Plan, any other plan, or the Plan in its entirety, for any reason, including, without limitation, in the event that any separate plan for a particular Debtor is not confirmed; provided, however, that any amendment, modification or supplement to the Plan (i) is reasonably acceptable to a Majority of Consenting Noteholders in accordance with the Noteholders Support Agreement and Noteholders Plan Term Sheet and (ii) shall not be inconsistent with the terms of the Banks Support Agreements. In addition, should the Plan, or any individual Debtor's plan, fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy Section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to amend, modify, supplement, or withdraw the Plan in its entirety; provided, however, that any

amendment, modification or supplement to the Plan (i) is reasonably acceptable to a Majority of Consenting Noteholders in accordance with the Noteholders Support Agreement and Noteholders Plan Term Sheet and (ii) shall not be inconsistent with the terms of the Banks Support Agreements.

## G.   Means for Implementation of the Plan.

### 1.   Non-Substantive Consolidation.

Pursuant to Section 5.1 of the Plan, the Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes thereof.  Unless otherwise provided by the Plan or the Confirmation Order, Allowed Claims held against one Debtor will be satisfied solely from the cash and assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by any of the Estates of the Debtors.  Except as specifically set forth in the Plan, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes (including, but not limited to, voting and distribution; provided, however, that there shall be only a single recovery on account of such Claims and any distribution from a Debtor on account of such Claims shall take into account the Distributions to be made by other Debtors on account of such Claims pursuant to the Plan), and such Claims shall be administered and treated in the manner provided in the Plan.

### 2.   Corporate Governance, Directors, Officers and Corporate Action.

(a)   Organizational and Governing Documents

As provided in Section 5.2.1 of the Plan, on the Effective Date, the Certificate of Incorporation and By-Laws of Reorganized RHDC in the forms attached as Exhibit 5.2.1(1) and Exhibit 5.2.1(2) to the Plan (to be filed with the Plan Supplement) shall go into effect.  The Certificate of Incorporation and By-Laws of Reorganized RHDC shall include (i) provisions authorizing [__] million shares of New RHDC Common Stock of which up to [__] shares shall initially be issued and outstanding as of the Effective Date; provided, however, that shares representing no less than ten percent (10%) of the New RHDC Common Stock on a fully diluted basis shall be reserved for issuance pursuant to the Management Incentive Plan and (ii) provisions, to the extent necessary or appropriate, effectuating the provisions of the Plan. Consistent with, but only to the extent required by, Section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities.

The certificates or articles of incorporation, by-laws, limited liability company agreements and partnership agreements, as applicable, of each of the Reorganized Debtors shall be amended as necessary to (a) include director and officer liability exculpation and indemnity provisions (including advancement of expenses) to the fullest extent permitted by Delaware law (or the law of the state of organization, if not Delaware), and (b) satisfy the provisions of the

Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, limited liability company agreements and partnership agreements, as applicable, as permitted by applicable law and subject to the Amended and Restated Credit Documents.

(b)     Directors and Officers of Reorganized RHDC

As of the Effective Date, the initial directors of Reorganized RHDC shall be the persons identified in Exhibit 5.2.2 to the Plan, which shall be attached as an Exhibit to the Plan Supplement. The term of any current members of the board of directors of RHDC not identified as members of the initial board of directors of Reorganized RHDC shall expire as of the Effective Date. The initial board of directors of Reorganized RHDC shall consist of seven (7) directors, including (a) the chief executive officer of Reorganized RHDC, (b) three (3) directors selected by Franklin Advisers, Inc., and (c) three (3) directors selected by the Consenting Noteholders; provided, however, that the Consenting Noteholders shall interview and consider any then serving directors of the RHDC Board of Directors who wish to be considered as a candidate for the Reorganized RHDC Board of Directors.

In accordance with Section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 5.2.2 of the Plan, the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized RHDC, and to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person. Each director of Reorganized RHDC shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation, By-Laws and applicable law. On the Effective Date, the term of any current directors of the board of directors of RHDC not identified as directors of Reorganized RHDC shall expire and such persons shall be deemed to have been removed as a director on the Effective Date. All existing executive officers of Reorganized RHDC are expected to continue to serve in their existing capacities.

(c)     Management of Reorganized Debtors Other Than RHDC

As provided in Section 5.2.4 of the Plan, the board of directors of each Reorganized Debtor (other than Reorganized RHDC) shall be identified and selected by the board of directors of Reorganized RHDC and consist of some or all of the members of the board of directors of Reorganized RHDC. All existing executive officers of the Reorganized Debtors are currently expected to continue to serve in their existing capacities.

(d)     Corporate Action

On the Effective Date, as provided in Section 5.2.5 of the Plan, the adoption of the Certificate of Incorporation or similar constituent documents, the adoption of the By-Laws, the Registration Rights Agreement, the selection of directors and officers for Reorganized RHDC and the Reorganized Debtors, and all other actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the entity structure of the Debtors or the Reorganized Debtors, and any entity action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without

any requirement of further action by the security holders, directors, managers, partners or shareholders of Reorganized RHDC, the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate directors and officers of Reorganized RHDC and/or of the other Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (including, without limitation, the Amended and Restated Credit Documents) in the name of and on behalf of Reorganized RHDC and/or the other Reorganized Debtors.

3.     **Issuance of New RHDC Common Stock and New RHDC Notes.**

Pursuant to Section 5.3.1 of the Plan, on the Effective Date, Reorganized RHDC shall (i) issue up to [__] shares of New RHDC Common Stock and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without further act or action under applicable law, regulation, order or rule; provided, however, that shares representing no less than ten percent (10%) of the New RHDC Common Stock on a fully diluted basis shall be reserved for issuance pursuant to the Management Incentive Plan; and (ii) issue the New RHDC Notes for distribution in accordance with the Plan. Article IX of this Disclosure Statement contains a more complete description of the New RHDC Common Stock to be issued under the Plan.

The issuance and distribution of the New RHDC Common Stock and New RHDC Notes under or in connection with the Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable non-bankruptcy law and under bankruptcy law, including, without limitation, Section 1145(a) of the Bankruptcy Code. Without limiting the effect of Section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto. In addition, all of the shares of New RHDC Common Stock and the New RHDC Notes issued pursuant to the Plan shall be fully paid and non-assessable and freely tradeable under Section 1145 of the Bankruptcy Code; provided, however, that to the extent that any of the New RHDC Common Stock or New RHDC Notes are not freely tradeable under Section 1145, the Holders thereof shall have customary demand and S-3 registration rights as set forth in and subject to any applicable Registration Rights Agreement.

4.     **Distribution of New Securities and Related Matters.**

Pursuant to Section 5.3.3, on or as soon as reasonably practicable after the Effective Date, all of the shares of the New RHDC Common Stock and the New RHDC Notes to which any Holder of a Claim shall become entitled pursuant to the Plan shall be made by delivery of one or more certificates representing such shares or notes as described in the Plan or issued in the name of such Holder or DTC or its nominee or nominees in accordance with DTC's book-entry exchange procedures, as contemplated by Section 7.5.2 of the Plan, subject to the terms and conditions of the Plan. In the period pending distribution of the New RHDC Common Stock and New RHDC Notes to any Holder of a Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such Holder's New RHDC Common Stock and/or New RHDC Notes

(including, without limitation receiving any proceeds of any permitted transfer of such New RHDC Common Stock or RHDC Notes), and to exercise all other rights in respect of the New RHDC Common Stock or New RHDC Notes (so that such Holder shall be deemed for tax purposes to be the owner of the New RHDC Common Stock or New RHDC Notes issued in the name of such Holder).

5.    **Reporting Requirements Under Securities Exchange Act of 1934 and Listing on the New York Stock Exchange or NASDAQ Stock Market.**

Pursuant to Section 5.4 of the Plan, as soon as reasonably practicable after the Effective Date, Reorganized RHDC shall continue to be a mandatory reporting company under Section 12 of the Securities Exchange Act of 1934, as amended.  In addition, as soon as practicable after the Effective Date but no later than sixty (60) days after the Effective Date, Reorganized RHDC shall use its commercially reasonable efforts to obtain the listing of the New RHDC Common Stock for trading on the New York Stock Exchange ("NYSE") or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so.  Persons receiving distributions of New RHDC Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with Reorganized RHDC's reasonable requests to assist Reorganized RHDC in its efforts to list the New RHDC Common Stock on the NYSE or for quotation on NASDAQ, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized RHDC who satisfy the independence and other requirements of the NYSE or NASDAQ and establishing committees of the board of directors of Reorganized RHDC and agreeing to such other requirements of listing on the NYSE or NASDAQ.

6.    **Amended and Restated Credit Agreements.**

(a)    Amended and Restated RHDI Credit Agreement.

As provided in Section 5.5.1 of the Plan, on the Effective Date, (a) Reorganized RHDI, as borrower, (b) Reorganized RHDC, as guarantor (c) the RHDI Lenders Agent, and (d) the Holders of Class 3D Claims shall become party to the Amended and Restated RHDI Credit Agreement.  In addition, on the Effective Date, (a) Reorganized RHDC, Reorganized RHDI and certain direct and indirect subsidiaries of RHDC that become party thereto, as guarantors, (b) the RHDI Lenders Agent, and (c) the Holders of Claims in Classes 1D and 10D through 16D shall become party to the Amended and Restated RHDI Lenders Guaranty & Collateral Agreement.

(b)    Amended and Restated DMW Credit Agreement.

As provided in Section 5.5.2 of the Plan, on the Effective Date, (a) Reorganized DMW, as borrower, (b) Reorganized DMI and Reorganized Dex Media West, Inc., as guarantors, (c) the DMW Lenders Agent, and (d) the Holders of Class 4D Claims shall become party to the Amended and Restated DMW Credit Agreement.  In addition, on the Effective Date, (a) Reorganized DMW, Reorganized Dex Media West, Inc., Reorganized Dex Media West Finance Co., Reorganized RHDC and certain direct and indirect subsidiaries of RHDC that become party thereto, as guarantors, (b) the DMW Lenders Agent, and (c) the Holders of Claims in Classes 6D

and 7D shall become party to the Amended and Restated DMW Lenders Guaranty & Collateral Agreement.

        (c)        Amended and Restated DME Credit Agreement.

As provided in Section 5.5.3 of the Plan, on the Effective Date, (a) Reorganized DME, as borrower, (b) Reorganized DMI and Reorganized Dex Media East, Inc., as guarantors (c) the DME Lenders Agent, and (d) the Holders of Class 5D Claims shall become party to the Amended and Restated DME Credit Agreement. In addition, on the Effective Date, (a) Reorganized DME, Reorganized Dex Media East, Inc., Reorganized Dex Media East Finance Co., Reorganized RHDC and certain direct and indirect subsidiaries of RHDC that become party thereto, as guarantors, (b) the DME Lenders Agent, and (c) the Holders of Claims in Classes 8D and 9D shall become party to the Amended and Restated DME Lenders Guaranty & Collateral Agreement.

## 7.  Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.

Pursuant to Section 5.6 of the Plan, on and after the Effective Date, the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdiction in which they are organized and pursuant to their respective certificates or articles of incorporation and by-laws, limited liability company agreements or partnership agreements in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of the Plan. Notwithstanding anything to the contrary in the Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise. Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, remedies and other encumbrances. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, with the sole exception of any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

## 8.  Cancellation of Notes, Instruments, Debentures and RHDC Interests.

Pursuant to Section 5.7 of the Plan, on the Effective Date, except as otherwise provided for herein, all (a) Notes, RHDC Interests, and any other notes, bonds, indentures (including the Notes Indentures), stockholders agreements, registration rights agreements, repurchase agreements and repurchase arrangements or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are

Impaired under the Plan shall be cancelled; (b) the obligations of the Debtors under any agreements, stockholders agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or indentures (including the Notes Indentures) governing the Notes, RHDC Interests and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims or Interests against a Debtor that relate to Claims or Interests that are Impaired under the Plan shall be discharged; and (c) the obligations of the Debtors under the DME Hedge Agreements, DMW Hedge Agreements and RHDI Hedge Agreements shall be terminated and discharged; provided, however, that any agreements, notes and related instruments and documents executed and delivered by any of the Debtors in connection with the DME Credit Agreement, DMW Credit Agreement or RHDI Credit Agreement shall be subject to the terms and conditions of the Amended and Restated Credit Documents. Notwithstanding the foregoing and anything contained in the Plan, the Notes Indentures shall continue in effect to the extent necessary to (i) allow the Debtors, the Reorganized Debtors, or the relevant Notes Indenture Trustees to make distributions pursuant to the Plan on or about the Effective Date on account of the Noteholders Claims under the respective Notes Indentures, (ii) permit the relevant Notes Indenture Trustee to assert its Notes Indenture Trustee Charging Lien, (iii) permit the Notes Indenture Trustee to appear in the Chapter 11 Cases, and (iv) permit the applicable Notes Indenture Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (iii); provided, however, that, for the avoidance of doubt, the Notes Indentures shall be, and shall be deemed to be, fully and completely terminated and discharged upon the making of the distributions set forth in clause (i) hereof. As of the Effective Date, any RHDC Interest that has been authorized to be issued but that has not been issued shall be deemed cancelled and extinguished without any further action of any party.

### 9. Cancellation of Liens.

Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Other Secured Claim (other than a Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

### 10. Compensation and Benefits Programs.

Pursuant to Section 5.9 of the Plan, except and to the extent previously assumed by an order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Employee Benefit Plans, including the Employment and Retirement Benefit Agreements, of the Debtors, as amended or modified, including programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before, on or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed except for (i) executory contracts or plans specifically rejected pursuant to the Plan, and (ii) executory contracts or plans that have previously been rejected, are the subject of a motion to reject or have been specifically waived by the beneficiaries of any plans or contracts; provided, however, that (x) the Debtors shall pay all

"retiree benefits" (as defined in Section 1114(a) of the Bankruptcy Code); (y) to the extent applicable, each of the Employment and Retirement Benefit Agreements shall be amended prior to (or upon) such assumption to provide that the implementation of the restructuring in accordance with the Plan shall not alone constitute "Good Reason" to terminate employment; and (z) notwithstanding anything to the contrary in Section 5.9.1 of the Plan, the assumption of Employee Benefit Plans not (i) listed on Exhibit C of the Noteholders Plan Term Sheet, or (ii) otherwise approved, authorized or assumed by an order of the Bankruptcy Court, shall be reasonably acceptable to a Majority of Consenting Noteholders.

RHDC and any other Reorganized Debtor whose employees are covered by the Employee Pension Plans shall assume and continue the Employee Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Employee Pension Plans in accordance with their terms and the provisions of ERISA. Further, nothing in the Plan shall be construed in any way as discharging, releasing or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from liability imposed under any law or regulatory provision with respect to the Employee Pension Plans or Pension Benefit Guaranty Corporation.

## 11. Management Incentive Plan.

Pursuant to Section 5.10 of the Plan, as of the Effective Date, Reorganized RHDC shall adopt the Management Incentive Plan substantially in the form to be attached as an exhibit to the Plan Supplement, pursuant to which not less than ten percent (10%) of the fully diluted New RHDC Common Stock shall be reserved for issuance. Awards under such Management Incentive Plan may be granted either (a) pursuant to action taken prior to the Effective Date with the consent of the Consenting Noteholders, with such grants to be effective on the Effective Date, or (b) from time to time on or after the Effective Date, as determined by the compensation committee of the Reorganized RHDC board of directors in such committee's discretion. On and after the Effective Date, eligible persons who receive awards under such Management Incentive Plan shall be entitled to the benefits thereof on the terms and conditions provided for therein. As of the Effective Date, all equity-based awards granted by a Debtor prior to the Petition Date shall terminate and cease to be binding on such Debtor.

## 12. Sources of Cash for Plan Distributions.

Except as otherwise provided in the Plan or the Confirmation Order, pursuant to Section 5.11 of the Plan, all cash necessary for the Reorganized Debtors to make payments pursuant to the Plan may be obtained from existing cash balances, the operations of the Debtors and the Reorganized Debtors or sales of assets, if any.

## 13. Restructuring Transactions.

Pursuant to Section 5.12 of the Plan, prior to, on or after the Effective Date, any Debtor or Reorganized Debtor may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions; provided, however, that (a) the Debtors shall have obtained the consent of a Majority of Consenting Noteholders prior to entering into or

undertaking any such Restructuring Transaction that is entered into or undertaken on or prior to the Effective Date and (b) any Restructuring Transaction that is entered into or undertaken after the Effective Date shall be subject to the terms of the Amended and Restated Credit Documents. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors; provided, however, that the Debtors shall have obtained the consent of a Majority of Consenting Noteholders prior to entering into any such Restructuring Transaction that is entered into on or prior to the Effective Date. In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations.

Schedule 5.12, to be filed with the Plan Supplement in form and substance reasonably acceptable, or acceptable, as the case may be, to a Majority of Consenting Noteholders in accordance with the Noteholders Support Agreement and Noteholders Plan Term Sheet, shall set forth a detailed description of the actions and steps required to implement the Restructuring Transactions.

On or prior to, or as soon as practicable after, the Effective Date, the Debtors or Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 5.12 of the Plan; provided, however, that the Debtors shall have obtained the consent of a Majority of Consenting Noteholders prior to entering into or undertaking any such Restructuring Transaction that is entered into or undertaken on or prior to the Effective Date. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, Sections 1123 and 1141 of the Bankruptcy Code and Section 303 of Title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind.

### 14. Additional Transactions Authorized Under the Plan.

In accordance with the provisions of the Plan and the Confirmation Order, on or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to Reinstate Claims or Interests or render Claims or Interests not Impaired.

**H.**    Treatment of Executory Contracts and Unexpired Leases.

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING THE TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

### 1. Assumption of Executory Contracts and Unexpired Leases.

Upon the occurrence of the Effective Date, all executory contracts or unexpired leases of the Debtors shall be deemed assumed in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, underline such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated in accordance with its terms, (iii) is an executory contract that is set forth on Exhibit 6.5 to the Plan, which shall be filed as an Exhibit to the Plan Supplement, or (iv) is subject to the Assumption/Rejection Motion. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of each such assumption pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to this Article VI shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Any monetary amounts by which each executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, pursuant to Section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by Section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtors unless otherwise ordered by the Bankruptcy Court.

Upon the occurrence of the Effective Date, all collective bargaining agreements entered into by the Debtors, or any of them, and in effect as of the Effective Date, shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the

collective bargaining agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order.

Insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date. To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to Section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor, its Estate, and all parties in interest in the Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement. To the extent that the Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Debtors reserve the right to seek rejection of such insurance policy or agreement or other available relief.

## 2. Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.5 of the Plan, which Exhibit shall be in form and substance reasonably acceptable to a Majority of Consenting Noteholders and which shall be attached as an Exhibit to the Plan Supplement, shall be deemed to have been rejected pursuant to Section 365 of the Bankruptcy Code. Each contract or lease listed on Exhibit 6.5 shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Debtors expressly reserve their right, at any time prior to the Effective Date, to amend Exhibit 6.5 to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto, provided, however, that such amendment to Exhibit 6.5 is reasonably acceptable to a Majority of Consenting Noteholders. To the extent that an executory contract or unexpired lease (i) is not listed on Exhibit 6.5, (ii) has not been previously rejected or (iii) is not subject to a motion to reject at the time of the Confirmation Date (including the Assumption/Rejection Motion), such executory contract or unexpired lease shall be deemed to have been assumed as provided in Section 6.1 of the Plan. Listing a contract or lease on Exhibit 6.5 shall not constitute an admission by a Debtor or a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

## 3. Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed with the Claims Agent and served upon counsel to the Debtors or the Reorganized

Debtors (as the case may be) by the earlier of thirty (30) days after the Effective Date or (ii) thirty (30) days after entry of a Final Order rejecting any executory contract or unexpired lease.

**I.**     Provisions Governing Distributions.

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

**1.     General Matters.**

Pursuant to Article VI of the Plan, except as otherwise provided in the Plan or as ordered by the Bankruptcy Court or to the extent that any Holder of an Allowed Claim agrees to different treatment, distributions to be made on account of Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Notwithstanding anything in the Plan to the contrary, distributions on account of Administrative Expense Claims that are Allowed Claims as of the Effective Date shall be made on, or as soon as practicable after the Effective Date, with no action to enforce a right to such payment until at least thirty (30) days after the Effective Date. Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Section 8.2 of the Plan. Notwithstanding the date on which any distribution of New RHDC Common Stock is actually made to a Holder of a Claim that is an Allowed Claim entitled to receive such distribution on the Effective Date, as of the date of the distribution such Holder shall be deemed to have the rights of a Holder of New RHDC Common Stock distributed as of the Effective Date. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**2.     Interest on Claims.**

As provided in Section 7.2 of the Plan, except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final Cash Collateral Orders), or required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

Notwithstanding the foregoing, the applicable borrower Debtor pursuant to the RHDI Credit Agreement, DMW Credit Agreement and DME Credit Agreement and the applicable Final Cash Collateral Order shall pay any reasonable fees and expenses due and payable, current scheduled amortization and interest at the non-default rate on the Revolving Loans and Term Loans, current fees in respect of any outstanding letters of credit and interest in respect of the Hedge Termination Payments, accruing thereunder, respectively, on or after the Petition Date and during the pendency of the Chapter 11 Cases.

**3.     Distributions.**

Except as specifically provided for in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to assist in or make the

distributions required by the Plan, including, but not limited to, the Indenture Trustees. Other than as specifically set forth in the Plan, distributions to be made on account of Allowed Noteholders Claims shall be made in accordance with the terms of the respective Notes Indenture or in accordance with the Plan to the extent that any such Notes Indenture is silent.

Section 7.4.2 of the Plan provides that, in the event that the Debtors or the Reorganized Debtors determine, with the reasonable consent of a Majority of Consenting Noteholders, that the aggregate dollar amount of Allowed General Unsecured Claims against any of RHDC, DMI, RHDI and DMW, respectively, exceeds the Maximum Payment for that particular Class, then the Debtors or the Reorganized Debtors, with the reasonable consent of a Majority of Consenting Noteholders, shall take any and all necessary steps to facilitate the *pro rata* distribution of the relevant Maximum Payment to the holders of Allowed General Unsecured Claims in such Class including, without limitation, seeking the Court's approval for setting reasonable reserves, if necessary, withholding portions of any distributions and/or providing other distribution mechanisms, as appropriate, pending the completion of the Claims allowance and reconciliation process for the applicable Debtor and/or Debtors. The Debtors reserve the right to modify, alter or supplement Section 7.4.2 of the Plan, with the reasonable consent of a Majority of Consenting Noteholders, on or before the Plan Supplement Filing Date.

Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001. If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent is notified in writing of such Holder's then current address.

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within six (6) months after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property. In such cases, any cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New RHDC Common Stock held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim or Interest.

### 4. Record Date for Distributions.

Under the terms of the Plan, with the exception of Allowed Prepetition Lenders Claims, the Debtors, the Reorganized Debtors, the Disbursing Agent and the Notes Indenture Trustees shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed

Claims or Interests that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date. The Reorganized Debtors, the Disbursing Agent, and the Notes Indenture Trustees shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official claims register as of the close of business on the Distribution Record Date.

Distributions to Holders of Allowed Noteholder Claims administered by each Notes Indenture Trustee shall be made, to the account of, or at the direction of, the respective Notes Indenture Trustee and subject to the rights of the Notes Indenture Trustees to assert their Notes Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such book-entry exchange, each Notes Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions on a *pro rata* basis as provided under the Plan with respect to such Claims upon which such Notes Indenture Trustee acts as trustee.

## 5. Means of Cash Payment.

Pursuant to Section 7.6 of the Plan, payments of cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfer from a bank selected by the Reorganized Debtors; provided that cash payments made to the Prepetition Lenders Agents shall be made in immediately available funds by wire transfer. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## 6. Withholding and Reporting Requirements.

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.

## 7. Setoffs.

Pursuant to Section 7.8 of the Plan, other than with regards to the Noteholders Claims, the RHDI Lender Claims, the DMW Lender Claims, and the DME Lender Claims, the Reorganized Debtors may, pursuant to Section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

### 8. Fractional Shares.

No fractional shares of New RHDC Common Stock shall be distributed. Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New RHDC Common Stock or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New RHDC Common Stock. The total number of shares of New RHDC Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for herein.

**J.** Provisions for Treatment of Disputed Claims and Disputed Interests.

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND DISPUTED INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

As set forth in Article VIII of the Plan, after the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim. After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court. In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim. Unless otherwise ordered by the Bankruptcy Court, the Debtors or Reorganized Debtors shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (a) ninety (90) days after the Effective Date or (b) such later date as may be determined by the Bankruptcy Court upon a motion which may be made without further notice or hearing.

No partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a Proof of Claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by Final Order. As soon as practicable after a disputed, contingent or unliquidated Claim becomes an Allowed Claim in an amount certain, the Holder of such Allowed Claim will receive all payments and distributions to which such Holder is then entitled under the Plan.

**K.** Confirmation and Consummation of the Plan.

### 1. Conditions to Confirmation of the Plan.

Pursuant to Section 9.1 of the Plan, the following are conditions precedent to the occurrence of the confirmation of the Plan, each of which may be satisfied or waived in accordance with Section 9.3 of the Plan:

(a) The Bankruptcy Court shall have entered an order, in a form reasonably acceptable to the Debtors and a Majority of Consenting Noteholders and the Prepetition Lenders Agents, approving the adequacy of the Disclosure Statement.

(b)     The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall be in form and substance reasonably acceptable to the Debtors, a Majority of Consenting Noteholders and the Prepetition Lenders Agents.

(c)     The Plan Related Documents shall each be in form and substance reasonably acceptable to the Debtors and a Majority of Consenting Noteholders.

## 2.     Conditions to Effective Date.

Pursuant to Section 9.2 of the Plan, the Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)     All conditions to Confirmation in Section 9.1 of the Plan shall have been either satisfied or waived.

(b)     The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors, a Majority of Consenting Noteholders and the Prepetition Lenders Agents.

(c)     All fees and expenses of counsel and the financial advisor to the Consenting Noteholders, as well as the out-of-pocket expenses of the Consenting Noteholders in connection with the restructuring of the Debtors that were incurred prior to the Confirmation Hearing, shall have been paid in full in cash.

(d)     Each of the Amended and Restated Credit Documents shall have been executed by the relevant Reorganized Debtors, and the Closing Date, as defined in each of the Amended and Restated Credit Documents, shall have occurred.

(e)     To the extent a Majority of Consenting Noteholders (i) determine that a Registration Rights Agreement is appropriate or necessary on the Effective Date and (ii) notify the Debtors in writing of such determination at least thirty (30) days prior to the Confirmation Hearing, then any such Registration Rights Agreement shall have been executed and delivered by the relevant Debtors.

## 3.     Waiver of Conditions.

Notwithstanding anything contained in Section 9.1 or 9.2 of the Plan, the Debtors, with the consent of a Majority of Consenting Noteholders, and, to the extent applicable, the Prepetition Lenders Agents, may waive in writing the occurrence of any of the foregoing conditions precedent to the Confirmation of the Plan and/or the Effective Date or to modify any of such conditions precedent; provided, however, that such consent shall not be unreasonably withheld or delayed.  Any such written waiver of a condition precedent set forth in Section 9.3 of the Plan may be effected at any time without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking

of any other such action. If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in the manner set forth above, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

**4.     Consequences of Non-Occurrence of Effective Date.**

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) to the extent permitted under the Bankruptcy Code, the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

**5.     Substantial Consummation.**

Substantial Consummation of the Plan shall be deemed to occur on the Effective Date.

**L.     Injunctions, Releases and Discharges**

**1.     Discharge of Claims and Termination of Interests.**

Pursuant to Section 10.1 of the Plan, as of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Interests, or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Interests or other rights of a Holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under Section 1141(d)(1)(A) of the Bankruptcy Code and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the Holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security Holder in any of the Debtors and all Interests, including RHDC Interests.

In addition, as of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against each of the Debtors, the Debtors' respective assets, property and Estates, the Reorganized Debtors and their respective Related Persons any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest and termination of all rights of any equity security Holder in any of the Debtors and all Interests, including RHDC Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any equity security Holder in any of the Debtors or terminated Interest, including an RHDC Interest.

### 2.  Discharge Injunction.

Pursuant to Section 10.1.2 of the Plan, except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is discharged pursuant to Section 10.1 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained prohibited, barred and enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors, any of their respective property and their respective Related Persons, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person discharged under Section 10.1.1 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

3. **Discharge and Discharge Injunction Integral to Plan.**

Each of the discharges and injunctions provided in Section 10.1 of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Debtors and the Reorganized Debtors shall have the right to independently seek the enforcement of the discharge and injunction set forth in Section 10.1 of the Plan.

4. **Releases by Debtors and Estates.**

Pursuant to Section 10.2.1 of the Plan, except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as representative of its respective Estate, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement, the Restructuring Transactions or the Plan Support Agreements that may be asserted by or on behalf of any of the Debtors or Reorganized Debtors or their respective Estates.

5. **Releases by Holders of Claims.**

Pursuant to Section 10.2.2 of the Plan, except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement, the Restructuring Transactions, the Plan Term

Sheets or the Plan Support Agreements; provided, however, that each Person that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in Section 10.2.2 of the Plan with respect to those Released Parties other than the Debtors, the Reorganized Debtors, and their respective predecessors, successors and assigns (whether by operation of law or otherwise).

6. **Injunction Related to Releases.**

Pursuant to Section 10.2.3 of the Plan, except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to Section 10.2 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person discharged under Section 10.1.1 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

7. **Releases and Injunctions Related to Releases Integral to Plan.**

Each of the releases and injunctions provided in Section 10.2 of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the releases and injunctions set forth in Section 10.2 of the Plan shall have the right to independently seek the enforcement of such releases and injunctions.

8. **Deemed Consent.**

By submitting a Ballot and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 10.2.2 of the Plan by marking the appropriate box on the Ballot, each Holder of a Claim or Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 10.2.2 of the Plan.

9. **No Waiver.**

Notwithstanding anything to the contrary contained in Section 10.2 of the Plan, the releases and injunctions set forth in Section 10.2 shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by the Reorganized Debtors pursuant to the Plan.

## M. <u>Supplemental Injunction</u>.

In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following injunctions to take effect as of the Effective Date.

Pursuant to Section 10.3 of the Plan, in order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in Sections 1141 and 524 of the Bankruptcy Code and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a) *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;*

(b) *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest*;

(c)    *creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;*

(d)    *except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest; and*

(e)    *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Related Documents or the Confirmation Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.*

## 2.    Bankruptcy Rule 3016 Compliance.

The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

## 3.    Integral to Plan.

Each of the injunctions provided in Section 10.3 of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Released Parties and any other Persons protected by the injunctions set forth in Section 10.3 of the Plan shall have the right to independently seek the enforcement of such injunctions.

## N.    Disallowed Claims And Disallowed Equity Interests.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on any and all disallowed Claims or disallowed Interests, and any Order disallowing any Claim or Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to Section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of Section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest, and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

**O.**     Exculpation.

Pursuant to Section 10.5 of the Plan, no Released Party shall have or incur any liability to (i) any Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) any other party in interest, (iii) any Person claiming by or through any of the foregoing entities, or (iv) any of the Related Persons of any of the foregoing entities, from (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken at any time or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement, the Restructuring Transactions, the Plan Term Sheets, the Plan Support Agreements, or any contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence, and each Released Party in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities under the Plan.

Notwithstanding any other provision herein, (i) no Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) no other party in interest, (iii) no Person claiming by or through any of the foregoing entities, and (iv) none of the Related Persons of any of the foregoing entities, shall, or shall be deemed to, have any Claim or right of action whatsoever against any Released Party for, or on account of or relating to (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Transactions, the Plan Term Sheets, the Plan Support Agreements, or any contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence.

**P.**     Revesting of Assets.

Pursuant to Section 1141(b) of the Bankruptcy Code, all property of the respective Estate of each Debtor, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens, Claims and Interests, except as specifically provided in the Plan or the Confirmation Order. Without limiting the

generality of the foregoing, each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for professional services and expenses.

**Q.**     Preservation of Rights of Action and Litigation Claims.

Pursuant to Section 10.7 of the Plan, except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims. The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Litigation Claims against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

**R.**     Survival of Indemnification Obligations.

**1.     Prepetition Indemnification and Reimbursement Obligations.**

Pursuant to Section 10.8.1 of the Plan, for purposes of the Plan, all respective obligations of RHDC and the other Debtors to indemnify and reimburse persons who are or were directors, officers, managers or employees and agents of the Debtors on the Petition Date or at any time thereafter, whether pursuant to certificates or articles of incorporation, codes of regulation, by-laws, limited liability company agreements, limited liability partnership agreements, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall be treated as if they are executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan as of the Effective Date, and such obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall not be discharged or impaired by the Plan, irrespective of whether the indemnification or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, managers or employees and agents of the Debtors shall survive the effectiveness of the Plan for claims related to or in connection with any actions, omissions or transactions prior to the Effective Date (including prior to the Petition Date). Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and the Debtors' assumption, of each of the Debtors' director and officer liability insurance policies. Additionally, the Debtors shall obtain (at market-based premiums) prior to the Effective Date insurance policies providing coverage for claims (as defined in such policies) made for any wrongful acts (as defined in such policies) or other covered conduct, acts or omissions occurring prior to the Effective Date (also referred to as "tail coverage") with coverage (in scope and substance) and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the date of entry of the Confirmation Order, which insurance policies shall be described in greater detail in the Plan Supplement and shall be reasonably acceptable to a Majority of Consenting Noteholders.

### 2. Integral Part of Plan.

Each of the provisions set forth in Section 10.8 of the Plan is an integral part of the Plan and is essential to its implementation. Each Person entitled to indemnification and insurance pursuant to Section 10.8 of the Plan shall have the right to independently seek the enforcement of each of the terms of Section 10.8 of the Plan.

**S.** <u>Miscellaneous Plan Provisions.</u>

THE FOLLOWING IS A SUMMARY OF CERTAIN MISCELLANEOUS PROVISIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

### 1. Retention of Jurisdiction.

Pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction pursuant to Section 11.1 of the Plan, over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, as more specifically described in Article XI of the Plan.

### 2. Surrender of Instruments.

As provided for in Section 12.1 of the Plan, as a condition to participation under the Plan, the Holder of a Note, debenture or other evidence of indebtedness of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such Note, debenture or other evidence of indebtedness shall surrender such Note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of an equity security or Note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the beneficial holder of such a Noteholders Claim shall be deemed to have surrendered such holder's security or Note, debenture or other evidence of indebtedness upon the surrender of such global security by DTC or such other securities depository or custodian thereof, or in the event the DTC or such other securities depository or custodian does not surrender such global security on the Effective Date or as soon as practicable thereafter, then the Debtors may waive any requirement of surrender of such Note. Except as otherwise provided in Section 12.1 of the Plan, if no surrender of a security, Note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance satisfactory to the Debtors, that such security, Note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim or Interest is based on such security, Note, debenture or other evidence of indebtedness thereof. The Debtors or the Reorganized Debtors (as the case may be) shall make subsequent distributions only to the persons who surrender the securities for exchange (or their assignees)

and the record Holders of such securities shall be those Holders of record as of the Effective Date.

### 3. Committees.

As provided for in Section 12.2 of the Plan, the appointment of the Unsecured Creditors Committee, and any other official committee in the Chapter 11 Cases, shall terminate on the Effective Date.

### 4. Post-Confirmation Date Retention of Professionals.

Pursuant to Section 12.3 of the Plan, upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

### 5. Bar Date for Payment or Reimbursement of Professional Fees and Expenses and Claims for Substantial Contribution.

Under the terms of Section 12.4 of the Plan, except as otherwise provided in the Final Cash Collateral Orders, all final requests for compensation or reimbursement of the fees of any professional employed in the Chapter 11 Cases pursuant to Section 327 or 1103 of the Bankruptcy Code or otherwise, including any Claims for making a substantial contribution under Section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and their counsel and the Office of the United States Trustee, not later than forty five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified in the preceding sentence and the requesting professional or other entity not later than twenty (20) days after the date on which the applicable application for compensation or reimbursement was served.

### 6. Effectuating Documents and Further Transactions.

Under Section 12.5 of the Plan, each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

### 7. Exemption from Transfer Taxes.

As provided in Section 12.6 of the Plan, pursuant to Section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, merger agreements,

agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, shall not be subject to any stamp tax or other similar tax.

### 8. Payment of Statutory Fees.

All fees payable pursuant to Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

### 9. Payment of Notes Indenture Trustee Fees.

Notwithstanding anything to the contrary in the Plan, the Notes Indenture Trustee Fees shall be paid in full, in cash, on the Effective Date; provided, however, that such amounts shall exclude any fees and expenses incurred by the Notes Indenture Trustees related to any objections to Confirmation of the Plan and/or such other actions that may interfere with or delay Confirmation of the Plan.

To the extent the Notes Indenture Trustee Fees are not paid in accordance with the Plan, the applicable Notes Indenture Trustee may assert the applicable Notes Indenture Trustee Charging Lien. The assertion of such Notes Indenture Trustee Charging Lien may potentially result in diluting and delaying distributions to the Noteholders.

### 10. Notes Indenture Trustees' Proofs of Claim in Respect of Noteholders Claims.

Consistent with Bankruptcy Rule 3003(c) and as provided in Sections 3.2.5(d), 3.3.4(d), 3.4.5(d), 3.5.5(d) and 3.5.6(d) of the Plan, in the event that the Notes Indenture Trustees file Proofs of Claim in respect of the Noteholders Claims and a Noteholder also files a Proof of Claim evidencing a duplicative Noteholders Claim, then only the applicable Proof of Claim filed by the Indenture Trustees shall be Allowed.

### 11. Amendment or Modification of the Plan.

Subject to Section 1127 of the Bankruptcy Code and, to the extent applicable, Sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors may alter, amend, modify or supplement the Plan, Plan Supplement or the Exhibits at any time prior to or after the Confirmation Date but prior to the Substantial Consummation of the Plan; provided, however, that any amendment, modification or supplement to the Plan is reasonably acceptable to a Majority of Consenting Noteholders and shall not be inconsistent with the terms of the Banks Support Agreements. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### 12. Severability of Plan Provisions.

Pursuant to the terms of Section 12.10 of the Plan, if prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or

provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13. Binding Effect; Successors and Assigns.

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and all other parties in interests in these Chapter 11 Cases and the respective successors and assigns of each of the foregoing, including, without limitation, the Reorganized Debtors. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 14. Revocation, Withdrawal or Non-Consummation of the Plan.

Subject to the rights of the Consenting Noteholders under the Noteholders Support Agreement and the Noteholders Plan Term Sheet, the Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

## VI. VOTING PROCEDURES AND REQUIREMENTS

The following Section describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims. If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot please call the Voting Agent, GCG, at 1-888-571-1767.

### A. Voting Deadline.

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE **ACTUALLY RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF 4:00 P.M. PREVAILING EASTERN TIME ON [DECEMBER 17, 2009] (THE "VOTING DEADLINE").  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.  ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

> **FOR FIRST CLASS MAIL:**
>
> THE GARDEN CITY GROUP, INC.
> ATTN: RHD BANKRUPTCY ADMINISTRATION
> P.O. BOX 9373
> DUBLIN, OH 43017-4273
>
> **FOR OVERNIGHT MAIL AND HAND DELIVERY:**
>
> THE GARDEN CITY GROUP, INC.
> ATTN: RHD BANKRUPTCY ADMINISTRATION
> 5151 BLAZER PARKWAY, SUITE A
> DUBLIN, OH 43017

Ballots will only be counted if mailed to the above address. Ballots cannot be transmitted orally, by facsimile or by electronic mail.  Accordingly, you are urged to return your signed and completed Ballot promptly.  Any executed Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both an acceptance and rejection of the Plan shall not be counted.

THE DEBTORS INTEND TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

**B.**    Holders of Claims Entitled to Vote.

In general, a holder of a claim may vote to accept or reject a plan of reorganization if (i) the holder's claim or interest is "allowed," i.e. generally not disputed, contingent, or unliquidated, and (ii) such holder's claim or equity interest is "impaired" (as defined below) by the plan.  However, if a holder of an allowed and impaired claim will not receive any distribution under a plan, than such holder is deemed to have rejected the plan and is not entitled to vote.  In the same vein, a holder of an allowed and unimpaired claim will be presumed to have accepted the plan and will not be entitled to vote.

Under the Bankruptcy Code, a class of claims or equity interests is presumed impaired unless a plan (i) does not alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder thereof; or (2) regardless of any legal right to an accelerated

payment of such claim or equity interest the plan (a) cures all existing defaults, except the defaults of a kind specified in Section 365(b)(2), (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim for any damages incurred as a result any such holder's reasonable reliance on such legal right to an accelerated payment, and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

As detailed in Section V.F.1 above, the Debtors are soliciting votes on the Plan from the Holders of Allowed Claims in Classes 1C through 19C, 1D through 19D, 1E through 20E, 1F through 16F, 1G, 3G, 4G, 10G through 16G, 1H and 4H, and the Holders of Allowed Claims in each are entitled to vote to accept or reject the Plan.

Also as detailed in Section V.F.3 above, with respect to the Impaired Class of Interests that is deemed to reject the Plan (Class 1I), and any other Class of Claims that votes to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

ANY VOTE NOT SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE WILL NOT BE COUNTED PURSUANT TO SECTION 1126(E) OF THE BANKRUPTCY CODE.

**C.** <u>Vote Required for Acceptance by a Class of Claims.</u>

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Solicitation Order.

**D.** <u>Voting Procedures.</u>

**1.** **Ballots.**

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

ANY BALLOT THAT IS RECEIVED BUT WHICH IS NOT SIGNED OR THAT OTHERWISE CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE CONSIDERED AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERRING ACCEPTANCE OR REJECTION OF THE PLAN.

In order for a vote to be counted, the respective Holder must complete and sign an original Ballot and return it in the envelope provided (only original signatures will be accepted). In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a contested Claim, this amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into which the Claim has been placed under the Plan. Accordingly, in voting to accept or reject the Plan, a Holder must use only the coded Ballot or Ballots sent with this Disclosure Statement.

Ballots must be delivered to the Voting Agent, at its address set forth above, and actually received by the Voting Deadline. THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this Disclosure Statement.**

### 2. Withdrawal or Change of Votes on the Plan.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any Holder of a Claim who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received with respect to the same Claim or Interest, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines was the last to be received.

## VII. CONFIRMATION OF THE PLAN

### A. Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to Section 1128 of the Bankruptcy Code will be held on [January 12, 2010] at [_____] [_.m.], prevailing Eastern Time, before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 3, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they

are received **on or before [December 17, 2009] at [4:00 p.m.], prevailing Eastern Time** by the following parties:

Counsel to the Debtors:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Facsimile: (312) 853-7036
Attn: James F. Conlan
     Jeffrey E. Bjork
     Paul S. Caruso

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Facsimile: (302) 571-1253
Attn: Robert S. Brady
     Edmon L. Morton

The United States Trustee:

U.S. Trustee
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, DE 19801
Facsimile: (302) 573-6497
Attn: Richard Schepacarter

Counsel to the Official Committee of Unsecured Creditors:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Facsimile: (646) 728-1669
Attn: Mark Somerstein
     Anne H. Pak

Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Facsimile: (302) 295-2013
Attn: Mark E. Felger

Counsel to the Consenting Noteholders:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Facsimile: (212) 872-1002
Attn: Michael S. Stamer
     Sarah Link Schultz
     Kristina M. Wesch

Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Facsimile: (302) 425-6464
Attn: Bonnie Glantz Fatell, Esq.

     Objections to confirmation of the Plan are governed by Rule 9014 of the Bankruptcy Rules. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.**    <u>Statutory Requirements for Confirmation of the Plan.</u>

     At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for

confirmation are that the Plan (i) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of Holders of Claims and Interests impaired under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(B) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

      1.      **Acceptance.**

Claims and Interests in Classes 1C through 19C, 1D through 19D, 1E through 20E, 1F through 16F, 1G, 3G, 4G, 10G through 16G, 1H, 4H and 1I are Impaired under the Plan (the "Impaired Classes"). As a condition to Plan Confirmation, the Bankruptcy Code requires that each Impaired Class vote to accept the Plan unless the Plan satisfies the "fair and equitable test" (as described below) as applied to such non-accepting Impaired Class. As such, the Impaired Classes must accept the Plan in order for it to be confirmed without application of the "fair and equitable test."

As stated above, Impaired Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims or Interests of each such Class (other than any Claims of creditors designated under Section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The Claims and Interests in Classes 1A through 19A, 1B through 19B, 2G, 3H, 4I, 5G through 9G, 10H through 16H, and 17F through 20F are Unimpaired under the Plan, and the Holders of Allowed Claims in each of these Classes are conclusively presumed to have accepted the Plan.

The Interests in Class 1I are Impaired and the Holders of such Interests will not receive or retain any property under the Plan. Accordingly, Class 1I is deemed not to have accepted the Plan and confirmation of the Plan will require application of the "fair and equitable test," described below.

      2.      **Fair and Equitable Test.**

The Debtors will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any impaired Class of Claims or Interests. To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting

class and if no class receives more than it is entitled to on account of its claims or interests. The Debtors believe that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(a)  Secured Creditors.  Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(b)  Unsecured Creditors.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)  Interest Holders.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the non-accepting class will not receive or retain any property under the plan.

**THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS FOR EACH DEBTOR ENTITY VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**

**3.  Feasibility.**

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Debtors and their financial advisors have analyzed the Debtors' ability to meet their obligations under the Plan. As part of that analysis, the Debtors have prepared consolidated projected financial results for each of the years ending December 31, 2009 through and including December 31, 2014. These financial projections, and the assumptions on which they are based (collectively, the "Projections"), are set forth in Exhibit E to this Disclosure Statement.

THE PROJECTIONS ARE SUBJECT TO FURTHER REVIEW AND ANALYSIS BY THE DEBTORS, AND THE DEBTORS RESERVE THE RIGHT TO SUPPLEMENT, AMEND, UPDATE AND/OR OTHERWISE MODIFY SUCH PROJECTIONS PRIOR TO THE HEARING ON THE DISCLOSURE STATEMENT AND UP TO AND THROUGH THE PLAN SUPPLEMENT FILING DATE.

The Debtors have prepared the Projections based upon certain assumptions that they believe to be reasonable under the current circumstances. Those assumptions the Debtors considered to be significant are described in Article VIII herein and the notes which are part of the Projections. The Projections have not been examined or compiled by independent accountants. Many of the assumptions on which the Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the Debtors' actual financial results. Therefore, the actual results achieved by the Debtors throughout the period covered by the Projections may vary from the projected results, and the variations may be material. In evaluating the Plan, all Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based.

### 4. Best Interests Test and Liquidation Analysis.

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "Best Interests Test"), each Holder of an Impaired Claim or Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in Chapter 7. The gross amount of cash available for distribution to creditors would be the sum of the proceeds from the disposition of the Debtors' assets during, and the cash held by the Debtors at the commencement of, their hypothetical Chapter 7 cases. Such amount would then be reduced by the costs and expenses of the liquidation. In order to determine whether the Best Interests Test has been satisfied, available cash and the proceeds from the hypothetical liquidation of the Debtors' assets would be applied to Secured Claims (to the extent of the value of the underlying collateral) and to satisfy Administrative Expense Claims (including any incremental Administrative Expense Claims that may result from the termination of the Debtors' businesses and the liquidation of their assets), Priority Tax Claims, and Priority Non-Tax Claims, all of which are senior in priority to Noteholders Claims and General Unsecured Claims. Any remaining cash would be available for distribution to the Holders of Noteholders Claims, General Unsecured Claims, Convenience Claims, and RHDC Interests in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The liquidation analysis attached hereto as Exhibit F (the "Liquidation Analysis") was prepared by the Debtors with assistance from their financial advisors, including Deloitte, and represents the Debtors' best current estimate of the cash proceeds, net of liquidation-related costs, that would potentially be available for distribution to the Holders of Claims and RHDC Interests if each of the Debtors were hypothetically liquidated under Chapter 7 of the Bankruptcy Code. The Liquidation Analysis assumes that the Debtors' Chapter 11 cases are converted into liquidation cases under Chapter 7 in a "shut-the-door" liquidation that does not preserve the

going concern value of the Debtors' estates. Unless otherwise stated, (i) the asset values used in the Liquidation Analysis reflect the unaudited book values of the Debtors' assets as of July 31, 2009 and (ii) the Debtors' liabilities are based on the Debtors' actual liabilities as of the Petition Date.

The Debtors' liquidation costs in a hypothetical Chapter 7 case would include the compensation of a bankruptcy trustee, as well as the compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the Debtors' operation during the pendency of the hypothetical Chapter 7 cases, and all unpaid Administrative Expense Claims that are allowed in the hypothetical Chapter 7 cases. The liquidation itself might trigger certain Priority Tax Claims or Priority Non-Tax Claims, such as Priority Non-Tax Claims for severance pay, and would likely accelerate Claims or, in the case of taxes, make it likely that the Internal Revenue Service would assert all of its Claims as Priority Tax Claims rather than asserting them in due course as is expected to occur during the course of the Chapter 11 Cases. These Priority Tax Claims and Priority Non-Tax Claims, which are not estimated for purposes of the Liquidation Analysis, would be paid in full out of the net liquidation proceeds, after payment of Secured Claims, Chapter 7 costs of administration, and other Administrative Expense Claims, and before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

**THE INFORMATION SET FORTH IN THE LIQUIDATION ANALYSIS IS PRELIMINARY AND IS SUBJECT TO MODIFICATION, REVISION AND SUPPLEMENTATION BY THE DEBTORS AT ANY TIME UP TO THE PLAN SUPPLEMENT FILING DATE.**

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR THE PURPOSES OF ESTIMATING THE NET PROCEEDS POTENTIALLY AVAILABLE FOR DISTRIBUTION IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED AS OR CONSTITUTES A CONCESSION OR ADMISSION FOR ANY PURPOSE OTHER THAN THE PRESENTATION OF A HYPOTHETICAL LIQUIDATION ANALYSIS FOR PURPOSES OF THE BEST INTERESTS TEST. THE LIQUIDATION ANALYSIS HAS NOT BEEN INDEPENDENTLY AUDITED OR VERIFIED.

The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors and their financial advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies that are beyond the control of the Debtors and their management. Accordingly, there can be no assurance that the estimated values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo a liquidation under Chapter 7. In addition, any such liquidation would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the Liquidation Analysis is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual liquidation proceeds could vary significantly from the amounts set forth in the Liquidation Analysis. Such actual liquidation proceeds could be materially higher or lower than the amounts set forth in the Liquidation Analysis, and no representation or warranty can be or is being made

with respect to the actual proceeds that would be generated from a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. The Liquidation Analysis should be read and considered in conjunction with the accompanying notes and assumptions.

As demonstrated by the Liquidation Analysis, the Debtors believe that under the Plan, Holders of Impaired Claims against and Impaired Interests in each Debtor will receive property with a value equal to or in excess of the value such Holders would receive in a hypothetical liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. Accordingly, the Liquidation Analysis demonstrates that the Plan satisfies the requirements of the "Best Interests Test."

## VIII. PROJECTED FINANCIAL INFORMATION

**A.** Projected Financial Information.

The Debtors believe that the Plan meets the feasibility requirement set forth in Section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Management developed a business plan and prepared financial projections for the calendar years 2009 through 2014 (the "Projection Period"). The Projections are attached to this Disclosure Statement as Exhibit E.

THE PROJECTIONS ARE SUBJECT TO FURTHER REVIEW AND ANALYSIS BY THE DEBTORS, AND THE DEBTORS RESERVE THE RIGHT TO SUPPLEMENT, AMEND, UPDATE AND/OR OTHERWISE MODIFY SUCH PROJECTIONS PRIOR TO THE HEARING ON THE DISCLOSURE STATEMENT AND UP TO AND THROUGH THE PLAN SUPPLEMENT FILING DATE.

The Debtors prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of the Debtors and the Reorganized Debtors. The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or Interests or other parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, even in the event that any or all of the underlying assumptions are shown to be in error.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement. Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections,

estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Projections included herein were prepared by Debtors' management prior to the Petition Date and were included in the Form 8-K that the Debtors filed with the Securities and Exchange Commission on May 29, 2009. Debtors' management is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Projections due to a material change in the Debtors' prospects.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' PROFESSIONALS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE X OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in RHDC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, RHDC's Quarterly Report on Form 10-Q for the second quarter ending June 30, 2009, and other RHDC reports to the Securities and Exchange Commission filed prior to the Bankruptcy Court's approval of this Disclosure Statement. These filings are available by visiting the Securities and Exchange Commission's website at http://www.sec.gov or the Debtors' website at http://www.rhd.com.

**B.**     Valuation of the Reorganized Debtors.

**THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE REORGANIZED DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED PURSUANT TO THE PLAN.**

1. **Overview.**

    The Debtors have been advised by Lazard, their investment banker and financial advisor, with respect to the consolidated enterprise value of the Reorganized Debtors (which consists of the aggregate enterprise value of Reorganized RHDC and its direct and indirect subsidiaries) on a going-concern basis (the "Enterprise Value").  The consolidated Enterprise Value is comprised of the following components: (a) the estimated value of the Reorganized Debtors' operations on a going concern basis and (b) the estimated value of tax attributes, including NOLs, amortizable tax basis, and original issue discount, as of an assumed Effective Date of December 31, 2009, with which the Debtors are expected to emerge from bankruptcy.  Solely for purposes of the Plan, the implied consolidated equity value of the Reorganized Debtors (the "Equity Value") is calculated as the Enterprise Value less the Debtors' projected total debt of $3.440 billion plus the projected cash balance of $125 million as of an assumed Effective Date of December 31, 2009.[23]

    Lazard has advised the Debtors that it believes that the proposed allocation of New RHDC Common Stock to the Holders of each of the RHDC Notes, the RHDI 11.75% Senior Notes, the DMI Notes and the DMW Notes and the proposed allocation of the New RHDC Notes to the Holders of the DMW Senior Notes reflect a reasonable allocation of the going concern value of Reorganized RHDC among the Holders of RHDC Notes, RHDI 11.75% Senior Notes, DMI Notes, and DMW Notes, based on, among other things, input from management of the Debtors as well as their legal advisors regarding the amount and appropriate treatment of the various claims against the applicable Debtor (including intercompany claims, the expenses of administration and claims of senior indebtedness) and based on other information provided by the Debtors and subject to all the qualifications and limitations set forth herein.

    Solely for purposes of the Plan, and consistent with the terms negotiated between the Debtors and the Consenting Noteholders in the Noteholders Support Agreement, Lazard has preliminarily estimated the hypothetical range of Enterprise Value to be between $4.235 billion and $5.350 billion.  As described above, this estimated hypothetical range of Enterprise Value includes approximately $500 million to $560 million of value associated with Reorganized RHDC tax attributes as of an assumed Effective Date of December 31, 2009.  Assuming the projected debt and cash balances as of an assumed Effective Date of December 31, 2009, this implies a range of consolidated Equity Value of the Reorganized Debtors between $920 million and $2.035 billion.  Based upon the implied range of Equity Value for the Reorganized Debtors and allocation of the New RHDC Common Stock among the Noteholders as reflected in the Plan, solely for purposes of the Plan, Lazard has preliminarily estimated the hypothetical range of the value of the New RHDC Common Stock to be distributed to the Noteholders is as follows: (i) between $193 million and $427 million for Holders of RHDC Notes; (ii) between $214 million and $474 million for Holders of DMI Notes; (iii) between $237 million and $525 million for Holders of RHDI 11.75% Senior Notes; (iv) between $120 million and $265 million for Holders of DMW Senior Notes; and (v) between $155 million and $344 million for Holders of

---

[23] Consistent with the terms of the Plan Support Agreements, the Debtors currently anticipate emerging from bankruptcy protection after January 1, 2010 but no later than January 31, 2010.  Lazard has advised the Debtors that the use of an assumed Effective Date that occurs after December 31, 2009 but no later than January 31, 2010 would not result in any material modifications to the hypothetical range of the Enterprise Value and the hypothetical range of the consolidated Equity Value of the Reorganized Debtors that are set forth in this Disclosure Statement.

DMW Senior Subordinated Notes. The foregoing preliminary estimates do not give effect to the potentially dilutive effect of any Management Incentive Plan.

Lazard has advised the Debtors that it believes that the proposed allocation of New RHDC Common Stock to the Holders of each of the RHDC Notes, the RHDI 11.75% Senior Notes, the DMI Notes and the DMW Notes and the proposed allocation of the New RHDC Notes to the Holders of the DMW Senior Notes is reasonable, based on, among other things, input from management of the Debtors as well as their legal advisors regarding the amount and appropriate treatment of the various claims against the applicable Debtor (including intercompany claims, the expenses of administration and claims of senior indebtedness) and based on other information provided by the Debtors and subject to all the qualifications and limitations set forth herein. However, Lazard's estimates of the hypothetical ranges of Enterprise Value and Equity Value do not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ESTIMATED HYPOTHETICAL RANGE OF ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 31, 2009, REFLECTS INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE AS OF AUGUST 31, 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT THESE VALUES, NEITHER THE DEBTORS NOR LAZARD SHALL HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THESE ESTIMATES.[24]**

With respect to the Financial Projections prepared by the management of the Debtors and included as Exhibit E to this Disclosure Statement, Lazard assumed that such Financial Projections were reasonably prepared in good faith and on a basis reflecting the most accurate currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimate of the hypothetical range of the Enterprise Value assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors in all material respects, including revenue growth and changes in operating margins, earnings and cash flow. If the Reorganized Debtors perform at levels materially above or below those set forth in the Financial Projections, such performance may have a material impact on the estimated hypothetical range of Enterprise Value.

In estimating the hypothetical range of the Enterprise Value of the Reorganized Debtors, Lazard (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Projections contained in Exhibit E to this Disclosure Statement, which data was prepared and provided to Lazard by the management of the Debtors and which relate to the Debtors' business and its prospects; (c) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the market value of public companies that Lazard deemed

---

[24] The Debtors and their advisors continue to analyze and conduct due diligence with respect to the various matters summarized in this section, including, without limitation, the Debtors' available NOLs as of the projected Effective Date. Accordingly, the Debtors reserve the right to supplement, modify, update and/or revise the information set forth in this section, if and as they may deem appropriate, through the hearing on approval of this Disclosure Statement and potentially up to the Plan Supplement Filing Date.

generally comparable to the operating business of the Debtors; (e) considered relevant precedent transactions in the print directory industry; (f) considered certain economic and industry information relevant to the operating business; and (g) conducted such other studies, analysis, inquiries, and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Debtors' business and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.

Lazard did not independently verify management's projections in connection with such estimates of the hypothetical range of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. In the case of the Reorganized Debtors, the estimates of the Enterprise Value prepared by Lazard represent the hypothetical reorganization value of the Reorganized Debtors. Such estimates were developed solely for purposes of the Plan and the analysis of implied relative recoveries to creditors thereunder. Such estimates reflect computations of the hypothetical range of the estimated Enterprise Value of the Reorganized Debtors through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimate of the range of the Enterprise Value of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Debtors, Lazard, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities.

As noted above, this estimate of the hypothetical range of Enterprise Value consists of the aggregate Enterprise Value of Reorganized RHDC and its direct and indirect subsidiaries on a going-concern basis. The Plan is premised upon complete deconsolidation of the Debtor entities. As such, the values of the individual Debtors subsidiaries of RHDC and the Claims against such Debtors may affect what is available for distribution to the creditors of each separate Debtor.

## 2. **Additional Assumptions Regarding the Reorganized Debtors.**

Solely for purposes of the Plan, with respect to the hypothetical range of Enterprise Value of the Reorganized Debtors, in addition to the foregoing, Lazard has relied upon the following assumptions:

- The successful reorganization of the Debtors' businesses and finances in a timely manner.

- The implementation of the Reorganized Debtors' business plan and the achievement of the financial forecasts reflected therein.

- The present senior management of the Debtors will continue in their current positions following consummation of the Plan.

- The general financial and market conditions as of the assumed Effective Date of the Plan will not differ materially from those conditions prevailing as of the date of this Disclosure Statement or through the projection period.

- The Enterprise Value consists of the aggregate enterprise values of Reorganized RHDC and its direct and indirect subsidiaries.

- The Plan becomes effective in accordance with the estimates and other assumptions discussed herein.

Lazard's estimate represents a hypothetical range of value that reflects the estimated intrinsic value of the Reorganized Debtors derived through the application of various valuation techniques. Such analysis does not purport to represent valuation levels that would be achieved in, or assigned by, the public markets for debt and equity securities or private markets for corporations. Lazard's estimate of the hypothetical range of Enterprise Value does not purport to be an appraisal or to necessarily reflect the values which may be realized if assets are sold as a going concern, in liquidation, or otherwise.

### 3. __Valuation Methodology.__

The following is a brief summary of certain financial analyses performed by Lazard, including a discounted cash flow analysis, publicly traded company analysis and precedent transactions analysis, to arrive at its estimate of the hypothetical range of the Enterprise Value of the Reorganized Debtors. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of the Debtors on which such analyses were based and other factors, including the projected financial results of the Reorganized Debtors. Lazard's estimates of the hypothetical range of Enterprise Values predominately relied upon the discounted cash flow analysis methodology given the limitations associated with the applicability of both the publicly traded company analysis and precedent transactions analysis in determining the Enterprise Value of the Reorganized Debtors for reasons described below.

Under the valuation methodologies summarized below, Lazard derived a range of hypothetical enterprise values assuming the Reorganized Debtors are full taxpayers. Lazard separately analyzed the value of the Debtors' tax attributes as of the assumed Effective Date, and added this value to derive the Enterprise Value.

(a)     Discounted Cash Flow Analysis

The Discounted Cash Flow ("DCF") analysis is a forward-looking enterprise valuation methodology that relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "WACC"). The WACC reflects the estimated blended rate of return that debt and equity investors would require to invest in the business based on its capital structure. The DCF analysis has three components: the present value of the projected un-levered after-tax free cash flows for a determined period, the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections) and the present value of the below market cost of secured debt at DME and DMW through the term of the relevant securities.

As the estimated cash flows and estimated WACC of the Reorganized Debtors are used to derive a potential value, an analysis of the results of such an estimate is not purely mathematical, but instead involves complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, as well as other factors that could affect the future prospects and cost of capital considerations for the Reorganized Debtors.

The DCF calculation was performed based on un-levered after-tax free cash flows for the projection period of 2010 to 2014. Lazard utilized management's detailed financial projections as the primary input. Beginning with earnings before interest and taxes ("EBIT"), the analysis taxes this figure at an assumed rate of 40% to calculate an un-levered net income figure. The analysis then adds back the non-cash operating expense of depreciation and amortization. In addition, other factors affecting free cash flow are taken into account, such as the change in working capital, pension contributions and capital expenditures, all of which do not affect the income statement and therefore require separate adjustments in the calculation.

Lazard performed this valuation for each of the four main operating entities, RHDI, DME, DMW and Business.com, on a deconsolidated basis assuming these entities were burdened with their proportionate share of RHDC overhead. The consolidated Enterprise Value of the Reorganized Debtors includes the sum of the discounted cash flow values for these four operating entities.

In performing the calculation, Lazard used a range of WACCs to discount future cash flows and terminal values between 9.0% and 11.0% for DME, DMW and RHDI, and between 15.5% and 17.5% for Business.com. These ranges are premised on a market cost of debt, not the anticipated cost of debt of the Reorganized Debtors upon emergence from bankruptcy. The Reorganized Debtors are only expected to benefit from the below market cost of secured debt through the October 2014 maturity of their credit facilities. The value of this benefit is measured separately. Lazard used a range of exit multiples of 2014 earnings before interest, taxes, depreciation and amortization ("EBITDA") between 4.75x and 6.25x for DME, DMW and RHDI, and 6.0x and 8.0x for Business.com to determine terminal values.

Finally, using the pricing of the new RHDI secured debt as a proxy for a market cost of debt (LIBOR + 600-625bps; 300bps LIBOR floor), Lazard calculated the present value benefit of

the Reorganized Debtors' below market cost of debt at DME (LIBOR + 250bps) and DMW (LIBOR + 450 bps; 300bps LIBOR floor).  In performing this calculation, Lazard measured the difference between the actual cost of debt at DME and DMW and the assumed market cost of debt and discounted this difference at a range of WACCs between 9.0% and 11.0%.  In performing this analysis, we assumed that the Reorganized Debtors will pay alternative minimum tax of 20%.

(b)     <u>Publicly Traded Company Analysis</u>

A publicly traded company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company.  The analysis establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as EBITDA.  The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet and cash flow statement.  In addition, each company's performance, profitability, margins, leverage and business trends are also examined.  Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company.  Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, market presence, size, and scale of operations.  The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information.  However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

Given the limited universe of comparable companies, coupled with the fact that most print directory and local media companies are highly distressed due to industry fundamentals, there are limitations as to its applicability in determining the Enterprise Value.

(c)     <u>Precedent Transactions Analysis</u>

The precedent transactions analysis estimates value by examining public merger and acquisition transactions.  The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors.  Since precedent transaction analysis reflects aspects of value other than the intrinsic value of a company, coupled with the fact that these transactions occurred in a different operating and financial environment, there are limitations as to its applicability in determining the Enterprise Value.

(d)     <u>Analysis of Post-Emergence Tax Attributes</u>

The Reorganized Debtors expect to have significant tax attributes, including NOLs, amortizable tax basis and original issue discount, which are expected to result from the deemed

exchanges for tax purposes of the DME, DMW and RHDI secured debt, following their emergence from bankruptcy. It is expected that the Debtors' tax attributes as of the filing date, plus the NOLs created through the pendency of bankruptcy, will exceed any cancellation of debt income (COD). Lazard has valued these tax attributes of the Reorganized Debtors by calculating the present value of the tax savings they would be expected to provide relative to the taxes the Reorganized Debtors would otherwise pay absent the availability of such attributes. Based on input from management and the Debtors' tax advisors, Lazard assumed that the cash flows resulting from the benefit of Reorganized Debtors' tax attributes would be subject to alternative minimum tax. These cash flows were then discounted at a range of discount rates, based on the Reorganized Debtors' relevant cost of capital or cost of equity. Furthermore, Lazard took into account a variety of qualitative factors in estimating the value of the tax attributes, including such factors as implementation and utilization risk.

**THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF AN ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION. IN PERFORMING THEIR ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.**

**IX.** DESCRIPTION OF CAPITAL STOCK OF REORGANIZED RHDC

On the Effective Date, the authorized capital stock of Reorganized RHDC will consist of a fixed number of shares of New RHDC Common Stock. Set forth below is a summary of (i) the terms of the New RHDC Common Stock, which will be set forth in their entirety in the Amended and Restated Certificate of Incorporation of Reorganized RHDC (the "Certificate of Incorporation"), which will be substantially in the form attached as Exhibit 5.2.1(1) to the Plan and (ii) the number and par value of shares of preferred stock authorized by the Certificate of Incorporation. Consistent with, but only to the extent required by, Section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall prohibit the issuance of non-voting equity securities. To the extent that there is any inconsistency between this summary and the Certificate of Incorporation, the terms of the Certificate of Incorporation shall control.

**A.** RHDC Common Stock.

The Certificate of Incorporation provides that Reorganized RHDC will have authorized [_____] ([_____]) shares of common stock, $.01 par value per share. Each share of New RHDC Common Stock will have one vote upon all matters to be voted on by the holders of New RHDC Common Stock, and shall be entitled to participate equally in all dividends payable with respect to the New RHDC Common Stock. The Board of Directors of Reorganized RHDC will

be elected by the affirmative vote of a majority of the New RHDC Common Stock present and entitled to vote on such matter.  Each share of New RHDC Common Stock will share equally, subject to the rights and preferences of any series of outstanding New RHDC Preferred Stock (as fixed by resolutions, if any, of the Board of Directors), in all assets of Reorganized RHDC, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of RHDC, or upon any distribution of the assets of the Reorganized RHDC.  Holders of the New RHDC Common Stock will not have preemptive rights.  Voting of the New RHDC Common Stock will not be cumulative.

**B.**     RHDC Preferred Stock.

The Certificate of Incorporation provides that Reorganized RHDC will have authorized [_____] ([_____]) shares of preferred stock, $.01 par value per share (the "New RHDC Preferred Stock"), issuable in one or more series by the Board of Directors without stockholder approval.  The Plan does not provide for issuance of any preferred stock as of the Effective Date.

# X. RISK FACTORS

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

**A.**     General Bankruptcy Law Considerations.

**1.**     **Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.**

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

In the event that any Class of Claims entitled to vote fails to accept the Plan in accordance with Section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 12.9

thereof. While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under Section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to any Class that may reject or may be deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

### 2. Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.

There can be no assurance with respect to timing of the Effective Date. The occurrence of the Effective Date is also subject to certain conditions precedent as described in Article IX of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

### B. Other Risk Factors.

### 1. Variances from Projections May Affect Ability to Pay Obligations.

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the pro forma financial statements attached as Exhibit E to this Disclosure Statement, in connection with the development of the Plan and in order to present the anticipated effects of the Plan and the transactions contemplated thereby. The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial position of the Reorganized Debtors for the periods indicated. The Projections are

qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Projections. The Projections are based upon a variety of assumptions as set forth therein, and the Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic and competitive uncertainties, many of which are beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations. Accordingly, actual results may vary materially from those shown in the Projections, which may adversely affect the ability of the Reorganized Debtors to pay the obligations owing to certain Holders of Claims entitled to distributions under the Plan and other indebtedness incurred after confirmation of the Plan.

Management believes that the industries in which the Reorganized Debtors will be operating are volatile due to numerous factors, all of which make accurate forecasting very difficult. Although it is not possible to predict all risks associated with the Projections and their underlying assumptions, there are some risks which management is presently able to identify. The Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in this Disclosure Statement and that the publicity associated with the bankruptcy proceeding contemplated by the Plan will not adversely affect the Reorganized Debtors' operating results. There can be no assurance that these two assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Reorganized Debtors' businesses, results of operations and financial condition.

Moreover, the Projections were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. Rather, the Projections were developed in connection with the planning, negotiation and development of the Plan. The Reorganized Debtors do not undertake any obligation to update or otherwise revise the Projections to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. In management's view, however, the Projections were prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of the Reorganized Debtors after the Effective Date. Nevertheless, the Projections should not be regarded as a representation, guaranty or other assurance by the Debtors, Reorganized RHDC, the Reorganized Debtors or any other person that the Projections will be achieved and holders are therefore cautioned not to place undue reliance on the projected financial information contained in this Disclosure Statement.

### 2. Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations.

Although the Plan will result in the repayment of approximately $700 million of secured debt and the elimination of approximately $5.7 billion of unsecured debt, the Reorganized Debtors will continue to have a significant amount of indebtedness.

Such levels of indebtedness may limit the ability of the Reorganized Debtors to refinance, obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes. Such levels of indebtedness may also limit the ability of the Reorganized Debtors to adjust to changing market conditions and to withstand competitive pressures, possibly leaving the Reorganized Debtors vulnerable in a downturn in general economic conditions or in their businesses or unable to carry out capital spending that is important to their growth and productivity improvement programs.

### 3. The Debtors May Have Insufficient Liquidity to Successfully Operate Their Businesses.

The Debtors expect to incur significant costs as a result of the Chapter 11 Cases. The Debtors are currently financing their operations during their reorganization using cash on hand and cash generated by operations which constitutes cash collateral pursuant to, and in accordance with, final cash collateral orders which were agreed to by the Debtors' secured lenders and approved by the Bankruptcy Court. In the event that the Debtors lose their authority to use cash collateral and do not have sufficient liquidity to fund their operations such that they need to obtain additional financing, there can be no assurance as to the Debtors' ability to obtain sufficient financing on acceptable terms or at all. The challenges of obtaining financing, if necessary, would be exacerbated by adverse conditions in the general economy and the volatility and tightness in the financial and credit markets. These conditions and our Chapter 11 Cases would make it more difficult for the Debtors to obtain financing.

### 4. Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.

It has been generally assumed in the preparation of the Projections that the historical book value of the Debtors' assets approximates those assets' fair value, except for specific adjustments. For financial reporting purposes, the fair value of the Debtors' assets must be determined as of the Effective Date. This determination will be based on an independent valuation. Although the Debtors do not presently expect this valuation to result in values that are materially greater or less than the values assumed in the preparation of the Projections, the Debtors can make no assurances with respect thereto.

### 5. Historical Financial Information May Not Be Comparable.

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 6. Market and Business Risks May Adversely Affect Business Performance.

In the normal course of business, the Debtors are subject to certain types of risks and variables, which the Debtors anticipate may materially affect their business performance following the Effective Date.[25] For example, the local search industry in which the Company

---

[25] See also RHDC's Annual Report on Form 10-K for the year ended December 31, 2008 and the additional "Risk Factors" contained therein.

operates is highly competitive and fragmented. The Company competes with other print and online yellow pages directory publishers, as well as other types of media including television, newspaper, radio, direct mail, search engines, local search sites, advertising networks, and emerging technologies. Looking ahead, new content delivery technologies continue to evolve in the media environment. The Company regularly monitors developing trends and technologies to assess opportunities for enhancing its capabilities through new product development, partnerships or acquisitions, and identifies competitive threats where a specific response may be warranted.

In nearly all of its markets, the Company competes with one or more traditional print yellow pages directory publishers, including independent publishers such as Yellowbook, White Directory Publishing, Inc. and Phone Directories Company. In some markets, RHDC competes with other incumbent publishers such as Idearc and AT&T. RHDC competes with these publishers based on cost, quality, features, usage leadership and distribution.

Most major yellow pages directory publishers offer print and online directories as well as online search products. Virtually all independent publishers, including Yellowbook, a competitor in the majority of the Company's markets, compete aggressively and use pricing and discounting as a primary competitive tool to try to increase their market share. Due to the recent economic environment and trends in the Company's industry and an increase in competition and more fragmentation in the local business search space, the Company experienced a significant decline in advertising sales during 2008 and expects this trend to continue throughout 2009. The Company believes these same trends are also impacting its competitors.

Online competition has intensified as technologies have improved and broadband penetration has increased, offering a diverse set of advertising alternatives for small businesses. The Company considers its primary online competition to be the major search engines, such as Google, Yahoo!, MSN and others, in addition to the online directory properties of the largest yellow pages directory publishers, such as Superpages.com, provided by Idearc, and YellowPages.com, provided by AT&T. These companies operate on a national scale, competing for consumer and business users across the Company's entire region and actively soliciting advertisers in many of the Company's markets.

The Company's integrated Dex Advantage product and service offerings, as well as its enhanced distribution arrangements, have involved, and will likely continue to involve, cooperating with other local media companies with whom the Company also competes, particularly with respect to online local search. As a result, particularly as usage continues to migrate from print to online, the Company bears some risk that such cooperation arrangements may presently or come to constitute a significant component of the aggregate distribution of the advertising message that the Company offers to certain of its advertisers.

In addition, the Debtors must meet substantial debt service obligations and comply with restrictive covenants under their post-confirmation debt agreements. They must also contend with (i) fluctuations in interest rates; (ii) potential adverse consequences from RHDC's recent suspension of trading on the NYSE; (iii) the potential termination of one or more material Internet search engine, local search or portal agreements; (iv) the impact of potential and actual bankruptcy proceedings against Qwest, Embarq or AT&T during the term of the Debtors'

respective commercial agreements with such companies; (v) the inability of the Debtors to enforce any of their key agreements with Qwest, Embarq or AT&T; (vi) future changes in directory publishing obligations in Qwest and AT&T markets and other regulatory matters; (vii) dependence on third-party providers of printing, distribution, delivery and IT services; (viii) work stoppages or increased unionization among the Debtors' workforces; (ix) the potential loss of certain intellectual property rights; and (x) the ongoing global credit liquidity crisis and general economic factors.

### 7. Business, Financial Condition and Results of Operations Could be Negatively Impacted by the Loss of Customers and Suppliers.

Difficulties of providing services while attempting to reorganize the Debtors' business in bankruptcy may make it more difficult to maintain and promote services and attract customers to the Debtors' services and to keep the Debtors' suppliers. The Debtors' suppliers, vendors and services providers may require stricter terms and conditions. The loss of any of the Debtors' customers or suppliers during the pendency of the Chapter 11 Cases could have an adverse effect on the Debtors' business, financial condition and results of operations. In addition, the Debtors may experience other adverse effects, including, without limitation, a loss of confidence by current and prospective suppliers. Any failure to timely obtain suitable supplies at competitive prices could materially adversely affect the Debtors' businesses, financial condition and results of operations.

### 8. Business Could Suffer From the Loss of Key Personnel.

Among the Debtors' most valuable assets are their highly skilled employees who have the ability to leave the Debtors and so deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Chapter 11 Cases, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and emergence from Chapter 11. Further attrition may hinder the Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition. In addition, so long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

### 9. Adverse Publicity in Connection with the Chapter 11 Case or Otherwise, Could Negatively Affect Business.

Adverse publicity or news coverage relating to the Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after emergence from the Chapter 11 Cases.

10. **Pursuit of Litigation by the Parties in Interest Could Disrupt Confirmation of the Plan and Could Have Material Adverse Effects on the Debtors' Business and Financial Condition.**

There can be no assurance that any parties in interest will not pursue litigation strategies to enforce any claims against the Debtors. Litigation is by its nature uncertain and there can be no assurance of the ultimate resolution of such claims. Any litigation may be expensive, lengthy, and disruptive to the Debtors' normal business operations and the Plan confirmation process, and a resolution of any such strategies that is unfavorable to the Debtors could have a material adverse affect on the Plan confirmation process or their respective business, results of operations, financial condition, liquidity or cash flow.

11. **Debtors May Have an Inability to Take Advantage of Business Opportunities During the Chapter 11 Cases Without Bankruptcy Court approval.**

Transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell or otherwise dispose of all or substantially all of the Debtors' assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage. The Debtors may be unable to continue to grow their businesses through acquisitions and restrictions on the Debtors' ability to pursue other business strategies, unless the Debtors obtain Bankruptcy Court approval for those transactions.

12. **Other Firms in the Industry May Have a Competitive Advantage.**

The local search industry in which the Debtors operate is highly competitive and fragmented. The Debtors compete with other print and online yellow pages directory publishers, as well as other types of media including television, newspaper, radio, direct mail, search engines, local search sites, advertising networks, and emerging technologies. Looking ahead, new content delivery technologies continue to evolve the media environment.

In nearly all of their markets, the Debtors compete with one or more traditional print yellow pages directory publishers, including independent publishers such as Yellowbook, White Directory Publishing, Inc., and Phone Directories Company, and in some markets, the Debtors compete with other incumbent publishers such as Idearc and AT&T. The Debtors compete with these publishers based on cost per reference, quality, features, usage leadership and distribution.

Some of the incumbent publishers with which the Debtors compete are larger than the Debtors and have greater financial resources than the Debtors. Though the Debtors have limited market overlap with incumbent publishers relative to the size of their overall footprint, the Debtors may not be able to compete effectively with these publishers for advertising sales in these limited markets. In addition, independent publishers may commit more resources to certain markets than the Debtors are able to commit, thus limiting the Debtors' ability to compete effectively with these publishers in these areas for advertising sales.

C.    <u>Risks to Creditors Who Will Receive Securities.</u>

The ultimate recoveries under the Plan to Holders of Claims in Classes 1E, 1F, 2D, 3E, 4E, 4F, and 10E through 16E that receive New RHDC Common Stock and to Holders of Class 4E Claims that also receive New RHDC Notes pursuant to the Plan will depend on the realizable value of these securities.  The securities to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below.  Prior to voting on the Plan, each Holder of a Claim in Classes 1E, 1F, 2D, 3E, 4E, 4F, and 10E through 16E should carefully consider the risk factors specified or referred to above and below, as well as all of the information contained in the Plan.

**1.      Lack of Established Market for the Securities May Adversely Affect Liquidity.**

There can be no assurance that an active market for the New RHDC Common Stock or the New RHDC Notes will develop, nor can any assurance be given as to the prices at which such securities might be traded.  Although the Company has agreed that Reorganized RHDC shall use its best efforts to obtain the listing of New RHDC Common Stock for trading on the NYSE or for quotation on the NASDAQ Stock Market, there can be no assurance that an active or liquid trading market will develop for either security.

The New RHDC Common Stock to be issued under the Plan has not been registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "<u>Securities Act</u>"), any state securities laws or the laws of any other jurisdiction.  Absent such registration, the New RHDC Common Stock may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws.  As explained in more detail in Article XII of the Disclosure Statement ("Certain Federal, State and Foreign Securities Law Considerations"), most recipients of New RHDC Common Stock will be able to resell such securities without registration pursuant to the exemption provided by Section 4(1) of the Securities Act.

**2.      Lack of Dividends on Securities May Adversely Affect Liquidity.**

The Debtors do not anticipate that cash dividends or other distributions will be made by Reorganized RHDC with respect to the New RHDC Common Stock in the foreseeable future.  In addition, covenants in certain debt instruments to which Reorganized RHDC or the Reorganized Debtors will be a party may restrict the ability of Reorganized RHDC or the Reorganized Debtors to pay dividends and make certain other payments.  Further, such restrictions on dividends may have an adverse impact on the market demand for New RHDC Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

**XI.** CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of

determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

*  *  *  *

Any discussion of U.S. federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any United States federal tax penalties that may be imposed on such person.  Each Holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

*  *  *  *

**A.** **Federal Income Tax Consequences to the Debtors.**

### 1. Cancellation of Indebtedness Income.

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt.  For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor.  COD Income is not required to be recognized, however, if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 and the discharge is granted, or is effected pursuant to a plan approved, by the court (the "Bankruptcy Exception").  Instead, the debtor is required to reduce certain of its tax attributes by the amount of COD Income, generally in the following order:  net operating losses ("NOLs"), general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the debtor's assets, and finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes").  Generally, the reduction in the tax basis of assets cannot exceed the excess of the total tax bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Floor Rule").  A debtor may elect to first apply the reduction to the basis of the debtor's depreciable assets, with any remaining balance applied to

125

the debtor's other Tax Attributes in the order stated above.  The Floor Rule does not apply if this election is made.

Debtors that realize COD Income in 2009 or 2010 may, in lieu of the rules described above, elect to take into taxable income the COD Income with respect to discharged debt in equal installments in 2014 through 2018 (i.e., the debtor would report 20% of the COD Income in each such year). This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized and must be made on the debtor's tax return for the year that includes the transaction that creates the COD Income.

Special rules apply to COD Income realized by a debtor corporation that is a member of a group filing a consolidated federal income tax return (the "Consolidated Attribute Reduction Rules"). The Consolidated Attribute Reduction Rules generally provide that the Tax Attributes attributable to the debtor corporation are the first to be reduced.  For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member, and also include the basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above.  To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group (including the portion of the consolidated NOL attributable to other members, but not including the basis of property of other members) must be reduced.  In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be reduced by Tax Attributes attributable to other members of the consolidated group.  In addition, to the extent that the debtor corporation is required to reduce its basis in the stock of another group member, the lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member.  Any required attribute reduction  takes place after the consolidated group has determined its taxable income, and any federal income tax liability, for the taxable year in which the COD Income is realized.

The Company expects to realize substantial COD Income as a result of implementation of the Plan.  The precise amount of COD Income will depend on, among other things, the fair market value of the New RHDC Common Stock, which cannot be known with certainty until after the Effective Date.  Assuming, however, that the New RHDC Common Stock is valued consistently with the valuation assumption utilized in Article VIII of this Disclosure Statement, the Company estimates that it will realize COD Income between approximately $4.9 billion and $6.1 billion for U.S. federal income tax purposes.  Pursuant to the Bankruptcy Exception, this COD Income will not be recognized as taxable income, but the Debtor that realizes the COD Income will have to reduce its Tax Attributes after calculating the tax for the taxable year of discharge.  The Company does not expect to make the elections described above to reduce depreciable property first or to defer COD Income to 2014-2018.

As of December 31, 2008, the Company had approximately $755 million of consolidated NOLs and approximately $6 billion in amortizable tax basis in intangible assets.  In addition, the Company expects to generate additional consolidated NOLs in 2009 and 2010.  The amount of such consolidated NOLs and amortizable tax basis remains subject to adjustment by the IRS.  As a general rule, an NOL incurred by a debtor during a taxable year can be carried back and

deducted from its taxable income generated within the two preceding taxable years and the remainder can be carried forward and deducted from the debtor's taxable income over the 20 succeeding taxable years.  Amortizable tax basis in intangible assets can generally be deducted ratably from the debtor's taxable income over the 15-year period commencing with the year the intangible asset is acquired.

It is expected that a significant portion of the COD Income will be attributable to RHDC and that the COD Income that RHDC will realize will significantly exceed the consolidated NOLs of the Company.  Under the Consolidated Attribute Reduction Rules described above, RHDC will first reduce its Tax Attributes starting with the consolidated NOLs attributable to RHDC.  Any COD Income in excess of the amount of consolidated NOLs attributable to RHDC will be applied primarily against its tax basis in assets.  It is expected that a significant portion of this reduction in tax basis will be with respect to RHDC's non-depreciable assets, such as stock in subsidiary corporations.  As described above, a basis reduction in the stock of a U.S. subsidiary corporation will require such subsidiary corporation to reduce its Tax Attributes in the amount by which the parent corporation reduced its stock basis in that subsidiary corporation, subject to the Floor Rule.

It is also expected that certain U.S. subsidiaries of RHDC will directly realize COD Income.  To the extent such subsidiaries have Tax Attributes remaining after the reduction of Tax Attributes described in the preceding paragraph, such subsidiaries will be required to reduce their Tax Attributes to the extent of the COD Income realized by such subsidiaries including, if necessary or applicable, basis in stock of subsidiary corporations and amortizable tax basis (again subject to the Floor Rule).

Any COD Income remaining after the reduction of Tax Attributes described in the two preceding paragraphs will then reduce certain consolidated tax attributes (such as NOLs) attributable to other members of the Company.

As a result of the application of these rules, it is expected that any NOLs of the Company that are not absorbed in the calculation of tax for the year of discharge and that cannot be carried back to an earlier taxable year will be eliminated and therefore not available to offset income of the Company for taxable years following the year of discharge.  Further, it is expected that a significant portion of the Company's tax basis in amortizable intangibles will be reduced, thereby potentially resulting in the Company having to pay U.S. federal income taxes sooner and in a greater amount than if its Tax Attributes were not required to be reduced under the foregoing rules.  Because of the application of the Floor Rule, however, the Company does not expect to reduce its Tax Attributes by the full amount of COD Income realized.  Specifically, the Company estimates that it will have over $2 billion in amortizable tax basis in intangible assets following attribute reduction.

**2.      Annual Section 382 Limitation on Use of NOLs and "Built-In" Losses and Deductions.**

(a)      Overview of Section 382

Section 382 of the IRC contains certain rules limiting the ability of corporations to utilize NOLs when there has been an "ownership change" (the "<u>Annual Section 382 Limitation</u>"). An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) that takes place during the three-year period ending on the date on which such change in ownership is tested.

As a general rule, the Annual Section 382 Limitation equals the product of the value of the stock of the loss corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (4.48% for ownership changes that occur during October 2009). Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. The Annual Section 382 Limitation is increased in the case of a corporation that has net unrealized built-in gains ("<u>NUBIG</u>"), i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. Such a corporation can use NOLs in excess of its Annual Section 382 Limitation to the extent that it realizes those NUBIGs for U.S. federal income tax purposes in the five years following the ownership change. For purposes of determining the Annual Section 382 Limitation for a consolidated tax group, the determination as to whether the group has a NUBIG generally is made on a consolidated basis (*i.e.*, by netting the built-in losses and built-in gains of all members of the group).

In addition to limiting a corporation's ability to use NOLs, the Annual Section 382 Limitation may also apply to certain losses or deductions which are "built-in" as of the date of the ownership change and that are subsequently recognized. If a loss corporation has a net-unrealized built-in loss ("<u>NUBIL</u>") at the time of the ownership change, then any built-in losses or deductions (which for this purpose includes a portion of the depreciation or amortization of depreciable or amortizable assets that have a built-in loss) that are recognized during the following five years (up to the amount of the original built-in loss) generally will be subject to the Annual Section 382 Limitation. Special rules apply for purposes of determining the amount of built-in losses of a consolidated tax group that are subject to an Annual Section 382 Limitation, including requirements to compute NUBILs on a separate company basis for certain members of the group. Under these rules, it is possible that a consolidated group may have an overall NUBIG for purposes of determining its ability to utilize NOLs, but that an individual member may have a NUBIL that will limit its ability to deduct built-in losses.

Section 382(l)(5) of the IRC provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "<u>382(l)(5) Bankruptcy Exception</u>"). The 382(l)(5) Bankruptcy Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change. However, under the 382(l)(5) Bankruptcy Exception, a corporation's pre-change losses and excess credits that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued on certain debt converted to stock in the reorganization. In addition, if the 382(l)(5) Bankruptcy Exception applies, a second ownership change of the corporation within a two-year period will cause the corporation to forfeit all of its unused NOLs that were incurred prior to the date of the second ownership change. If a

corporation qualifies for the 382(l)(5) Bankruptcy Exception, the use of its NOLs will be governed by that exception unless the corporation affirmatively elects for the provisions not to apply.

If a corporation in bankruptcy is not eligible for the 382(l)(5) Bankruptcy Exception or elects out of that provision, a special rule under Section 382(l)(6) of the IRC will apply in calculating the Annual Section 382 Limitation. Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the debtor's assets (determined without regard to liabilities) immediately before the ownership change.

(b)     Application of Section 382 to the Company.

The Company believes it underwent an ownership change on March 6, 2009. Because this ownership change occurred before the Petition Date, the Company did not qualify for the 382(l)(5) Bankruptcy Exception or the special rule of Section 382(l)(6). However, the Company believes it had a significant NUBIG at the time of the ownership change and expects that it will recognize almost all of this NUBIG within the five-year period following the change date. As a result, the Annual Section 382 Limitation resulting from such ownership change is not anticipated to have a material impact on the Company's ability to use its NOLs in 2009 or 2010.

Although the Company believes that it had an overall NUBIG on a consolidated basis at the time of the ownership change, certain members of the Company had a NUBIL at the time of such ownership change. As a result of the special rules described above, certain of the Company's built-in losses and deductions (which for this purpose includes a portion of the depreciation or amortization of depreciable or amortizable assets that have a built-in loss) are subject to limitations on recognition for the five-year period following such ownership change. Based on current projections, these limitations are not expected to result in material U.S. federal income taxes payable for the Company. The Company will likely, however, be liable for alternative minimum taxes as a result of certain members having a NUBIL as of such change date (see "Alternative Minimum Tax", below).

It is expected that the Company will undergo an additional ownership change as a result of the implementation of the Plan. The Company does not expect any additional limitations resulting from such ownership change to be more severe than those resulting from the prior ownership change, regardless of whether the Company applies the 382(l)(5) Bankruptcy Exception (if available) or the special rule under Section 382(l)(6).

3.     Alternative Minimum Tax.

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") each year at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax for such year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, even though for regular tax purposes a corporation might otherwise be able to offset all of its taxable

income by NOL carryovers from prior years, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Further, if a corporation that undergoes an "ownership change" within the meaning of Section 382 of the IRC has a NUBIL at the time of such change, the corporation is required to compute its AMTI based, in part, on the fair market value, rather than the tax basis, of its assets. Any AMT tax that a corporation pays is generally allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years to the extent that the corporation is no longer subject to AMT.

As a result of these rules, even though the Company may not have regular U.S. federal income tax liability by reason of its Tax Attributes, it will likely owe AMT.

**B.**    Federal Income Tax Consequences to Holders of Claims and Interests.

The United States federal income tax consequences of the transactions contemplated by the Plan to Holders of Claims or Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the United States federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a beneficial owner of a Claim or Interests that is a United States Person. The general United States federal income tax consequences to Holders of Claims or Interests that are Non-United States Persons are discussed below under Article XI.B.11 of this Disclosure Statement.

The United States federal income tax consequences to Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for United States federal income tax purposes. Certain Holders of Claims or Interests (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to Holders of Claims or Interests, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY

URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### 1. General.

A Holder who receives cash or other consideration (including, without limitation, New RHDC Common Stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. The manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law. Each Holder is urged to consult its tax advisor with respect to the allocation of amounts received between the principal and interest portions of its Claim.

If not otherwise so required, a Holder who receives New RHDC Common Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of the New RHDC Common Stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for United States federal income tax purposes as a result of the consummation of the Plan by Holders of Claims or Interests who hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

2. **Holders of Convenience Claims (Classes 1C through 19C).**

Holders of Convenience Claims will realize and recognize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between their adjusted tax bases in such Claims immediately prior to the Effective Date and the amount of cash they receive pursuant to the Plan.

3. **Holders of Claims in Classes 1D and 3D through 16D (Lenders Claims and Lenders Guaranty Claims).**

Pursuant to the Plan, the terms of Claims in Classes 1D and 3D through 16D ("Lenders Claims and Lenders Guaranty Claims") may be modified by way of amendment to the Credit Agreement under which such claim arose. In addition, Holders of such Claims may receive cash in partial satisfaction of such claim. The United States federal income tax consequences of the Plan to Holders of Lenders Claims and Lenders Guaranty Claims depend, in part, on whether the modification of its Claim constitutes a "significant modification" of such Claim pursuant to Treasury Regulations under Section 1001 of the IRC. Examples of significant modifications include, but are not limited to, changes in the yield of a debt instrument by more than a certain threshold; changes in the timing of payments if it results in a material deferral of scheduled payments; substitution of a new obligor or a change in payment expectations in certain circumstances; and certain changes in the nature of a debt instrument.

If the modification of a Lenders Claim or Lenders Guaranty Claim does not constitute a "significant modification" of such Claim, the Holder of such Claim should not have an exchange that would give rise to a taxable event for United States federal income tax purposes, and any cash received should be treated as a reduction in the principal amount of such Claim. In such a case, such Claim Holder will not recognize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan, the Holder's holding period in its Claim will remain constant, and the Holder's tax basis in its Claim will be equal to its basis before the transaction, minus any cash received in respect of such Claim.

If the modification of a Lenders Claim or Lenders Guaranty Claim constitutes a "significant modification" of such Claim, the Holder of such claim will, for United States federal income tax purposes, be deemed to exchange its Claim for a new debt instrument issued on the date of the exchange (the "New Debt"), and the Holder will realize gain or loss for United States federal income tax purposes as a result of the deemed exchange equal to the difference between (i) its adjusted tax basis in such Claim, determined immediately prior to the Effective Date, and (ii) the sum of (A) the "issue price" of the New Debt it receives in the exchange and (B) any cash received in respect of such Claim. The "issue price" of the New Debt will equal the principal amount thereof if it is not treated as "publicly traded" or its fair market value on the Effective Date if it is treated as "publicly traded." For these purposes, a debt instrument generally is treated as "publicly traded" if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified

brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

Based on current interest rates and other relevant factors, the Company expects that, for United States federal income tax purposes, the modifications of Lenders Claims and Lenders Guaranty Claims will constitute "significant modifications" of such Claims, and, therefore, that the Holders of such Claims will be deemed to exchange such Claims for New Debt.

The United States federal income tax consequences to a Holder who is deemed to exchange its Lenders Claim or Lenders Guaranty Claim for New Debt depend on whether its Claim is a "security" for United States federal income tax purposes. See "Definition of 'Security'" below. If a Lenders Claim or Lenders Guaranty Claim does not constitute a "security" for United States federal income tax purposes, then the deemed exchange of the Claim will be a taxable transaction, and the Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the deemed exchange. In such a case, such Claim Holder's initial tax basis in the New Debt it is deemed to receive in exchange for its Lenders Claim or Lenders Guaranty Claim should equal the issue price of the New Debt. Such Claim Holder's holding period in the New Debt it receives in the deemed exchange would commence on the day after the Effective Date.

If a Lenders Claim or Lenders Guaranty Claim constitutes a "security" for United States federal income tax purposes and the New Debt received in the exchange does not constitute a "security" for United States federal income tax purposes, then the deemed exchange of the Claim will be a taxable transaction as described in the preceding paragraph.

If a Lenders Claim or Lenders Guaranty Claim constitutes a "security" for United States federal income tax purposes and the New Debt received in the exchange constitutes a "security" for United States federal income tax purposes, then the deemed exchange of such Claim will be treated as a "recapitalization" for United States federal income tax purposes. In such a case, such Claim Holder who realizes a loss on the exchange will not be permitted to recognize such loss. In addition, an exchanging Holder that realizes gain on the exchange will be required to recognize gain to the extent of the lesser of (i) the amount of gain realized and (ii) the amount of cash, if any, received by such Holder in respect of its Claim. A Claim Holder's initial tax basis in the New Debt it is deemed to receive in exchange for its Lenders Claim or Lenders Guaranty Claim should equal the sum of (x) its adjusted tax basis in such Claim and (y) the amount of gain it recognizes on the deemed exchange, reduced by the amount of cash, if any, received by such Holder in respect of its Claim. A Claim Holder's holding period in the New Debt it receives will include the holding period in the Lenders Claim or Lenders Guaranty Claim surrendered.

A Holder who receives New Debt will generally be required to include interest on the New Debt in income in accordance with such Holder's regular method of tax accounting. If, however, the New Debt is treated as issued with original issue discount for United States federal income tax purposes, a Holder of New Debt will be required to include in income the amount of such original issue discount over the term of the New Debt based on the constant yield method. In such a case, a Holder will be required to include amounts in income before they are received. A Holder's tax basis in a New Debt will be increased by the amount of original issue discount

included in income and reduced by the amount of cash (other than payments of stated interest) received with respect to the New Debt.

### 4. Holders of Class 1E Claims (RHDC Noteholders Claims).

The Holders of Class 1E and 1F Claims (the "RHDC Debt Claims") will realize gain or loss for United States federal income tax purposes on the exchange of its RHDC Debt Claim for New RHDC Common Stock equal to the difference between (i) the adjusted tax basis in the RHDC Debt Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the New RHDC Common Stock it receives in the exchange.

The tax consequences to a Holder of an RHDC Debt Claim depend on whether its RHDC Debt Claim is a "security" for United States federal income tax purposes. See "Definition of 'Security'" below. If an RHDC Debt Claim does not constitute a "security" for United States federal income tax purposes, then the exchange of the RHDC Debt Claim for New RHDC Common Stock will be a taxable transaction, and the Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a Holder's initial tax basis in the New RHDC Common Stock it receives in the exchange will equal the fair market value of such New RHDC Common Stock on the Effective Date, and a Holder's holding period in its New RHDC Common Stock will commence on the day after the Effective Date.

If a Holder's RHDC Debt Claim constitutes a "security" for United States federal income tax purposes, then the exchange of the RHDC Debt Claim for New RHDC Common Stock will be treated as a recapitalization for United States federal income tax purposes. In such a case, (i) a Holder of such an RHDC Debt Claim should not recognize any gain or loss realized for United States federal income tax purposes with respect to the exchange of such RHDC Debt Claim, (ii) the Holder's initial tax basis in the New RHDC Common Stock it receives in the exchange should equal its adjusted tax basis in such RHDC Debt Claim and (iii) the Holder's holding period in the New RHDC Common Stock it receives in the exchange should include its holding period in the RHDC Debt Claim surrendered.

### 5. Holders of Class 1F, 2D, 3E, 4F, and 10E through 16E Claims (RHDI Noteholders Guaranty, DMI Noteholders, RHDI Noteholders, and DMW Senior Subordinated Notes Noteholders Claims).

The Holders of Class 1F, 2D, 3E, 4F, and 10E through 16E Claims (the "Subsidiary Debt Claims") will realize gain or loss for United States federal income tax purposes on the exchange of its Subsidiary Debt Claim for New RHDC Common Stock equal to the difference between (i) the adjusted tax basis in the Subsidiary Debt Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the New RHDC Common Stock it receives in the exchange.

As described more generally above, we intend to take the position that the New RHDC Common Stock received by a Subsidiary Debt Claim Holder is actually transferred by such Subsidiary. As a result, the exchange of a Subsidiary Debt Claim for New RHDC Common

Stock cannot be a "recapitalization" for United States federal income tax purposes, and therefore the exchange of a Subsidiary Debt Claim for New RHDC Common Stock will be a taxable transaction. In such a case, (i) the Holder of such a Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange, (ii) a Holder's initial tax basis in the New RHDC Common Stock it receives in the exchange will equal the fair market value of such New RHDC Common Stock on the Effective Date and (iii) a Holder's holding period in its New RHDC Common Stock will commence on the day after the Effective Date.

The IRS could, however, challenge this position and, if it is successful, Holders may not be entitled to recognize a loss on the exchange.

### 6. Holders of Class 4E Claims (DMW Senior Notes Noteholders Claims).

The Holders of Class 4E Claims will realize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Class 4E Claim, determined immediately prior to the Effective Date, and (ii) the sum of (A) the "issue price" of the New RHDC Notes and (B) the fair market value of the New RHDC Common Stock it receives. The "issue price" of the New RHDC Notes is generally expected to equal the principal amount thereof if they are not treated as "publicly traded" or their fair market value on the Effective Date if they are treated as "publicly traded." For these purposes, a debt instrument generally is treated as "publicly traded" if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

As described more generally above, we intend to take the position that the New RHDC Common Stock received by a Class 4E Claim Holder is actually transferred by DMW. As a result, the exchange of a Class 4E Claim cannot be a "recapitalization" for United States federal income tax purposes, and therefore the exchange of a Class 4E Claim for New RHDC Notes and New RHDC Common Stock will be a taxable transaction. In such a case, (i) the Holder of such a Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange, (ii) a Class 4E Claim Holder's initial tax basis in the New RHDC Common Stock it receives in exchange for its Class 4E Claim should equal the fair market value of such New RHDC Common Stock, and a Class 4E Claim Holder's initial tax basis in the New RHDC Notes it receives in exchange for its Class 4E Claim should equal the issue price of such New RHDC Notes and (iii) A Class 4E Claim Holder's holding period in property it receives in the exchange would commence on the day after the Effective Date.

The IRS could, however, challenge this position and, if it is successful, Holders may not be entitled to recognize loss on the exchange.

A Holder who receives New RHDC Notes will generally be required to include interest on the New RHDC Notes in income in accordance with such Holder's regular method of tax accounting. If, however, the New RHDC Notes are treated as issued with original issue discount for United States federal income tax purposes, a Holder of New RHDC Notes will be required to include in income the amount of such original issue discount over the term of the New RHDC Notes based on the constant yield method. In such a case, a Holder will be required to include amounts in income before they are received. A Holder's tax basis in a New RHDC Note will be increased by the amount of original issue discount included in income and reduced by the amount of cash (other than payments of stated interest) received with respect to the New RHDC Note.

### 7. Holders of General Unsecured Claims (Classes 1G, 2E, 3F, 4G, 5E through 9E, 10F through 16F, and 17D through 19D).

A Holder of General Unsecured Claims that, at the option of the Debtors, receives cash and/or property pursuant to the Plan will realize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its General Unsecured Claims, determined immediately prior to the Effective Date, and (ii) the sum of (A) the fair market value of any property, if any, and (B) the amount of cash, if any, it receives.

### 8. Holders of RHDC Interests (Class 1I).

Pursuant to the Plan, all RHDC Interests will be extinguished and cancelled as of the Effective Date, and Holders of RHDC Interests will receive nothing in exchange for such Interests. As a result, each Holder of RHDC Interests generally should recognize a loss for United States federal income tax purposes equal to the Holder's tax basis in such Interests extinguished under the Plan unless the Holder previously claimed a loss with respect to such Interests under its regular method of accounting.

### 9. Definition of "Security".

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for United States federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### 10. Market Discount.

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation acquired by a Holder in the secondary market is a "market discount bond" as to that Holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory *de minimis* amount, the tax basis of the debt obligation in the Holder's hands immediately after its acquisition. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. A Holder who receives New RHDC Notes in an exchange pursuant to the Plan that constitutes a recapitalization for United States federal income tax purposes may not be required immediately to include in income the accrued market discount to the extent such accrued market discount is allocable to the New RHDC Notes. In this event, such portion of the accrued market discount should carry over to the New RHDC Notes. Holders who have accrued market discount with respect to their claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

### 11. Non-United States Persons.

A Holder of a Claim that is a Non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 12. Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's United States federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

### C. Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES

UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**D.**     Reservation of Rights.

        This tax Section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XI and the other tax related Sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XII.  CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS

**A.**     Exemption From Registration Requirements.

        Upon consummation of the Plan, the Debtors will rely on Section 1145 of the Bankruptcy Code to exempt the issuance of the New RHDC Common Stock, from the registration requirements of the Securities Act and of any state securities or "blue sky" laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan.  The Debtors believe that Reorganized RHDC is a successor to RHDC under the Plan for purposes of Section 1145 of the Bankruptcy Code and that the offer and sale of the New RHDC Common Stock under the Plan satisfies the requirements of Section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

**B.**     Subsequent Transfers of Securities.

        In general, recipients of the New RHDC Common Stock will be able to resell the New RHDC Common Stock without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of Section 1145(b) of the Bankruptcy Code. In addition, the New RHDC Common Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of the New RHDC Common Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

        Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made

with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New RHDC Common Stock under the Plan are deemed to be "underwriters," the resale of the New RHDC Common Stock by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such New RHDC Common Stock or other securities without registration pursuant to the provisions of Rule 144 under the Securities Act. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

Certain persons may have rights to require Reorganized RHDC to register shares of New RHDC Common Stock held by such person for resale pursuant to a registration statement filed and effective under the Securities Act in accordance with the terms and conditions of the Registration Rights Agreement.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW RHDC COMMON STOCK, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW RHDC COMMON STOCK ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

**XIII.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

**A.** Continuation of the Chapter 11 Cases.

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases. The Debtors could have difficulty operating with the high costs, operating financing and the eroding confidence of their customers and trade vendors, if the Debtors remained in chapter 11. If the Debtors were able to obtain financing and continue as a viable going concern, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under chapter 7 or chapter 11. Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

**B.** <u>Liquidation Under Chapter 7 or Chapter 11</u>.

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets. In addition, the Debtors believe that the Liquidation Analysis attached to this Disclosure Statement as <u>Exhibit F</u> is speculative as it is necessarily premised upon assumptions and estimates. As such, the Liquidation Analysis can give no assurance as to the value which would be realized in a chapter 7 liquidation.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distributions to the Holders of Claims or Interests under a plan of liquidation confirmed in the Chapter 11 Cases probably would be delayed substantially.

## XIV. CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to Holders of Claims against any of the Debtors. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

Accordingly, the Debtors urge all Holders of Claims entitled to vote on the Plan to vote to <u>accept</u> the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than [4:00] p.m., prevailing Eastern Time, on [December 17, 2009].

Dated:  October 19, 2009

Respectfully submitted,

R.H. DONNELLEY CORPORATION (for itself and on behalf of the Affiliate Debtors, as Debtors and Debtors in Possession)


By:  /s/ Steven M. Blondy                              .
Steven M. Blondy
Executive Vice President and Chief Financial Officer


SIDLEY AUSTIN LLP

James F. Conlan
Jeffrey C. Steen
Jeffrey E. Bjork
Paul S. Caruso
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors in Possession